UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EUGENE JOHNSON, EVELYN HOUSER,        :
ANTHONY GONZALEZ, IGNACIO RIESCO,     :
and PRECIOUS DANIELS,                 :
                                      :          10 Civ. 3105 (FM)
                          Plaintiffs, :
                                      :
            - against -               :
                                      :
GARY LOCKE, Secretary, United States  :
Department of Commerce,               :
                                      :
                          Defendant.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' CLAIMS FOR INJUNCTIVE AND DECLARATORY RELIEF

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2726
Fax:  (212) 637-2717
Email: daniel.filor@usdoj.gov
       tara.lamorte2@usdoj.gov
       natalie.kuehler@usdoj.gov

DANIEL P. FILOR
TARA M. La MORTE
NATALIE N. KUEHLER

Assistant United States Attorneys
- Of Counsel -

**Table of Contents**

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      Plaintiffs' Claims for Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.     Census's Decennial Operations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.      Relevant Policies and Practices Governing
                the 2010 Decennial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.      Development of Relevant Policies and Practices
                For the 2020 Decennial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    Census's Non-Decennial Operations and Background Screening Procedures. . . . . . . . . . 6

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.      Plaintiffs Lack Standing to Sue for Injunctive or Declaratory Relief. . . . . . . . . . . . . . . . 8

        A.      Parties Seeking Injunctive or Declaratory Relief
                Must Allege a Real and Immediate Threat of Harm. . . . . . . . . . . . . . . . . . . . . 8

                1.      General Standing Doctrine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                2.      Standing to Maintain Claims for Injunctive and
                        Declaratory Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        B.      Plaintiffs Cannot Demonstrate the Existence of an Official Policy
                Sanctioning the Conduct About Which They Complain, Nor
                Show Any Probability of Future Injury. . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                1.      The Challenged Policies and Practices Have Terminated. . . . . . . . . . . . 12

                2.      The Policies and Practices That Will Govern Employment
                        Screening for the 2020 Decennial Will Not Be Developed
                        for Several Years, and Are Likely to Be Materially Different. . . . . . . . . 14

                3.      Plaintiffs' Willingness to Perform Temporary Work or
                        Non-Decennial Work Is Insufficient to Create a "Real and
                        Immediate" Likelihood of Future Harm . . . . . . . . . . . . . . . . . . . . . . . 17

II.     Plaintiffs' Claims for Prospective Injunctive Relief Are Not
        Ripe for Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## Table of Authorities

**Cases:**                                                                       *Page*

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967), *overruled on other grounds,*
    *Califano v. Sanders*, 430 U.S. 99 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Allen v. Wright*, 468 U.S. 737 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Alliance for Env'tl Renewal v. Pyramid Crossgates Co.*,
    436 F.3d 82 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Blackwelder v. Safnauer*, 866 F.2d 548 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Carver v. City of New York*, 621 F.3d 221 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Catanzano v. Wing*, 277 F.3d 99 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco*
    *Managed Care*, 433 F.3d 181 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 17, 19

*Clarry v. United States*, 85 F.3d 1041 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Connecticut v. Duncan*, 612 F.3d 107 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Cook v. Colgate Univ.*, 992 F.2d 17 (2d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Dickerson v. Feldman*, 426 F. Supp. 2d 130 (S.D.N.Y. 2006). . . . . . . . . . . . . . . . . . . . . . . . . 20

*Doe v. Blum*, 729 F.2d 186 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Does I Through III v. District of Columbia*, 216 F.R.D. 5 (D.D.C. 2003). . . . . . . . . . . . . . . . . 20

*Donahue v. City of Boston*, 304 F.3d 110 (1st Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Facio v. Jones*, 929 F.2d 541 (10th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Feliciano v. Romney*, 336 F. Supp. 1340 (S.D.N.Y. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Fitzgerald v. Thompson*, 353 Fed. App'x 532, 535 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . 18

*Golden v. Zwickler*, 394 U.S. 103 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 19

*Jackson-Bey v. Hanslmaier*, 115 F.3d 1091 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 18

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 17, 19

*Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803 (2003). . . . . . . . . . . . . . . . . 21

*Nevada v. Dep't of Energy*, 457 F.3d 78 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*O'Shea v. Littleton*, 414 U.S. 488 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Pettus v. Morgenthau*, 554 F.3d 293,. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Shain v. Ellison*, 356 F.3d 211 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Summers v. Earth Island Inst.*, 555 U.S. 488, 129 S. Ct. 1142 (2009). . . . . . . . . . . . . . . . . . . . . . 9

*Texas v. United States*, 523 U.S. 296 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*The People of the Village of Gambell v.Babbitt*, 999 F.2d 403 (9th Cir. 1993). . . . . . . . . . . 12, 22

*Town of Bethel v. Howard*, 198 F.3d 235 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Valley Forge Christian Coll. v. Americans United for Separation of*
    *Church and State*, 454 U.S. 464 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Ward v. Bank of New York*, 455 F. Supp. 2d 161 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . 23

*Warth v. Seldin*, 422 U.S. 490 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 21

*White v. First Am. Registry*, 230 F.R.D. 365 (S.D.N.Y. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Worth v. Jackson*, 451 F.3d 854 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

**Statutes, Rules & Regulations:**

42 U.S.C. §§ 2000e *et seq* ("Title VII"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fed, R. Civ. P. 12(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fed. R. Civ. P. 68. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EUGENE JOHNSON, EVELYN HOUSER,     :
ANTHONY GONZALEZ, IGNACIO RIESCO,   :
and PRECIOUS DANIELS,            :

                     Plaintiffs,    :      10 Civ. 3105 (FM)

                              :

      - against -           :

                              :

GARY LOCKE, Secretary, United States  :
Department of Commerce,          :

                     Defendant.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' CLAIMS FOR INJUNCTIVE AND DECLARATORY RELIEF

Defendant Gary Locke, Secretary of the United States Department of Commerce ("Census" or the "Government"), by and through his attorney, Preet Bharara, United States Attorney for the Southern District of New York, respectfully submits this memorandum in support of his motion to dismiss Plaintiffs' claims for injunctive and declaratory relief pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiffs allege that Census' policies and practices governing temporary hiring for the 2010 Decennial Census have had a discriminatory impact on them in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII").  Notwithstanding that the challenged policies and practices are no longer in force, that the policies and practices that will govern future Decennial hiring have not yet been formulated, and that temporary hiring for the 2020 Decennial is years away, Plaintiffs nevertheless contend they are entitled to prospective equitable relief, including an injunction requiring Census to employ "Uniform Guidelines for

Employee Selection Procedures and related EEOC Guidance" in future hiring.  (*See* First Am. Compl. ¶ 130).  They are wrong.  Under these circumstances, Plaintiffs lack standing to seek injunctive or declaratory relief.

Pursuant to Article III of the United States Constitution, a plaintiff seeking injunctive or declaratory relief must show both the existence of an official policy, and a likelihood of "real and immediate" future harm through application of that policy.  Plaintiffs cannot show either.  First, the policies and practices they challenge in this lawsuit have expired: no individual will ever again be subject to those policies.  Second, Census' development of policies and practices to govern temporary hiring for the 2020 Decennial is in its infancy.  These future policies and practices are expected to differ substantially from those at issue here.  Third, Plaintiffs fail to allege that they will again apply for a Decennial position with Census, and thus cannot show they will be subject to *any* of Census' temporary hiring policies and practices in the future.  And finally, any attempt by Plaintiffs to save their claims for injunctive and declaratory relief by relying upon non-Decennial positions must fail: no Plaintiff has ever applied for a non-Decennial field position, and their assumption that the background screening policies governing non-Decennial hiring are the same or even similar to those governing Decennial hiring is wrong.

Indeed, under these circumstances, *no* individual – let alone any of the Plaintiffs – faces a "real and immediate" threat that they will again suffer the same injuries from application of any of Census' hiring policies and practices, as is necessary to invoke the jurisdiction of the Court.  Accordingly, Plaintiffs' claims for injunctive and declaratory relief must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

For all these reasons, as elaborated below, the Court should dismiss Plaintiffs' claims for

injunctive and declaratory relief pursuant to Rule 12(b)(1) of the Federal Rules of Civil

Procedure.[1]

## BACKGROUND

### I.      Plaintiffs' Claims for Relief

In addition to seeking lost wages and benefits for their disparate impact claim, Plaintiffs

also seek prospective equitable relief, including an injunction prohibiting Census from engaging

in the policies and practices described in the First Amended Complaint "consistent with the less

discriminatory alternatives" proposed by Plaintiffs (Compl. ¶ 129), an injunction mandating that

Census implement certain policies and practices with respect to temporary employment (*id*. ¶

130), and a declaration that the polices and practices described in the First Amended Complaint

are unlawful and violate Title VII (*id*. ¶ 128).  As all temporary positions associated with the

2010 Decennial have expired, Plaintiffs no longer seek injunctive relief with respect to the 2010

Decennial.  (*See id*. ¶ 131).

### II.     Census's Decennial Operations

#### A.      Relevant Policies and Practices Governing the 2010 Decennial

The Census Bureau is charged by the Constitution and statute to conduct the Census of

Housing and Population, known as the Decennial.  To conduct the 2010 Decennial, Census hired

---

[1]  Census' motion to dismiss Plaintiffs' claims for injunctive and declaratory relief is directed to Plaintiffs' First Amended Complaint (hereinafter "Complaint"), which is the operative complaint in this matter.  As the Court is aware, however, Plaintiffs have filed a motion to further amend their Complaint.  That motion and its eventual resolution do not affect Census's motion to dismiss Plaintiffs' claims for injunctive and declaratory relief, because Plaintiffs request precisely the same prospective equitable relief in their proposed Second Amended Complaint.  Thus, any ruling on this motion would apply with equal force to the proposed Second Amended Complaint.

over one million temporary workers, all of whom were required, pursuant to Executive Order 10,450, to undergo background checks.

Census's Census Hiring and Employment Check ("CHEC") Office was responsible for conducting background checks of applicants.  (*See* Declaration of Sandra Patterson, Assistant Division Chief for the CHEC Office, dated June 28, 2011, ("Patterson Decl.") ¶ 1).  To accomplish this, the CHEC Office submitted applicants' biographical information to the FBI. (*Id.* ¶ 2).  The FBI, in turn, conducted an electronic search against its Criminal Justice Information Services Division's criminal database, and reported any tentative matches to CHEC. (*Id.* ¶ 2; *see also id.* ¶ 3).

Applicants whose personal identifiers matched those contained in the FBI's criminal history record, and whose identified crimes could potentially be disqualifying for Decennial work, were sent a letter (the "30-day letter") from CHEC providing them with the opportunity to dispute identification by submitting their fingerprints or, if there was no issue of misidentification, to provide official court documentation concerning the disposition of their criminal history.  (*Id.* ¶ 3; *see also* Compl. ¶ 15).  CHEC also employed a matrix of adjudication guidelines to determine who ultimately is suitable for hire, based on criminal history (the "adjudication criteria").  (*See* Declaration of Tara M. La Morte, dated June 28, 2011, Ex. 1; *see also* Compl. ¶¶ 22-27).

CHEC "is no longer applying its policies and practices used to determine the suitability of applicants for . . . the 2010 Decennial." (Patterson Decl. ¶ 5).  In fact, CHEC ceased sending 30-day letters to 2010 Decennial applicants on July 31, 2010 (*id.* ¶ 6), and is no longer adjudicating the criminal histories of any applicants (*id.* ¶ 8).

4

**B.      Development of Relevant Policies and Practices For the 2020 Decennial**

While the basic design of the Decennial Census has remained fairly consistent since 1970, Census operations have become increasingly expensive, as Census has been forced to hire additional personnel to knock on doors of residents who fail to respond to the mailed written questionnaire.  (*See* Declaration of Frank Vitrano, Associate Director for 2020 Census, dated June 27, 2011, ("Vitrano Decl.") ¶¶ 4, 5).  Accordingly, as explained by Associate Director Vitrano, who is responsible for overseeing the planning for the 2020 Decennial, Census is examining alternative designs to conduct operations more efficiently, as well as alternative methods for the public to respond to the questionnaire, including internet and telephone response options.  (*Id*. ¶¶ 6, 7).

Significantly, Census is not scheduled to determine these *preliminary* design alternatives until 2015, when the agency submits its Fiscal Year 2015 budget to Congress.  (*Id*. ¶ 8).  At that time, Census will begin operational development and systems testing for the activities associated with implementation of the 2020 Decennial.  (*Id*.).  Thus, for example, the procedures and systems needed to implement mail, internet, and telephone data collection will be developed and tested beginning 2015.  (*Id*.).

Accordingly, the development of basic administrative functions, including the development of background screening policies, will not begin until 2015.  (*Id*. ¶¶ 8-11; *see also* Patterson Decl. ¶ 9).  As Associate Director Vitrano explains, "early operational development will supply key information needed to conduct the 2020 Census," and may impact the number and types of positions that would need to be filled.  (Vitrano Decl. ¶ 9).  Moreover, the development of background screening policies "depend[s] heavily on knowing how . . . the

5

agency plan[s] to conduct the Decennial Census."  (*Id.* ¶ 11).

Other factors will also affect the scope and nature of background screening policies and procedures for the 2020 Decennial.  For example, the CHEC Office is monitoring federal guidelines and regulations that will impact federal background checks, such as Homeland Security Presidential Directive 12 ("HSPD-12").  (*See* Patterson Decl. ¶ 10).  HSPD-12 imposes, among other things, heightened background check requirements on any federal employee who will have access to federal electronic systems.  (*Id.*).

In light of Census's anticipated substantial changes in operations and the need to incorporate new federal requirements concerning background check processes, the CHEC Office expects to have a different background screening process for whatever group of 2020 Decennial employees Census decides to employ.  (*Id.* ¶¶ 13, 14).

## III.    Census's Non-Decennial Operations and Background Screening Procedures

There are other positions at the Census Bureau that are subject to other application, background check, and hiring processes.  The Census Bureau also hires, through a wholly different process, other employees to carry out the Bureau's ongoing "non-Decennial" operations, which include, for example, the Current Population Survey and the American Community Survey.  (*See* Patterson Decl. ¶ 16).  These are continuing surveys.  (*See* Declaration of Viola Lewis Willis, Chief, Decennial Administrative Branch, dated June 27, 2011, ("Willis Decl.") ¶¶ 2, 5).  Census also conducts one-time surveys between Decennials.  (*Id.* ¶ 2).

Most employees hired for non-Decennial field operations are hired on indefinite

appointments.  (*Id*. ¶ 5).[2]  In contrast, all Decennial field employees are hired on a temporary basis.  (*Id*. ¶ 6).

There are other differences between the field positions of Decennial and non-Decennial employees.  Unlike Decennial enumerators, non-Decennial Field Representatives have broader responsibilities, including the use of laptop computers to ask survey questions and enter responses and, for some surveys, the authority to issue reimbursements to survey responders and pay for translator services.  (*Id*. ¶¶ 3, 4, 6).

In light of the differences in the scope and nature of non-Decennial and Decennial operations, the background check processes for non-Decennial operations are "fundamentally different" than the background check process employed for the Decennial.  (Patterson Decl. ¶ 16).

As an initial matter, the background check screening of an applicant for a non-Decennial position does not occur until *after* the relevant Regional Office makes a conditional offer of employment to the applicant.  (*Id*. ¶ 17).  At that time, CHEC reviews information submitted by the applicant and reports any inconsistencies to the Regional Director, as well as facts about the applicant's criminal, employment, and or educational record.  (*Id*. ¶¶ 17, 18).

Unlike hiring for Decennial operations, it is the Regional Director – not CHEC – that is responsible for making a suitability determination.  (*Id*. ¶¶ 17, 18).  Accordingly, CHEC does not apply the "adjudication criteria" that were used for the 2010 Decennial.  (*Id*. ¶ 18).  Nor does the non-Decennial hiring process include the use of a 30-day letter.  (*Id*. ¶ 21).

_____

[2]  The Census Bureau may hire employees on a temporary basis in connection with a one-time survey, which usually takes between six and nine months to complete.  (*Id*.).

After an employee is hired, further background screening is conducted by the Office of Personnel and Management, an independent federal agency.  (*Id*. ¶ 20).  The Office of Personnel and Management sends the results of its investigation to the Census Bureau.  (*Id*.).

## ARGUMENT

**I.     Plaintiffs Lack Standing to Sue for Injunctive or Declaratory Relief**

 **A.     *Parties Seeking Injunctive or Declaratory Relief  Must Allege a Real and Immediate Threat of Harm***

  **1.     General Standing Doctrine**

Pursuant to Article III of the Constitution, the judicial power of the United States is limited "to the resolution of 'cases' and 'controversies.'" *Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 471 (1982).  Standing doctrine is one of several doctrines designed to effectuate Article III's case or controversy requirement.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Broadly speaking, standing requires a litigant to demonstrate a sufficient "personal stake in the outcome of the controversy . . . to justify exercise of the court's remedial powers on [his or her] behalf."  *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (internal quotation marks omitted).  As such, standing is a jurisdictional prerequisite, "determining the power of the court to entertain the suit."  *Id*. at 498.[3]

Standing doctrine serves a number of important purposes.  Fundamentally, standing is

---

[3]  As standing is a threshold jurisdictional issue that is appropriately resolved at the outset of a case, *Pettus v. Morgenthau*, 554 F.3d 293, 298 (2d Cir. 2009), Federal Rule of Civil Procedure 12(b)(1) is an appropriate mechanism for challenging a litigant's constitutional standing to bring a claim, *Alliance for Env'tl Renewal v. Pyramid Crossgates Co.*, 436 F.3d 82, 88-89 (2d Cir. 2006).  In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court may, if necessary, refer to evidence outside the pleadings.  *Id*.; *see also Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

"built on a single basic idea – the idea of separation of powers."  *Allen v. Wright*, 468 U.S. 737,

752 (1984).  Allowing the judiciary to "oversee legislative or executive action" when

unnecessary to protect a complainant's concrete interests would "significantly alter the allocation

of power away from a democratic form of government."  *Summers v. Earth Island Inst.*, 555 U.S.

488, 129 S. Ct. 1142, 1149 (2009) (internal quotation marks omitted).

To meet "the irreducible constitutional minimum of standing," *Lujan*, 504 U.S. at 560, a

party invoking federal jurisdiction must allege the following three elements: (1) an "injury in fact

– an invasion of a legally protected interest which is (a) concrete and particularized, and (b)

actual or imminent, not conjectural or hypothetical," *id*. at 560 (internal quotation marks and

citations omitted); (2) that the injury is "fairly traceable to the challenged action of the

defendant," *id*. (internal quotation marks and citations omitted); and (3) that it is "likely, as

opposed to merely speculative, that the injury will be redressed by a favorable decision," *id*. at

561 (internal quotation marks and citation omitted).

### 2.      Standing to Maintain Claims for Injunctive and Declaratory Relief

A plaintiff bears the burden of demonstrating standing separately for each form of relief

sought.  *See Donahue v. City of Boston*, 304 F.3d 110, 116 (1st Cir. 2002).  In seeking injunctive

and declaratory relief, a plaintiff must show a likelihood of encountering the same injury again in

the immediate future – otherwise there is no impending threat of injury in fact, and no remedial

benefit to be achieved from entry of a prospective judicial decree.  *See Summers*, 129 S. Ct. at

1149; *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-105 (1983) (injunctive relief); *Golden v.

Zwickler*, 394 U.S. 103, 108-09 (1969) (declaratory judgment).

The Supreme Court's decision in *City of Los Angeles v. Lyons* is the seminal case on the

issue of litigants' standing to seek equitable relief.  In *Lyons*, the plaintiff alleged that he was injured during a routine traffic stop by several Los Angeles police officers who, without provocation, applied a chokehold to him.  In addition to seeking damages, the plaintiff sought to enjoin police officers' use of chokeholds absent a threat of deadly force.  The Supreme Court held that the plaintiff lacked standing to seek prospective relief, however, because while he "may have been illegally choked by the police," 461 U.S. at 105, that fact did nothing to establish a "sufficient likelihood that he will again be wronged in a similar way," *id*. at 111.

Thus, *Lyons* firmly established that a plaintiff lacks standing to sue for injunctive relief based on allegations of "'[p]ast exposure to illegal conduct.'" *Id*. at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) (holding that class of plaintiffs claiming discriminatory enforcement of criminal law did not allege case or controversy based on past harms from the alleged unconstitutional practices)).  Rather, he must show a "real and immediate threat" that he will suffer the same injury in the future, to assure that the court does not entertain a suit based on speculative or hypothetical harms.  *Id*. at 105, 111.  "[P]ast wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *Id*. at 103.

Following *Lyons*, the Second Circuit has instructed that "a plaintiff seeking injunctive relief must demonstrate *both* a likelihood of future harm *and* the existence of an official policy or its equivalent." *Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004) (emphasis in original).  Thus, to maintain a claim for declaratory or injunctive relief, not only must a plaintiff show the existence of an official policy sanctioning the alleged illegality, but she must also show that she will be affected by the implementation of that policy in the future.  *Shain*, 356 F.3d at 214, 216;

10

*Clarry v. United States*, 85 F.3d 1041, 1049 (2d Cir. 1996) (holding that plaintiffs could not

maintain claim for injunction as to a repealed policy); *see also Zwickler*, 394 U.S. at 108-09

(reversing entry of declaratory judgment as to constitutionality of statute; although previously

convicted under statute, it was "most unlikely" Zwickler would again be subject to statute so as

to present a case or controversy of "sufficient immediacy and reality").  With respect to the latter

requirement, the Second Circuit warned that a plaintiff "cannot rely on past injury to satisfy the

injury requirement but must show a likelihood that he . . . will be injured in the future." *Shain*,

356 F.3d at 215 (quotation marks and citations omitted).  Moreover, the future threat of injury

"must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Id.* at 215 (quoting

*O'Shea*, 414 U.S. at 494; *Zwickler*, 394 U.S. at 110).

     Finally, it is well-established that a litigant cannot challenge a policy or practice to which

he has not submitted.  *See Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997)

(citing cases).

     As shown below (as in these cases), Plaintiffs' allegations fall decisively short of

establishing the immediate threat of harm required to sue for declaratory and injunctive relief.[4]

---

[4]  Insofar as Plaintiffs seek prospective relief designed to shape the background screening policies that will govern future Decennials, principles of standing supply the proper rubric to analyze their claims.  (*See* Compl. ¶¶ 129-131); *E.g.*, *Clarry*, 85 F.3d at 1049.  However, even if Plaintiffs' request for a declaration that the policies and practices they challenge are unlawful (*see* Compl. ¶ 128), is analyzed under principles of mootness, the outcome is the same because, as described below, the policies and practices they challenge are no longer in existence.  *See, e.g.*, *Worth v. Jackson*, 451 F.3d 854, 860-61 (D.C. Cir. 2006) (holding moot plaintiff's request for an injunction as to an agency policy that was repealed).  Indeed, mootness is often described as ensuring that a litigant maintains standing throughout the life of the lawsuit.  *See, e.g.*, *Cook v. Colgate Univ.*, 992 F.2d 17 (2d Cir. 1993); *see also Catanzano v. Wing*, 277 F.3d 99, 107 (2d Cir. 2001) ("The mootness doctrine, which is mandated by the 'case or controversy' requirement in Article III of the United States Constitution, requires that federal courts may not adjudicate matters that no longer present an actual dispute between parties." (citation omitted));

**B.**     ***Plaintiffs Cannot Demonstrate the Existence of an Official Policy Sanctioning the Conduct About Which They Complain, Nor Show Any Probability of Future Injury***

Plaintiffs cannot meet the stringent reasonableness standards necessary for future-injury standing.  Specifically, as discussed below, neither Plaintiffs – nor any other individual – will ever again be subject to the challenged policies and practices.  And beyond observing that the relevant policies for the 2020 Decennial are likely to vary significantly, any further description of those policies and practices would be speculative.  Finally, Plaintiffs cannot credibly assert any concrete plan to apply for the next Decennial, and any supposed interest in non-Decennial positions is irrelevant.   Under these circumstances, whether considered singly or in combination, Plaintiffs simply do not face a "real and immediate threat" of future injury, as is necessary to invoke the Court's jurisdiction to obtain prospective equitable relief.

**1.     The Challenged Policies and Practices Have Terminated**

First, although Plaintiffs describe in detail the policies and practices purportedly employed by Census in connection with the 2010 Decennial, it cannot be disputed that those policies and practices are no longer in force.  (*See* Patterson Decl. ¶¶ 5-8).  Indeed, the last appointments that were subject to the challenged policies and practices expired on June 18, 2011. (*Id*. ¶ 7).

---

*Blackwelder v. Safnauer*, 866 F.2d 548, 550 (2d Cir. 1989) (observing that a claim becomes moot "when the issues presented are no longer 'live'"); *The People of the Village of Gambell v.Babbitt*, 999 F.2d 403, 406 (9th Cir. 1993) (holding moot claims for equitable relief with respect to sale of oil and gas exploration leases after sale completed and leases relinquished). Notably, Plaintiffs acknowledge that equitable claims – other than backpay – with respect to the 2010 Decennial are no longer viable in light of the fact that the 2010 Decennial has concluded, as evidenced by their decision to drop their claim to be restored as eligible applicants or employees. (*See* Compl. ¶¶ 131-32).

Plaintiffs may argue that their Complaint is also intended to encompass Census's supposed use of the challenged screening policies and practices in connection with non-Decennial hiring.  Contrary to Plaintiffs' conjecture, however, the policies and procedures governing hiring and background checks for non-Decennial positions – positions for which they never applied –  are dramatically and materially different.  As an initial matter, the initial and final screening determinations for non-Decennial positions are not even made by Census's "CHEC" Office, which made background screening determinations for the 2010 Decennial.  (Patterson Decl. ¶¶ 18, 20).  Rather, an entirely separate, independent agency – the Office of Personnel and Management – conducts the final background check process.  (*Id*. ¶ 20).  Census's CHEC Office merely provides background information and reports any inconsistencies concerning the information submitted by the applicant to the relevant Regional Directors of Census Regional Offices, who are then responsible for making an initial suitability determination.  (*Id*. ¶¶ 17-19).  Indeed, the policies and practices about which Plaintiffs complain do not apply to non-Decennial hiring.  Unlike the 2010 Decennial positions at issue in their Complaint, there are no "30-day letters" (*See* Compl. ¶ 15) or "adjudication criteria" (*see id.* ¶¶ 22-28) used in screening for non-Decennial positions.  (*See* Patterson Decl. ¶¶ 16-22).  Thus, any supposed intent to apply for a non-Decennial position cannot supply standing to obtain injunctive and declaratory relief regarding *different* policies and practices applicable to Decennial hiring.  *See, e.g.*, *Jackson-Bey*, 115 F.3d 1091 (2d Cir. 1997) (citing cases including *Doe v. Blum*, 729 F.2d 186, 189-90 (2d Cir. 1984) (denying standing to plaintiffs – sexually active teenagers – who never applied for and therefore were never denied desired family planning benefits)).

Accordingly, Plaintiffs face no likelihood of future injury from the policies and practices

they assert in their Complaint, and simply cannot rely on them as a basis to obtain an injunction or declaratory judgment.  *See Shain*, 356 F.3d at 215 (instructing that a plaintiff "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he . . . will be injured in the future").  On this point, the Second Circuit's decision in *Clarry* is instructive.  There, former air traffic controllers who had been terminated for participating in a nationwide strike sought a declaratory judgment and injunction against the FAA's policy of inserting into its contracts with private companies a prohibition against the employment of the strikers.  85 F.3d at 1049.  However, because the policy had been repealed "before the plaintiffs filed their amended complaint . . . . neither a declaratory judgment . . . nor an injunction prohibiting the FAA from enforcing the policy would benefit the plaintiffs in any way."  *Id*.  The Circuit thus held that the plaintiffs lacked standing to pursue the claim.  *Id*.  The same result pertains here.

> ### 2.     The Policies and Practices That Will Govern Employment Screening for the 2020 Decennial Will Not Be Developed for Several Years, and Are Likely to Be Materially Different

Nor does anything in Plaintiffs' Complaint suggest any reasonable likelihood that Census will institute policies and practices that are substantially similar to those challenged here, further undermining any claim of immediate future harm.[5]  In fact, the record indicates that future background screening policies are likely to change dramatically, and shows that any more specific forecast as to what the policies may be would be speculative.

As the Vitrano Declaration explains, operational planning for the next Decennial – while underway – is in its early stages.  Indeed, Census is not scheduled to determine *preliminary*

---

[5]  Even if Census' future criteria for temporary hiring were developed, any challenges to those criteria would not be ripe, as the next period of temporary hiring will not occur for multiple years.  *See infra* Part II; (*See* Patterson Decl. ¶ 9; Vitrano Decl. ¶¶ 8, 10-11).

design alternatives, including, *e.g.*, providing the public with alternative methods to respond to the Census questionnaire, until 2015.  (Vitrano Decl. ¶¶ 7-8).  It is only at that time that Census will begin conducting operational development and systems testing (*id*. ¶ 8), which, in turn, "will supply key information necessary in determining the number and type of positions needed to conduct the 2020 Census (*id*. ¶ 9).  As a result, secondary research and development, which includes the examination and development of background screening policies, will not occur until sometime after 2015.  (*Id*. ¶¶ 8, 10-11).  As Vitrano, the Associate Director for the 2020 Census, explains, "[m]ost of the activities included in the secondary research, including the development of background screening policies, depend heavily on knowing how we plan to actually conduct the Decennial Census."  (*Id*. ¶ 11).

In addition to these operational factors, other considerations also will affect the development of future screening policies.  Census is currently reviewing and monitoring new federal mandates regarding federal background checks, including, for example, heightened background check requirements imposed by Homeland Security Presidential Directive 12.  (*See* Patterson Decl. ¶¶ 10-13).  As a result, Census "will likely make major changes for the 2020 Decennial."  (*Id*. ¶ 14).

Accordingly, Census's development of screening and hiring policies for the next Decennial is years away.  In light of the operational development that must be done and new legal requirements to incorporate, it is simply impossible to intelligently predict what policies and practices Census might choose to adopt in connection with its future temporary hiring.

Notwithstanding the multitude of changing factors that will impact the timing and substance of screening policies for the next Decennial, Plaintiffs may argue that Census is likely

15

to employ a similar screening process in the future, on the basis that the agency used similar processes in connection with the 2000 Decennial.  That argument, however, must be rejected. Not only is it factually inaccurate, but it is belied by the experiences of several of the individual and proposed Plaintiffs, as alleged in their Complaints.  For example, Plaintiff Evelyn Houser previously worked for the Census in 1990 (Compl. ¶ 54).  Proposed Plaintiff Scotty Desphy was hired as a temporary worker during the 2000 Decennial (*see* Proposed SAC ¶ 109), and Proposed Plaintiff Chynell Scott has also worked for Census in the past (*id.* ¶ 96).  Indeed, Plaintiffs allege that Census changed its adjudication criteria in the midst of the 2010 Decennial.  (Compl. ¶ 25). Plaintiffs' experiences are revealing: in fact, Census has changed its background check processes from one Decennial to the next.  (*See* Patterson Decl. ¶¶ 14-15).  As an example of one significant change, CHEC's Assistant Division Chief lists the inclusion of the fingerprinting component in the 2010 Decennial – a change that was not instituted until 2008.  (*Id.* ¶ 15).

For these additional reasons, Plaintiffs lack standing to obtain prospective equitable relief.  Courts facing similar challenges to underdeveloped or non-final agency policies have concluded likewise.  In *Worth v. Jackson*, for instance, a HUD employee brought a Title VII action challenging certain unwritten policies and practices that HUD had allegedly put into place after repealing an official affirmative action plan.  451 F.3d 854, 855-56 (D.C. Cir. 2006). Notwithstanding that HUD's prior policy had expressly taken race and gender into account in employment decisions, the District of Columbia Court of Appeals held that the plaintiff lacked standing to obtain prospective relief with respect to his claim that HUD would continue to do so. Absent any written directive or policy, the plaintiff's claim was speculative: "Thus, [w]hile there is, of course, some chance that somewhere, at some time, [plaintiff] may again be exposed to a

16

prospective injury, that possibility seems to us far too remote and attenuated to establish a case or controversy under Article III." *Id.* at 860 (internal quotation marks omitted; alteration in original); *see also Feliciano v. Romney*, 336 F. Supp. 1340, 1344-46 (S.D.N.Y. 1971) (holding that tenants' request for an injunction against HUD concerning renewal project that may violate federal legal requirements was nonjusticiable; although HUD approved guidelines for plan and issued letters of consent, it had not yet made a firm financial commitment to the project).

> **3.     Plaintiffs' Willingness to Perform Temporary Work or Non-Decennial Work Is Insufficient to Create a "Real and Immediate" Likelihood of Future Harm**

Finally, although Plaintiffs have alleged a willingness to engage in temporary work, none could credibly allege concrete plans to apply for the 2020 Decennial, as the associated hiring process is undeniably in the far distant future. *Lyons*, 461 U.S. at 108. As such, Plaintiffs face no immediate threat of encountering Census' decennial hiring policies and practices – whatever they may be – and thus, for this separate and independent reason, cannot establish the predicate necessary to justify implementation of injunctive or declaratory remedies.

As an initial matter, Plaintiffs' claims that they are "ready, willing, and able" to work for Census if offered a "temporary position" is insufficient to confer standing. (*See* Compl. ¶¶ 58, 52, 68, 73, 78, 86). In *Lujan v. Defenders of Wildlife*, the Supreme Court held that "[s]uch 'some day' intentions – without any description of concrete plans, or indeed even any specification of *when* the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require." 504 U.S. at 564; *see also Worth*, 451 F.3d at 858 (holding Title VII plaintiff's "assertion that he 'intends to apply for new positions and promotions at HUD on a regular basis in the future' is just the kind of speculative intention normally insufficient for standing

purposes"); *see also Shain*, 356 F.3d at 213, 216 (noting that plaintiff did not aver that he might again be subject to the policy, and that inferences required to establish a sufficient likelihood of future injury were too speculative); *Town of Bethel v. Howard*, 198 F.3d 235, *2 (2d Cir. 1999) (holding that plaintiff's failure to assert "plans (let alone concrete ones)" to engage in activity, along with other factors, rendered case non-justiciable).

In any event, Plaintiffs cannot assert any "concrete plans" that would subject them to the challenged policies and practices or any similar policies, given that those policies and practices are no longer in effect and that screening processes for future Decennial positions are nonexistent. *See supra* Parts I.B.1, I.B.2; *Worth*, 451 F.3d at 860; *Clarry*, 85 F.3d at 1049.

Nor can Plaintiffs manufacture standing through expressing an interest in non-Decennial positions. As described above, the entire hiring structure, including background screening policies and practices that apply to non-Decennial positions are materially different than those to which Plaintiffs were previously subject. *See supra* Background & Part I.B.1. Thus, Plaintiffs cannot point to those policies to show that they face a "real and immediate" threat of suffering the same injury, which is a necessary prerequisite of equitable standing. *Shain*, 356 F.3d at 216 (mere existence of a policy is not sufficient to confer standing, even if individual was previously subject to that policy; a showing of future harm is required). Moreover, *none* of the Plaintiffs (or proposed Plaintiffs) ever applied for non-Decennial field positions, and thus have never suffered any injury or adverse action as a result of those policies. (*See* Willis Decl. ¶¶ 7-12); *see Fitzgerald v. Thompson*, 353 Fed. App'x 532, 535 (2d Cir. 2009) (holding that failure to submit application deprived plaintiffs of standing to challenge access); *Jackson-Bey*, 115 F.3d at 1096 (noting that plaintiff must actually submit to challenged policy to establish standing, and citing

18

cases); *Clarry*, 85 F.3d at 1050 (holding that plaintiffs lacked standing to challenge FAA

employment policy because they did not apply for requisite position).  Simply put, any claim

based on non-Decennial policies would have to be exhausted through the administrative process

by the timely filing of a separate complaint in accordance with 29 C.F.R. § 1614, which could

ultimately become the subject of a separate lawsuit.

As such, Plaintiffs lack any present or probable future relevant connection to any

Decennial Census, and cannot demonstrate that absent injunctive and declaratory relief, injury

would "proceed with a high degree of immediacy."  *Lujan*, 504 U.S. at 564 n.2 (noting that a

plaintiff's "mere profession of an intent" or allegation of injury "at some indefinite future time"

is insufficient to confer standing).  Thus, for this additional reason, there is no basis in the

Complaint to conclude that any injury is "certainly impending," as Article III requires.  *Lujan*,

504 U.S. at 564-65 & n.2 (internal quotation marks omitted).

\*   \*   \*   \*

As to their requests for injunctive and declaratory relief, Plaintiffs are unable to take their

suit outside the realm of the hypothetical.  Far from facing a "likelihood of substantial and

immediate irreparable injury" *Lyons*, 461 U.S. at 103 (internal quotation marks omitted), the

likelihood of future harm from the complained-of policies and practices here is essentially zero.[6]

Nor can Plaintiffs show how an injunction or declaratory judgment would redress their alleged

injuries.  In the absence of these jurisdictional requirements, Plaintiffs claims for declaratory and

injunctive relief must be dismissed.  *See Lyons*, 461 U.S. at 109; *id*. at 105-06; *Zwickler*, 394

_____

[6]  Of course, as in *Lyons*, Plaintiffs have an adequate remedy at law.  *See* 461 U.S. at 111
("The legality of the violence to which Lyons claims he was once subjected is at issue in his suit
for damages and can be determined there.").

U.S. at 108-09; *Shain*, 356 F.3d at 213, 216; *Clarry*, 85 F.3d at 1049-50; *Facio v. Jones*, 929

F.2d 541, 544 (10th Cir. 1991) (explaining that a "plaintiff cannot maintain a declaratory or

injunctive action unless he or she can demonstrate a good chance of being likewise injured [by

the defendant] in the future"); *White v. First Am. Registry*, 230 F.R.D. 365, 367 (S.D.N.Y. 2005)

("[W]here, as here, a plaintiff challenges an allegedly wrongful policy, he or she must allege

credibly a realistic threat from the policy." (internal quotation marks omitted)).[7]

## II.     Plaintiffs' Claims for Prospective Injunctive Relief Are Not Ripe for Review

Plaintiffs' claims for injunctive relief regarding future Decennials fail for an additional

reason: they are not ripe for judicial review.  Absent a concrete dispute concerning Census'

hiring decisions for the 2020 Decennial, judicial review of Census' future hiring policies and

practices is premature.

Like standing, ripeness is a justiciability doctrine rooted in Article III.  It is designed to

"'prevent the courts, through avoidance of premature adjudication, from entangling themselves in

abstract disagreements over administrative policies, and also to protect the agencies from judicial

---

[7]  That Plaintiffs sought to bring this action on behalf of a putative class is irrelevant.  As
an initial matter, the Court dismissed Plaintiffs' class claims.  (*See* Op. & Order dated Mar. 14,
2011).  But even if the Complaint included viable class allegations (and per the Court's order, it
does not), "[a] class action allegation adds nothing to the standing inquiry since the named
plaintiffs must allege and show that they personally have been injured, not that injury has been
suffered by other, unidentified members of the class to which they belong and which they purport
to represent." *Carver v. City of New York*, 621 F.3d 221, 228 n.6 (2d Cir. 2010) (internal
quotation marks omitted); *see also Dickerson v. Feldman*, 426 F. Supp. 2d 130, (S.D.N.Y. 2006)
(citing *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care*,
433 F.3d 181, 198 (2d Cir. 2005)); *Does I Through III v. District of Columbia*, 216 F.R.D. 5, 9
(D.D.C. 2003) ("[S]tanding and entitlement to equitable relief are threshold jurisdictional
requirements that must be satisfied prior to the certification of a class." (internal quotation marks
omitted)).  Moreover, in this case, no member of the putative class as described in either
Plaintiffs' Complaint or proposed Second Amended Complaint has standing to obtain injunctive
and declaratory relief.

interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Connecticut v. Duncan*, 612 F.3d 107, 112 (2d Cir. 2010) (quoting *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003)); *see also Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975) ("The standing question thus bears close affinity to questions of ripeness-whether the harm asserted has matured sufficiently to warrant judicial intervention-and of mootness-whether the occasion for judicial intervention persists."). Courts determine whether a case is ripe for review by examining (1) whether the issues presented are fit for judicial review, and (2) what hardship the parties will suffer in the absence of review. *Duncan*, 612 F.3d at 113 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99 (1977)).

In this case, an examination of both prongs of the ripeness inquiry reveals that Plaintiffs' claims for injunctive relief are not justiciable. First, as these claims target future Decennial screening policies and practices that have not yet been developed, *see supra* Part I.B.2, they are not presently "fit" for judicial review. *See Nevada v. Dep't of Energy*, 457 F.3d 78, 84 (D.C. Cir. 2006) (observing that ripeness doctrine is intended in part to protect "the agency's interest in crystallizing its policy before that policy is subjected to judicial review" (internal quotation marks omitted)). Indeed, any judicial decisionmaking concerning Census' theoretical future policies and practices would necessarily be based on an incomplete, speculative, and undeveloped record. Under these circumstances, judicial involvement is plainly premature. *See, e.g.*, *Worth*, 451 F.3d at 862 ("Even assuming HUD will someday apply a discriminatory policy to Worth, absent concrete application of that policy, we lack 'sufficient confidence in our powers of imagination' to ascertain its contours." (quoting *Texas v. United States*, 523 U.S. 296, 301

(1998)); *The People of the Village of Gambell v. Babbitt*, 999 F.2d 403, 407-08 (9th Cir. 1993)

(holding that claim for declaratory and injunctive relief concerning Secretary's sale of oil and gas

exploration leases not ripe; Secretary's alleged past pattern of conducting lease sales does not

pose a specific, present controversy, and factual record necessary for decision cannot be

developed absent tangible prospect of leasing activity in the region).

Nor can Plaintiffs meet the "hardship" component of the ripeness inquiry.  To satisfy the

hardship prong, Plaintiffs must show that withholding judicial resolution "creates a direct and

immediate dilemma" for the parties.  *Duncan*, 612 F.3d at 115.  "The mere possibility of future

injury, unless it is the cause of some present detriment" does not suffice.  *Id*. (internal quotation

marks omitted).

Here, however, as the next Decennial will not occur until 2020, any temporary hiring for

that count is numerous years away.  (*See* Patterson Decl. ¶ 9; Vitrano Decl. ¶¶ 8, 10-11).

Plaintiffs cannot point to any "direct and immediate" harm that would flow from withholding

judicial intervention on vague and undeveloped future temporary hiring policies and practices.

Nor do mere representations by Plaintiffs of their "interest" in non-Decennial positions satisfy

this requirement.  Thus, as to Plaintiffs' claims for injunctive relief, this case is simply too

speculative for resolution by a federal court, and Plaintiffs' "attempt to enlist the judiciary in

shaping agency policy" must be rejected.  *Worth*, 451 F.3d at 862.

In short, as to Census' future Decennial screening policies and practices, there is no "live"

controversy.  For this independent reason, Plaintiffs' claims for injunctive relief must be

dismissed as non-justiciable.[8]

## CONCLUSION

For the foregoing reasons, Census respectfully requests that the Court dismiss

Plaintiffs' claims for injunctive and declaratory relief pursuant to Rule 12(b)(1) of the Federal

Rules of Civil Procedure.

Dated: New York, New York
      June 28, 2011

                PREET BHARARA
                United States Attorney for the
                Southern District of New York
                Attorney for Defendant


                */s/ Tara M. La Morte*
By:    DANIEL P. FILOR
       TARA M. La MORTE
       NATALIE N. KUEHLER
       Assistant United States Attorneys
       86 Chambers Street
       New York, New York 10007
       Tel.: (212) 637-2726/2746/2741
       Fax:  (212) 637-2717/2702

---

[8] In addition to seeking injunctive and declaratory relief, Plaintiffs also seek compensation for the amount of money they assertedly would have earned had they been hired in connection with the 2010 Decennial.  If the Court dismisses Plaintiffs' claims for injunctive and declaratory relief, Census may move to dismiss the remaining monetary claims of the individual Plaintiffs as moot, pursuant to Rule 68 of the Federal Rules of Civil Procedure.  "When a defendant offers the maximum recovery available to a plaintiff, the Second Circuit has held that the case is moot and there is no justification for taking the time of the court and the defendant in the pursuit of minuscule individual claims which defendant has more than satisfied." *Ward v. Bank of N.Y.*, 455 F. Supp. 2d 261, 267 (S.D.N.Y. 2006) (internal quotation marks omitted).