**OUTTEN & GOLDEN LLP**
Adam T. Klein
Justin M. Swartz
Lewis M. Steel
Ossai Miazad
Amber C. Trzinski
Sally J. Abrahamson**
3 Park Avenue, 29th Floor
New York, NY 10016

**COMMUNITY SERVICE SOCIETY**
Judy Whiting
Paul Keefe
105 East 22nd Street
New York, NY  10010

**COMMUNITY LEGAL SERVICES, INC.**
Sharon Dietrich*
1424 Chestnut Street
Philadelphia, PA  19102

**LATINOJUSTICE PRLDEF**
Jackson Chin
99 Hudson Street, 14th Floor
New York, NY 10013

**LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW**
Ray P. McClain*
Jane Dolkart*
1401 New York Ave., NW
Washington, DC  20005

**CENTER FOR CONSTITUTIONAL RIGHTS**
Darius Charney
666 Broadway 7th Floor
New York, NY 10012

**INDIAN LAW RESOURCE CENTER**
Robert T. Coulter*
602 North Ewing Street
Helena, MT 59601

**PUBLIC CITIZEN LITIGATION GROUP**
Michael T. Kirkpatrick*
1600 20th St. NW
Washington, DC  20009

*\* Admitted pro hac vice*
*\*\* Pro hac vice forthcoming*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

EVELYN HOUSER, ANTHONY GONZALEZ, IGNACIO RIESCO, PRECIOUS DANIELS, FELICIA RICKETT-SAMUELS, CHYNELL SCOTT, VIVIAN KARGBO, and SCOTTY DESPHY, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

REBECCA M. BLANK, Secretary, United States Department of Commerce,

Defendant.

**10-cv-3105 (FM)**

**SECOND AMENDED CLASS ACTION COMPLAINT**

Individual and Representative Plaintiffs Evelyn Houser, Anthony Gonzalez, Ignacio Riesco, Precious Daniels, Felicia Rickett-Samuels, Chynell Scott, Vivian Kargbo, and Scotty Desphy ("Plaintiffs"), individually and on behalf of all others similarly situated, allege, upon personal knowledge as to themselves and upon information and belief as to other matters, as follows:

## SUMMARY OF THE CLAIM

1.    The United States Census Bureau ("Census") hired over one million temporary workers to conduct the 2010 census in a manner that discriminated against over one hundred thousand African Americans and Latinos.  Near the outset of this hiring program, the United States Equal Employment Opportunity Commission ("EEOC") informed Census officials that the method of screening out applicants based on criminal history data could well have a racially discriminatory impact in violation of Title VII of the Civil Rights Act, but Census failed to revise its screening procedures to rectify the problem.

2.    Approximately 3.8 million people applied for temporary work with Census to help complete the 2010 decennial count.  As a precondition of employment, Census required nearly all job applicants who have ever been arrested to produce within 30 days the "official court documentation" for any and all of their arrests – regardless of whether a conviction resulted, the nature of the arrest, its relationship to the job, or when it took place.  This requirement eliminated 93% of these applicants – roughly 700,000 people – from being considered for employment during the 2010 census.  Of the small percentage who were able to find and deliver this documentation on time, Census next applied an arbitrary and irrational screen whereby even those who had never been convicted, those who had their records officially expunged, and those with very minor and old offenses were excluded from this civic undertaking.  Indeed, less than 5% of applicants required to submit official court documentation ultimately were deemed eligible

1

for hire.  Moreover, numerous applicants who satisfied both the 30-day letter requirement and eligibility screen nonetheless were denied employment because virtually all available positions had been filled during the attendant delay.  Because each of these employment practices, individually and collectively, has a significant adverse impact upon African Americans and Latinos (who are arrested and incarcerated at rates substantially higher than whites), and because these practices are neither job-related nor consistent with business necessity, they are unlawful under Title VII of the Civil Rights Act.

## BACKGROUND OF THE LITIGATION

3.     Plaintiffs Eugene Johnson and Evelyn Houser filed this class action on April 13, 2010.  The Complaint challenged Census's requirement that applicants with any history of being arrested must produce their "official court documentation."  At that time, Plaintiffs did not know that 93% of applicants with an arrest history were categorically excluded from consideration. Plaintiffs also did not know the actual standards applied by Census to analyze applicants' criminal background for the purpose of making final suitability determinations.  Indeed, Census had kept that information a closely guarded secret for over a decade, refusing to tell applicants, the general public, or even Congress, which crimes in particular mandated exclusion or any other factors involved in the determination.

4.     Through this litigation, Plaintiffs now know that the exclusionary effect of the "official court documentation" requirement is enormous, and that by excluding 93% of applicants with a record of almost any arrest, this single device, combined with the application of Census's criminal-history screen and processing-time delay, operated very nearly as a "no arrest or conviction history allowed" policy for the 2010 decennial census.

5.     This process, and the consequent wide-scale exclusion of applicants with criminal backgrounds, including nothing more than a single arrest without prosecution, is not new.

2

Plaintiffs have learned that when Census hired temporary workers for the 2000 decennial census, it used the same background screening process as it used for the 2010 census, with a similar massive exclusionary effect. Following the 2000 census, and again in 2010, Census failed to analyze the reasons for this exclusion and the discriminatory racial and ethnic impact of its practices.

6.     This litigation also has forced Census, for the first time ever, to divulge its criminal background screening criteria. As discussed further below, the records and testimony produced pursuant to court order reveal that the criteria are arbitrarily drawn and dramatically over-inclusive, automatically excluding many people who present no threat to the public or to the integrity of the process. In the limited areas where the criteria allowed for discretion, Census officials inconsistently applied *ad hoc* standards, unguided by professional principles or social science, and based largely on gut instinct.

7.     Plaintiffs also have learned that in a detailed letter on July 10, 2009, the EEOC criticized Census for the racially discriminatory impact of its criminal background policy, and notified Defendant that its practice may "run afoul" of Title VII of the Civil Rights Act. In addition, Plaintiffs have learned that other individuals filed formal Equal Employment Opportunity ("EEO") complaints with the Department of Commerce, putting Defendant on notice of class-wide discrimination resulting from Census's criminal background policy as early as October 2008.

8.     On August 5, 2010, Plaintiffs filed a First Amended Class Complaint, adding the newly acquired information and five new class representatives. This Second Amended Complaint adds three additional class representatives with exhausted administrative complaints in compliance with the Class Regulations for federal sector employees and makes other modifications responsive to the Court's Decision and Order of March 15, 2011 and March 22, 2012.

## FACTUAL BACKGROUND

9.      The United States Constitution requires the federal government to conduct a census of the entire population every ten years.  The work conducted by Census – which had a $14 billion budget for the 2010 count – forms a cornerstone of our democracy, serving as the basis for determining representation in the House of Representatives, informing the drawing of voting districts, and allocating substantial amounts of federal funding.  It is imperative for all individuals and communities that the work of the Census be done accurately and in a manner that is fair and free of discrimination.

10.     This imperative must apply not only to the counting work at the core of Census's mission, but also to the way in which Census hires its workforce.  Had its hiring been done appropriately, Census would have identified the most qualified workers and screened out those who posed a legitimate risk to public safety and the integrity of the census. Unfortunately, it did not do so.

### A.  The Hiring Process

11.     Temporary employment for the 2010 decennial census involved two types of positions.  Census Takers (also known as Enumerators), Census Crew Leaders, and Recruiting Assistants were responsible for conducting the door-to-door count and interacted directly with the public.  Others, including Clerks, were engaged in office work, and had no personal interaction with the public.  Despite the differences between these two types of positions with respect to public interaction, Census subjected all applicants to the same criminal background check process and standards.

12.     Each applicant took a written test and completed an application, which included a question as to whether the individual had been convicted of a crime within the past 10 years. Census then ran each applicant's name and other personal identifiers through the Federal Bureau

of Investigation ("FBI") Criminal Justice Information Services Division's Name Index (the "FBI database"), which searches for all arrests, regardless of whether a conviction resulted, and has no time limitation (including juvenile arrests).  If an arrest record appeared, the Census procedure was to send a form letter to nearly all such applicants, requiring that these applicants produce the "official court documentation" of all arrests to remain eligible for employment, even in instances where an individual's FBI record showed no disqualifying criminal activity.  The form letter gave applicants less than 30 days after receiving the notification (the "30-day letter") to fully comply. To those few who managed to timely provide "official court documentation," Census applied an "adjudication" screen to eliminate applicants it considered unsuitable for employment.  The process of satisfying the requirements of the 30-day letter and then being subjected to the adjudication screen took months to complete, and many applicants simply never heard any response from Census whatsoever.  For many otherwise qualified applicants, the attendant time delay was tantamount to a denial of employment.

### 1. The FBI Background Check

13.     The FBI database from which Census drew its arrest and criminal records information is enormous.  Law enforcement agencies across the United States arrest approximately 14 million people per year, transmitting fingerprint records for those charged with crimes to the FBI database.  Over 70 million people in the country, well over 20% of the adult population, have a criminal record. Virtually all of these arrest records remain in the FBI database forever.

14.     As Census knows well, and as reported by the U.S. Department of Justice's Bureau of Justice Statistics, the FBI database is *missing* final disposition information for roughly *half* of all of its arrest records. This has a clear negative effect for the millions of people whose

5

entire criminal history consists of having been arrested and fingerprinted, but never convicted.[1] These quick releases may occur when the police pick up the wrong person, lack evidence to prosecute, or determine that someone made a false crime report. In still other cases, upon review of the facts the district attorney declines to prosecute cases forwarded them by the police. Indeed, the total number of prosecutorial declinations on an annual basis is over half a million nationwide. Many people will have been over-charged, only to plead to or be found guilty of a lesser (sometimes non-criminal) offense. Others in the FBI database have actually gone to trial and been found not guilty by a jury of their peers, yet even these individuals may have no record in the database of that favorable disposition.

### 2. The 30-Day Letter

15.     Nearly all applicants whose name matched a record in the FBI database were sent the 30-day letter, whether or not they applied to work in a position with direct public contact. The letter states:

> A. If you do not dispute the identity of the arrest record in question, provide OFFICIAL COURT documentation on any and all arrest(s) and/or conviction(s) in your past;
>
> B. If you wish to dispute the identity of the arrest record in question, you may provide a set of original fingerprints . . . If you send a fingerprint card that shows a match with criminal history record in question, and you did not provide the requested court documentation, you will be made ineligible for hire. . . For your application to remain active, you must return all documents within 30 days of the date appearing above.

(A copy of this letter is attached as Exhibit A).

16.     Measured by the Census's stated policy of considering only a conviction or pending charge "that affects hiring eligibility," the 30-day letter had two critical flaws: (a) it screened out applicants who had arrests but no convictions, and (b) it required documentation, at a significant cost of money and time to the applicant, of "any and all" *arrests*, even where the

---

[1] For example, in the State of New York more than 200,000 people per year who are arrested are never convicted of any crime or offense.

charges were no longer pending and there had been no conviction.

17.     The 30-day letter placed a substantial burden on applicants who have been arrested but never convicted.  While their FBI records—even if assumed to be 100% true—would not exclude them under well-established legal precedent barring the use of arrest-only records, the difficulty, and often impossibility, of obtaining such proof deterred and outright excluded many individual class members from working for Census.  Many of these arrests were for petty offenses and citations below the level of misdemeanors.  The law is quite clear that Census cannot disqualify applicants based on arrest charges alone (unless the charge is pending, in which case a conviction may still result).[2]  The federal government recognizes that restrictions on hiring individuals on the basis of arrest records are discriminatory and illegal.  The 1990 EEOC Policy Guidance ("EEOC Arrest Guidance") on the use of arrest records for employment decisions states: "[A]rrests alone are not reliable evidence that a person has actually committed a crime." The Guidance relies upon the Supreme Court decision in *Schware v. Board of Bar Examiners*, 353 U.S. 232, 241 (1957), which held  that "[t]he mere fact that a [person] has been arrested has very little, if any, probative value in showing that he has engaged in misconduct."  The EEOC Arrest Guidance goes on to address the precise situation presented in this case: "Even where there is no direct evidence that an employer used an arrest record in an employment decision, a pre-employment inquiry regarding arrest records may violate Title VII.  It is generally presumed that an employer only asks questions which he/she deems relevant to the employment decision." Additionally, the Department of Justice recognizes that it is improper to stigmatize arrestees as criminals, and considers any arrest without disposition, where one year or more has elapsed from

---

[2]  By contrast, according to the background check policy of the U.S. Postal Service:  "No inquiries may be made, either orally or in writing, of the applicant or of any other person, concerning arrest records, except where the arrest resulted in a criminal conviction, or where the charges are still pending."  United States Postal Service, *Employment and Placement Handbook EL-312*, Sept. 2001, Updated with Postal Bulletin Revisions Through October 25, 2007, p. 108 ("Postal Handbook").

the date of arrest with no active prosecution of the charge, to be a "nonconviction." 28 C.F.R. Ch. I, § 20.3(q). The 30-day letter screen also violated the Department of Justice's directive disapproving any employer policy that requests that applicants obtain official certification of no criminal record. 28 C.F.R. Ch. I, § 20.21(c)(2), pp. 414, 421.

18. In addition, the 30-day letter unfairly deterred or excluded many people with old and minor convictions for non-criminal offenses, misdemeanors, and other crimes that did not involve violence or dishonesty, and which bear no relationship to fieldwork or office clerical assignments. Thus, Census required applicants to provide official documentation even when the charge revealed in the FBI database, and any conviction thereon, was irrelevant to the requirements of the job.

19. The 30-day letter also failed to identify for the applicant the purported criminal activity found in the FBI database search that was the basis for Census's concern, thereby sending the applicant on an often futile exploration for records of any police interaction in their past. The older and less serious those records, the more difficult such records generally are to find, placing a greater burden on those applicants—like some of the named Plaintiffs in this suit—whose history least approximates actual risk. Indeed, some of the records that are impossible, or most difficult, to locate are of arrests that were never prosecuted. It is impossible for an individual who was merely arrested any number of years ago to provide "official court documentation" when the matter never went to court. In other words, Census demanded that many applicants prove a non-event in order to advance in the hiring application process.

20. Census knew full well when it began planning for the 2010 count that the 30-day letter would effectively eliminate the vast majority of applicants with any arrest history from the ranks of its temporary workers. Census used the same screening process for the 2000 decennial census count, and had the same non-response rate of approximately 93%. Census planned for the

30-day letter to have the same exclusionary effect in 2010, and therefore provided scant staffing and resources for its CHEC ("Census Hiring and Employment Check") office on the expectation that there would be little to check.

21.     The number of class members who have been effectively denied temporary employment by Census due to the use of the 30-day letter alone is staggering.  Because over 35% of all arrests nationwide never lead to prosecution or conviction, the raw number of excluded individuals from the 2010 decennial census hiring process who have done nothing more than get arrested at some point in their life is likely in the hundreds of thousands.  Adding those with minor and old convictions that are irrelevant to these jobs, it is reasonable to estimate that roughly half a million people who should have been made eligible were prevented from being considered for employment by this single practice.

### 3. Census's Suitability Policy

22.     For over a decade, the actual test used by Census to determine each applicant's suitability based on criminal history had been carefully concealed from public view.  Census refused to tell applicants, the general public, or even Congress, which crimes in particular mandate exclusion; whether there is any temporal limitation, including whether juvenile records can be considered; whether any distinction is made between non-criminal offenses, misdemeanors, and felonies; and any other factors it deems relevant to the determination.

23.     The records and testimony in this litigation now reveal that the criteria are dramatically over-inclusive, so that Census excluded many people who presented no threat to the public or to the integrity of the process.  Census documents identify its interest in conducting the criminal background screen as preventing "risk to public safety or data integrity."  Yet Census applied an irrational, overbroad "adjudication" screen to the small percentage of applicants who were able to decipher and comply with the requirement to provide "official court

9

documentation," failing to limit exclusion to those who presented a legitimate risk to the safety of the public or the integrity of the counting process.

24.     Pursuant to the adjudication criteria, Census rejected applicants for nearly all felonies, even if decades old, even if committed as a juvenile, and even where the case was expunged or dismissed through deferred adjudication, probation, or similar diversion programs. Census also required exclusion for most misdemeanors, except the most minor offenses such as "abusive language" or "liquor possession by a minor."

25.     These adjudication guidelines and practices changed in arbitrary fashion over the course of the hiring process, failing in each iteration to limit exclusion to those who present a legitimate risk to the safety of the public or the integrity of the counting process.  For example, Census changed its screening policy in February 2010 to exclude applicants with pending charges for certain minor misdemeanors, even where an individual with a recent conviction for the exact same charge would be eligible for hire.  When the criteria were changed to become less stringent, applicants who had been previously excluded but who would be eligible under the revised criteria were not notified or granted reconsideration.

26.     Additionally, where the criteria allow for discretion, Census officials employed *ad hoc* and inconsistent standards, unguided by professional principles or social science, and based largely on gut instinct, which inherently includes the bias of the decision-maker.[3]  The unprofessional nature of this enterprise is exhibited in a training document for CHEC analysts with the following "Reminders": "Defer anything you feel strongly about and/or can't make an

---

[3] By contrast, over a recent 2 ½ year period, the Transportation Security Administration ("TSA") screened the FBI records of about 1.6 million port workers pursuant to the Maritime Transportation Security Act of 2002.  During that time, at least 60% of the employee petitions to "waive" their disqualifying felony offense based on evidence of rehabilitation were granted by TSA, resulting in nearly 5,000 workers getting hired who otherwise would have lost their opportunity for this work.  Department of Homeland Security, TWIC Dashboard.

unbiased decision" and "Don't be afraid to ask for help – ask your roommates, colleagues or the CHEC Staff."

27.     Even those applicants who passed through the adjudication process and were told to report for work were subject to further screening, as Census required all new hires to be fingerprinted. Census then conducted a second FBI background check using those fingerprints, and again applied its "adjudication" screen, sometimes even after the individual had begun work.

28.     No one who was excluded from hire was offered the right to appeal the decision to the CHEC office. For those applicants who nonetheless took it upon themselves to challenge the decision, Census applied a standardless *ad hoc* review process. In fact, the Chief of the CHEC office is not aware of a single job denial being reversed through appeal.

### 4. Denial by Delay

29.     Even among those who passed the "adjudication" screen and were ultimately deemed "eligible for hire," many did not have any real chance of being hired because of the months of delay created by the unnecessary 30-day letter process. Many such applicants who applied well before the bulk of hiring took place in the spring and summer of 2010, and who, on the face of their records, do not pose a threat to public safety or the integrity of the count, were found "eligible" *after* virtually all hiring had been completed. Since at least early June 2010, Census was explicit in telling these applicants: "Please be aware that most temporary Census jobs are now filled and major census operations are nearing completion or are already completed."

### B.  Discriminatory Impact

30.     Census's use of these arbitrary pre-employment screens was not only unfair, it also resulted in discrimination on the basis of race, ethnicity, color, and national origin. Because the arrest and conviction rates of African Americans and Latinos far exceed those of whites nationwide, the arbitrary use of criminal history in employee selection imports these racial and

11

ethnic disparities into the employment process.[4]  Thus, Plaintiffs bring this class action suit
pursuant to Title VII of the Civil Rights Act of 1964, which provides:  "All personnel actions
affecting … applicants for employment … in executive agencies [of the federal government]
shall be made free from any discrimination based on race, color … or national origin."  42 U.S.C.
§ 2000e-16(a).

31.     Since at least the 2000 decennial census, the Secretary of Commerce and other
government officials have known, or should have known, that Census's criminal background
screening devices exclude from consideration hundreds of thousands of applicants, and that this
exclusion disproportionately affects African Americans and Latinos.

32.     Unfortunately, Census's hiring process not only discriminated against hundreds of
thousands of individuals seeking to serve the public interest, but also undermined its own stated
goal of reducing the historic under-count in communities of color.  Through this lawsuit,
Plaintiffs seek both to end Census's discriminatory hiring practices and to improve its ability to
achieve its constitutionally mandated goal of counting all who live in the United States.

## CLASS DEFINITION

33.     Plaintiffs bring this case as a class action under Federal Rules of Civil Procedure
23(a) and (b), on behalf of the following class:

> All African American and Latino persons who applied for temporary employment with
> the United States Census Bureau, who, under Defendant's criminal records policy, were
> sent a 30-day notice to produce official court documentation or fingerprints, and who
> were thereafter barred from employment, between the commencement of the temporary
> employment application process for the 2010 decennial census and the date of judgment

---

[4] The President of the National District Attorneys Association has told prosecutors that they
"must comprehend this full range of consequences that flow from a crucial conviction" and
asked: "[h]ow can we ignore a consequence of our prosecution that we know will surely be
imposed by the operation of law?  These collateral consequences are simply a new form of
mandated sentences."  R. Johnson, *Message from the President, Collateral Consequences*, The
Prosecutor (May/June 2001).

in this action ("the Class").

## JURISDICTION AND VENUE

34.     The court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(4), as this claim

arose under the Constitution and laws of the United States, and under § 717 of Title VII, 42

U.S.C. § 2000e *et seq.*

35.     Venue is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3), because

Defendant's unlawful employment practice was committed in Manhattan, employment records

relevant to Defendant's illegal actions are maintained and administered in New York City.

## EXHAUSTION OF ADMINISTRATIVE REQUIREMENTS

36.     On August 10, 2009, Plaintiff Evelyn Houser filed an Informal EEO Complaint

based on her denial of temporary employment with Census.  Ms. Houser explicitly challenged the

policy employed by Census of excluding applicants with criminal history as having a racially

disparate impact in violation of Title VII, and included in her complaint references to the three

EEOC Guidance statements bearing on the use of arrest and criminal conviction records in

employment.  On August 28, 2009, Ms. Houser filed a timely written Charge of Discrimination

with the Equal Employment Opportunity Office of the Department of Commerce ("EEO

Office").  On September 29, 2009, the EEO Office rejected that charge by issuing a Final Agency

Decision dismissing Ms. Houser's complaint.  Ms. Houser appealed that decision to the Office of

Federal Operations of the EEOC.  The EEOC issued a decision on January 29, 2010, which Ms.

Houser received on or about February 1, 2010.  The EEOC's decision explicitly provided that

Ms. Houser had the right to file a civil action in federal District Court within ninety calendar days

from the receipt of the decision.  This action was filed on April 13, 2010, within the required time

limits.

13

37.     Plaintiff Felicia Rickett-Samuels filed an informal charge of discrimination against the Census Bureau on February 25, 2010.  On March 18, 2010 she received a notice of right to file a formal complaint.  Ms. Rickett-Samuels filed a formal complaint with the EEO Office on March 30, 2010.  On May 13, 2010, Mr. Rickett-Samuels filed an amended formal complaint with the EEO office, adding class allegations in compliance with 29 C.F.R. § 1614.204.  Ms. Rickett-Samuels explicitly challenged the Census Bureau's policy and practice of failing to hire applicants with prior arrests and/or criminal convictions, alleging that such policy and practice has a disparate impact on African Americans and Latinos.  More than 180 days have passed since the filing of Ms. Rickett-Samuel's formal class complaint, and Defendant has not taken final action.  Therefore, pursuant to 29 C.F.R. § 1614.407(b), Ms. Rickett-Samuels has the right to participate in this action as a class representative.

38.     On April 9, 2010, Plaintiff Chynell Scott filed a formal EEO class complaint of discrimination based on Census's denial of her application for temporary employment.  Ms. Scott explicitly challenged the Census Bureau's policy and practice of failing to hire applicants with prior arrests and/or criminal convictions, alleging that such policy and practice has a disparate impact on African Americans and Latinos.  Ms. Scott's complaint was brought on a class-wide basis pursuant to 29 C.F.R. § 1614.204.  More than 180 days have passed since the filing of Ms. Scott's formal class complaint, and Defendant has not taken final action.  Therefore, pursuant to 29 C.F.R. § 1614.407(b), Ms. Scott has the right to join this action as a class representative.

39.     On April 18, 2010, Plaintiff Vivian Kargbo filed an informal charge of discrimination based on her denial of temporary employment with Census.  On June 22, 2010, she received a notice of right to file a formal complaint.  Ms. Kargbo filed a formal complaint with the EEO Office on June 24, 2010.  Ms. Kargbo explicitly challenged the Census Bureau's policy and practice of failing to hire applicants with prior arrests and/or criminal convictions,

alleging that such policy and practice has a disparate impact on African Americans and Latinos. Ms. Kargbo's complaint was brought on a class-wide basis pursuant to 29 C.F.R. § 1614.204. More than 180 days have passed since the filing of Ms. Kargbo's formal class complaint, and Defendant has not taken final action. Therefore, pursuant to 29 C.F.R. § 1614.407(b), Ms. Kargbo has the right to join this action as a class representative.

40.     On April 1, 2010, Plaintiff Scotty Desphy contacted the EEO Office to make a complaint of racial discrimination. The EEO Office sent Ms. Desphy a notice of her right to file a formal complaint, which she received on April 28, 2010. Within 15 days of her receipt of that letter, on May 11, 2010, Ms. Desphy filed a formal EEO class complaint of discrimination based on Census's denial of her application for temporary employment. Ms. Desphy explicitly challenged the Census Bureau's policy and practice of failing to hire applicants with prior arrests and/or criminal convictions, alleging that such policy and practice has a disparate impact on African Americans and Latinos. Ms. Desphy's complaint was brought on a class-wide basis in full compliance with 29 C.F.R. § 1614.204. More than 180 days have passed since the filing of Ms. Desphy's formal class complaint, and Defendant has not taken final action. Therefore, pursuant to 29 C.F.R. § 1614.407(b), Ms. Desphy has the right to join this action as a class representative.

41.     In addition, Defendant was on notice early in its hiring process, both from the EEOC and from other deterred and excluded applicants, of the class-wide discriminatory impact of Census's criminal background screening policy.

42.     On July 10, 2009, one month prior to Ms. Houser's formal complaint, the Acting Chairman of the EEOC wrote a detailed four-page letter to the Secretary of the Department of Commerce and the Acting Director of the U.S. Census Bureau.

43.     Under Section 717 of Title VII, the EEOC has "authority to issue ... such orders and instructions as it deems necessary and appropriate" to fulfill its statutory obligation to ensure non-discrimination in all federal agencies.  Further, "[t]he head of each such department, agency, or unit *shall comply* with such ... orders, and instructions."  42 U.S.C. § 2000e-16 (emphasis added).

44.     The July 10, 2009 letter was sent explicitly under the EEOC's authority pursuant to Section 717 and stated that the EEOC was aware of reports of "numerous instances nationwide," in which Census told applicants that their record of an arrest or conviction would disqualify them unless shown to be incorrect, that the Census application states that adult convictions other than a minor traffic violation could be the basis for nonselection, and that "this information suggests that the Census Bureau's approach is overbroad and may run afoul of Title VII."  The letter further informed the Secretary and Acting Director: "Unless there is a record that an arrest resulted in a conviction, an arrest in itself is not evidence that the person engaged in the conduct alleged.  Therefore, without confirmation, the Census Bureau should not disqualify people based on an arrest record."

45.     Regarding individuals with convictions, the EEOC went on to state that "[p]ursuant to longstanding EEOC policy guidance, when there is evidence of criminal conduct, objective evidence concerning three factors should be considered: The nature and gravity of the offense or conduct (including the circumstances surrounding the offense or conduct, and the number of offenses for which the individual was convicted); [t]he amount of time that has passed since the arrest or conviction and/or completion of the sentence; and [t]he nature of the job held or sought."

46.     The EEOC further noted that it had become aware of Census's use of the 30-day letter, and stated:  "this practice is inconsistent with Census Bureau's obligation under Title VII,

to objectively assess whether the applicant or employee in fact engaged in the conduct alleged." Additionally, the EEOC stated that "the Census Bureau should not exclude people from employment for offenses that do not predict an unacceptable risk."

47.     Defendant also was on notice of the class-wide discriminatory impact of Census's criminal background screening policy since the very outset of the 2010 decennial hiring process through the EEO complaints of deterred and excluded applicants other than Ms. Houser.  As early as October 2008, an African American applicant filed a formal charge of race discrimination, challenging Census's rejection of his application for temporary employment.  His complaint states that his challenge was based on the "disparate and adverse impact" of Census's criminal background policy on him as a minority worker, noting his understanding that the policy has a "discriminatory impact on the protected class."

48.     In August 2009, another African American applicant filed a formal complaint of class-wide discrimination, alleging that the "Census Bureau's policy and practice of using criminal conviction information to screen out candidates for hire is discriminatory in that it has a disparate impact on African Americans…"  The complaint specifically sought "class and individual injunctive, declaratory and monetary relief (back and front pay) and all other relief provided for under Title VII."  The complaint also alleged intentional discrimination.

49.     Additionally, between July 2009 and April 2010, at least five other applicants of color filed formal charges of race discrimination based on Census's criminal background process.

50.     Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

51.     Plaintiff **Evelyn Houser** is a 70-year-old African American resident of Philadelphia, Pennsylvania.  Ms. Houser has lived in Philadelphia for decades and has contributed to her community as a block captain, committee person, and poll worker.  Ms. Houser

is presently retired but has a life-long history of work in housekeeping, security and office positions, counseling, home health aide positions, data entry, and retail. She has also raised four children on her own.

52.    Ms. Houser worked for Census in 1990. She started as a Census Taker, and then was given an office job, where she was involved in hiring, including helping to perform background checks, interviewing candidates, and speaking with job applicants on the telephone. She performed both jobs well.

53.    After applying for a temporary position for the 2010 census, Ms. Houser received the 30-day letter in March 2009. Census did not provide Ms. Houser with a copy of the arrest record about which it was requesting information. As a result, Ms. Houser did not know with certainty what was on the record to which she was expected to respond. On March 31, 2009, Ms. Houser obtained a set of her fingerprints. She mailed them to Census on or about the same day, which was within the 30-day period in which Census requested a response to its letter. Ms. Houser believed that providing the fingerprints was a satisfactory response to the 30-day letter. She did not understand that she might have to provide court documentation to comply with Census's requests.

54.    Census denied Ms. Houser's application. By letter dated May 21, 2009, Census informed Ms. Houser that she had not provided the requested information within 30 days. It also stated that as a result of her failure to act as requested, she was no longer being considered for employment. Ms. Houser then appealed to the EEO office of the Department of Commerce, and then to the EEOC, as discussed above. Ms. Houser remains available to work for Census if she were to be hired.

55.    Ms. Houser has a 1981 case for theft and forgery, where she tried to cash a check she had found. Ms. Houser was placed in a diversionary program known in Pennsylvania as

"accelerated rehabilitative disposition" (ARD). She was never formally convicted. Ms. Houser has not been arrested since the 1981 case, 30 years ago.

56.     Because of her clean criminal record over the last 30 years, her prior satisfactory employment by the Census Bureau (which was *after* her criminal case), her extensive work history, and her civic activities in her neighborhood, Ms. Houser is a strong job applicant to be a Census employee. Since the time of her application, Ms. Houser has remained ready, willing and able to work for Census if she were to be hired.

                                                                    ****

57.     Plaintiff **Felicia Rickett-Samuels** is an African American resident of Stamford, Connecticut. Ms. Samuels is a paralegal at a law firm in Manhattan, where she has worked for the past nine years. Her work involves handling sensitive documents and daily face-to-face interaction with the firm's clients. Ms. Samuels has a B.A. and Masters Degree in human resources. Ms. Samuels holds a Notary Public commission issued by the State of New York, which requires that she be of good moral character.

58.     Ms. Samuels also is a Waiver Service Provider for the Jewish Child Care Association, which provides mentorship to children in the foster care system. She also serves on the Board of Directors of the College and Community Fellowship at the City University of New York ("CUNY") Graduate Center, and she volunteers with Upwardly Global, an organization in which she works as a mentor and career coach for immigrant job-seekers.

59.     Ms. Samuels saw the Census temporary position as an opportunity to make some extra money to pay back her student loans, and she applied for the position in January 2009. Ms. Samuels answered the question on the application about criminal background, stating that she had been convicted of three felonies. She also submitted a copy of the Certificate of Good Conduct issued to her by the State of New York Division of Parole. A Certificate of Good Conduct is

issued to individuals convicted of more than one felony who have demonstrated rehabilitation to the satisfaction of the Division of Parole, after a waiting period and the submission of documentary evidence. A Certificate of Good Conduct creates a presumption of rehabilitation according to New York's Correction Law section 753(2).

60.    Ms. Samuels applied for the Census position at a governmental building in Stamford, Connecticut. She filled out the application and took the test in less than two hours. During her entire time in that room, she never saw any kind of posting or information about applicants' rights to appeal or challenge their treatment by the Census Bureau. The application and testing room had a large oval table with seats around it where applicants filled out their paperwork, with overflow at the sides of the room in classroom chairs. There was one Census official seated near the door who gave an introduction about the Census project, and who answered basic questions about the application, such as whether to use full names. The Census official never said anything about appealing or complaining about any part of the Census hiring process. Ms. Samuels recalls no postings whatsoever behind or to the side of this person, nor anywhere else in the room.

61.    At the end of March 2009, Ms. Samuels received a 30-day letter from Census. In response, she sent Census another copy of her Certificate of Good Conduct, which lists her convictions for attempted assault in 1989, attempted sale of a controlled substance in 1993, and possession of marijuana in 1998.

62.    Roughly a week later, she received a letter from Census denying her application. Nothing in this letter nor in any related papers or communications advised her of any of the procedures available to applicants for federal employment (nor of the time periods provided in federal law and regulations) to challenge an adverse decision declaring her ineligible for hire that the applicant believed to be discriminatory on the basis of race or ethnicity in violation of Title

20

VII. She then called Census in Washington, D.C., but the person she spoke with would not tell her why she had been denied. The Census official also did not tell Ms. Samuels that she could appeal the decision. Since the time of her application, Ms. Samuels has remained ready, willing and able to work for Census if she were to be hired.

****

63.     Plaintiff **Anthony Gonzalez** is a Latino resident of Riverview, Florida. Mr. Gonzalez was an Alcohol and Substance Abuse Treatment ("ASAT") Counselor for the New York State Department of Correctional Services ("DOCS") for sixteen years, prior to his retirement in November 2009.

64.     Mr. Gonzalez applied to work for Census in February 2010, seeking the position as part of his public service, and recognizing the importance of an accurate count in terms of political representation and the receipt of federal funds. He also desired part-time work to supplement his fixed income. He received a 92 on the test, speaks Spanish, and is skilled in communicating with diverse populations.

65.     Prior to working for the prison system, DOCS conducted a full investigation of Mr. Gonzalez' background, which includes three felonies for burglary and one for weapons possession in the 1980's, during a time in which he experienced a serious drug abuse problem. After completing a substance abuse treatment program in Albany, New York following his last conviction, Mr. Gonzalez wanted to prevent others from following the same path, and he became trained in substance abuse counseling. In 1992, he received his Certified Alcohol and Substance Abuse Counselor credential from the New York State Office of Alcoholism and Substance Abuse Services. Mr. Gonzelez has been sober and has had no criminal activity for the past 24 years, and he is now 52 years old.

66.     In response to his application to Census, Mr. Gonzalez received a 30-day letter in March 2010.  He knew he would not be able to get official court documentation in 30 days of such old convictions, so he downloaded his listing on the DOCS Inmate Lookup website, which described his 1986 burglary conviction, and submitted that print-out.  He also submitted copies of his retirement certificate and a letter from the Commissioner of DOCS thanking Mr. Gonzalez for his outstanding service.

67.     To this date, Mr. Gonzalez has not heard a response from Census, though he has remained ready, willing and able to work for Census if he were to be hired.

****

68.     Plaintiff **Precious Daniels** is an African-American resident of Detroit, Michigan.  Ms. Daniels applied for a temporary job with the 2010 census in January of 2010 and was sent a 30-day letter.  She tried to comply with Census's request but was met with only obstacles, and was unable to obtain and produce the requested documentation.

69.     Ms. Daniels is well qualified to work for Census.  She has lived in the largely African-American community on the west side of Detroit her whole life, knows the people there well, and would be comfortable in any part of West Detroit where she might have been assigned.

70.     Ms. Daniels went to high school at Redford High School in Detroit.  For two years she attended Marygrove College in Detroit and studied psychology.  She received a certification in phlebotomy from Crocker Adult Center in 2000.

71.     For ten years, Ms. Daniels has been a phlebotomist at various Detroit-area hospitals and medical centers.  She works with the public all day long, and it is her job to gain the trust of strangers so that she can make them comfortable enough to draw their blood.

72.     Ms. Daniels applied for a job with Census out of a desire to utilize her skills to assist the U.S. government in gaining access to and in quickly establishing a rapport with her

community.  She recognizes the importance of getting an accurate count and wanted to help Detroit receive its fair share of federal funding.  If hired, she anticipated meeting some reluctance or refusal to participate, and was prepared to explain what is at stake for the community.

73.    Ms. Daniels was arrested once, in November of 2009, for participating in a peaceful protest against Blue Cross Blue Shield of Michigan to pressure them to stop paying lobbyists to weaken health care coverage.  She and others were arrested for blocking the doorway.  She was taken to jail, was released on $50 bail, and subsequently appeared in court for a hearing, at which the charge of disorderly conduct was dropped.  Ms. Daniels has no other criminal history.

74.    Since criminal charges against her had been dropped, Ms. Daniels assumed that Census must have been confusing her record with someone else.  She went to the Central District police precinct and paid to get fingerprinted.  She then mailed her fingerprint card to Census to dispute the identity of the arrest record.  She was subsequently informed by Census that the fingerprints matched the ones they had on file.  Census directed her to provide official documentation on her criminal history.

75.    Ms. Daniels called the 36th District Court to try to obtain her criminal record.  The court officer told her that there was no record for her.  At that point, she did not see what else she could do to provide "official" documentation that she had never been prosecuted.  To date, Ms. Daniels has not been hired by Census, though she has remained available to work since the time of her application.

****

76.    Plaintiff **Ignacio Riesco** is a Latino resident of Massachusetts.  Mr. Riesco is a student at Harvard University in the Faculty of Arts and Sciences, where he is finishing his undergraduate degree, while also preparing for law school.  He also is starting a charity, where

he takes students and professors to volunteer at a local women's shelter.

77.     In 2006, while working in ticket sales at Disney World in Orlando, Florida, Mr. Riesco was wrongly arrested for taking money from his employer.  Subsequently, it was determined that he was not responsible for the financial loss, and the charges against him were dismissed.

78.     Mr. Riesco applied for temporary work with Census in March 2010, and he received the 30-day letter in April.  Within a few days, he submitted a disposition document of the wrongful arrest case, showing that all the charges had been dropped.  He then called Census and was told that it would take up to five weeks for his file to clear, but not to worry because Census was still hiring.  Mr. Riesco made repeated subsequent calls to check on the status of his application, but he never received further correspondence, and to this date has not received a decision on his application.

****

79.     Plaintiff **Chynell Scott** is an African American resident of Philadelphia, Pennsylvania.  Ms. Scott has an undergraduate degree from Philadelphia University and has been taking course toward obtaining a Masters in Business Administration.

80.     Ms. Scott worked for the Census Bureau twice in the past, first performing address verification and subsequently as a field representative doing door-to-door interviews.  Ms. Scott performed the job well on both occasions.

81.     Ms. Scott sought to work for Census during the 2010 decennial process, and took the written examination on December 9, 2009.  She was informed that her score was 100%.

82.     The only criminal case involving Ms. Scott arose from an arrest on July 24, 2008.  Ms. Scott had parked in a Wal-Mart parking lot and had gone into the store for 10 minutes while leaving her two children in the car.  When she returned to the car, police officers were there and

24

accused her of inappropriate behavior by leaving the children unattended.  Ms. Scott was not arrested.

83.     Because she was upset at how she had been treated, Ms. Scott later made a complaint to the officers' supervisor.  After submitting that complaint, charges from the incident in the parking lot were filed against her.  The charges comprised four misdemeanors and two summary offenses.  On September 8, 2009, Ms. Scott pled guilty to the summary offense of disorderly conduct.  All other charges were dropped.  Ms. Scott was sentenced to pay fines and costs, which she paid by November 5, 2009.  She was not sentenced to any jail or probation time.

84.     The Census Bureau sent Ms. Scott a 30-day letter on December 16, 2009.  In early January 2010, Ms. Scott mailed Census a "court summary" about her case.  On February 3, 2010, the Census Bureau sent her a letter denying employment based on her criminal record.

85.     Since the time of her application, Ms. Scott has remained ready, willing and able to work for Census if she were hired.

****

86.     Plaintiff **Vivian Kargbo** is an African American resident of Dorchester, Massachusetts.  Ms. Kargbo works as a home health aide during the day, as a server at a restaurant on nights and weekends and is also a part-time student at Roxbury Community College.

87.     Ms. Kargbo sought to work for Census during the 2010 decennial process, and took the written examination on or about March 10, 2010.  She was informed that her score was in the 80th percentile.

88.     The Census Bureau sent Ms. Kargbo a 30-day letter on March 24, 2010.

89.     Ms. Kargbo has never been convicted of a crime.  Ms. Kargbo has two dismissed charges against her, both of which have been sealed under Massachusetts law.

90.     When Ms. Kargbo received the 30-day letter from Census, she did not understand what official court documentation she was expected to provide.  By correspondence dated March 31, 2010 she sent the Census Bureau her fingerprints, reasonably expecting that this is what was requested of her.

91.     She subsequently called Census several times to find out the status of her application but was not provided with any information.

92.     Since the time of her application, Ms. Kargbo has remained ready, willing and able to work for Census if she were hired.

****

93.     Plaintiff **Scotty Desphy** is a 60-year-old African American resident of Philadelphia, Pennsylvania.  Ms. Desphy was hired as a temporary worker during the 2000 Census, and performed her job well.  She has held steady employment, including work most recently as a psychiatric technician at Friends Hospital in Philadelphia.  Ms. Desphy is currently working toward a Master's degree from Temple University.

94.     Ms. Desphy is well qualified to work for Census again.  She has the same record of contacts with law enforcement as she did when her explanation of her record was accepted, and she was hired to work for Census in 2000.  Ms. Desphy applied for a Census position in February 2010, and subsequently received a 30-day letter.  Ms. Desphy responded with a written explanation of the single criminal event in her life and two letters of reference supporting her moral character.  Nevertheless, on March 4, 2010, Census sent Ms. Desphy a letter rejecting her for temporary employment in the 2010 census.

95.     The only criminal case against Ms. Desphy occurred nearly 30 years ago in 1982.  She was attacked by an inebriated woman, and Ms. Desphy struck her in self-defense.  Ms. Desphy was charged with assault and was given one year of probation with no jail time.  The

judge informed her that the charge would be expunged upon successful completion of probation. Ms. Desphy did complete her probation without further incident.

96. Since the time of her application, Ms. Desphy has remained ready, willing and able to work for Census if she were hired.

****

97. At all times relevant to this complaint, Plaintiffs were applicants for employment to, or employees of, an executive agency of the United States government within the meaning of Title VII, 42 U.S.C. § 2000e-16(a).

98. Defendant Rebecca M. Blank is the Acting Secretary of the United States Department of Commerce, and has full authority over the United States Census Bureau. 42 U.S.C. § 2000e-16(c).

## STATEMENT OF THE CLAIM

### A. The Census Hiring Process has a Discriminatory Racial and Ethnic Impact

99. Census's screening practice effectively imported acute racial and ethnic disparities in the criminal justice system into the employment process, thereby multiplying the negative impact on African American and Latino job applicants with arrest and minor or old conviction histories. Indeed, the Department of Justice recognizes that a practice of using the FBI criminal records database in a widespread manner for criminal screening, without further refinement, undermines employment anti-discrimination policies. Attorney General's Report on Criminal History Background Checks, June 2006, p. 20.

100. Racial disparities in the U.S. criminal justice system are severe. African Americans and Latinos are far more likely to have arrest records and convictions than whites. While African Americans make up approximately 12.3% of the population, they account for approximately 28.3% of arrests and an even greater percentage of felony convictions

27

nationwide.[5]  Similarly, Latinos are arrested and incarcerated at rates significantly higher than their proportion of the population.

101.    The FBI estimates that well over 14 million people were arrested nationwide in 2007 alone.  Most arrests are for minor crimes and non-criminal offenses such as curfew and loitering violations, vagrancy, and disorderly conduct.[6]  African Americans are as much as 15 times more likely than whites to be arrested for low-level offenses.[7]  Yet less than 20% of the arrests of African Americans for these offenses result in convictions.  The racial disparities are exacerbated by the fact that more than 80 percent of those charged with crimes nationwide are indigent and absorb the collateral consequences of these incidents in numerous aspects of their lives.[8]

## B.  The 30-Day Letter Created a Barrier to Employment that is Neither Job-Related nor Consistent with Business Necessity

102.    The 30-day letter screened out individuals who would be eligible for employment

---

[5]  The statistics cited in this Complaint are derived from publicly available sources and are subject to that limitation.

[6]  In 2008 in New York State, more than 87 percent of adult convictions were for misdemeanors or petty offenses.  (N.Y. Division of Criminal Justice Services (DCJS), *Dispositions of Adult Arrests by County and Region* (6/18/2009).  Nationwide, only 4.2 percent of the 14 million annual adult arrests resulted in charges for violent crimes.  *Crime in the United States 2007* (FBI, Sept. 2008).

[7]  For example, from 1997 to 2006, the New York City Police Department arrested, charged with misdemeanors, and jailed more than 353,000 people for possessing small amounts of marijuana. U.S. Government surveys have consistently found that Whites use marijuana at higher rates than African Americans.  Yet, African Americans constituted 52% of the arrests (while accounting for only 26% of the city's population).  Relative to white arrest rates for marijuana, the arrest rate of African Americans is five times greater and the arrest rate of Latinos is nearly three times greater.  H. Levine & P. Small, MARIJUANA ARREST CRUSADE: *RACIAL BIAS AND POLICE POLICY IN NEW YORK CITY,* 1997 – 2007 (New York Civil Liberties Union, April 2008).

[8]  Denial of employment and other collateral consequences (such as eviction from public housing and denial of public benefits) trap many low-income individuals—especially African Americans and Latinos—in recurring encounters with the criminal justice system.  Studies consistently have shown that recidivism is directly linked to lack of economic opportunity.  Individuals and their families begin to suffer collateral consequences from the moment of arrest, and these punishments create significant barriers to successful reentry from the criminal justice system.  *See* M. Smyth, *From Arrest to Reintegration*, 24 Criminal Justice 3 (Fall 2009, ABA).

according to any rational and fair system of determining who does not present a legitimate threat to the public safety or the integrity of the counting process, i.e. those with arrests but no convictions, and those with convictions that are old or do not relate to violence or dishonesty. The 30-day letter does not identify the criminal history information that prompted Defendant to send the letter. By requiring applicants to provide official court documentation of *all* arrests, Census created a hurdle that often was insurmountable, and in many cases is literally impossible to overcome. Many of the "official court documents" that Census requires simply do not exist.

103.   Even where compliance was not a literal impossibility, the difficulty, time, and expense of attempting to obtain and submit official records within 30 days presented a significant impediment to many applicants. Where the individual was not able to comply within 30 days, his or her application, like Ms. Houser's, was automatically denied with no opportunity to re-apply.

104.   Ironically, the directive in the 30-day letter to produce documentation of "any and all arrest(s) and/or conviction(s)" deterred or excluded many of the best-qualified applicants with arrest records of non-criminal or insignificant charges that are decades old. Generally speaking, the older and less serious one's record, the harder it is to find the original file, and the more likely one is to fail to obtain and submit it, especially when limited to less than a month to do so. Census thus unnecessarily excluded qualified potential workers and undermined its own publicized goal of "indigenous hiring," i.e. hiring people to work in the communities in which they live. This not only violated Title VII because of the racial impact of relying on arrest records as a screen, but also increased the risk that Census would end up with a substantial undercount in communities of color. Due to the historically low mail-in response rate in many such communities, there was a heightened need to hire putative class members.

### 1. Compliance with the 30-Day Letter was Impossible for Many Applicants

105.    Many people with criminal histories have had their records expunged or sealed and have been returned to the legal position of having never been arrested or convicted.   As of the latest report in 2006, sixteen states and the District of Columbia have statutes providing for expungement of felony convictions; twenty states have statutes that provide for setting aside felony convictions; and fifteen states have statutes that provide for the sealing of conviction records.  However, often these expungements and sealings are not reported to the FBI from the states in which they originated, so the records of convictions are never removed from the FBI database.  Yet, many of these records are not accessible to members of the general public, and some expunged or sealed records are actually destroyed (e.g. Pennsylvania) or made unavailable for release (e.g. New Jersey and Arkansas).  In a number of states and localities, regardless of expungement or sealing, criminal records have been destroyed pursuant to official record retention policies or by inadvertence.  Thus, many Census applicants were caught in a Catch-22: they would not be hired unless they provided an official document that no longer exists, but failure to respond with official documentation led to automatic rejection.[9]

### 2. Compliance with the 30-Day Letter was Unduly Burdensome

106.    Even where records have not been destroyed, a vast number of applicants were faced with insurmountable hurdles in determining where their records were kept and how to obtain them.  The process by which official court records are obtained is unknown to many people, especially those with only fleeting interaction with the criminal justice system.  The 30-day letter failed to provide even the simplest advice on which records to obtain and how to obtain

---

[9] By contrast, the criminal background check policy of the U.S. Postal Service provides: "In instances where a criminal conviction is set aside, vacated, or annulled, expunged, or sealed pursuant to state or court order, the conviction may not serve as a basis for the disqualification of the applicant.  Further, no inquiry may be made, either oral or written, directly or indirectly, into that conviction." Postal Handbook, p. 109.

them.  Finding and securing copies of such records often requires sophistication about states and individual court systems' record-keeping mechanisms, which vary widely from state to state and locality to locality.

107.    Additionally, because Census directed them to provide "all" official records, many applicants faced the nearly impossible burden of finding records that are decades old, possibly located in a different state, in four weeks or less (depending on mailing time of 30-day letter). Even where conceivably possible, the cost and delay involved in such a search are cumulative and prohibitive.  This had a particular impact on retirees living on limited incomes, who Census actively encouraged to apply.  To make matters worse, the directive to supply "all" official records of "any arrest" literally includes juvenile infractions.

### 3. The 30-Day Letter was Ambiguous and Created Confusion

108.    Many applicants were rightly confused as to what constitutes an arrest and thus were confused as to how to comply with the 30-day letter.  There is no universal definition of when a person is arrested.  For example, the Department of Justice distinguishes between an "arrest" and "detention," without clearly defining either.  28 C.F.R. § 20.3(d).  If people are not sure whether an encounter with the police has been reported as an arrest, they will not know which incidents to investigate.  In many African American and Latino neighborhoods, where stop-and-frisk and other encounters with police frequently occur, it is hard to know which interactions resulted in a record and which did not.[10]

109.    Since filing the initial Complaint in this case, Plaintiffs learned that the 30-day letter is intended to solicit documentation only where the arrest led to police booking and fingerprinting.  Yet, when applicants were confused and sent documentation on arrests for

---

[10] For example, in 2009, African Americans and Latinos collectively represented 84% of all individuals subjected to "stop and frisk" by the police in New York City, while they compromise only 53 percent of the city's population.

citations or other minor offenses where they were released without being booked, Census

"adjudicated" those applicants, diminishing their chances of being hired, and in some cases

leading to rejection from employment.

110.    There also is significant ambiguity in the term "official court documentation" used

in the 30-day letter.  There is a wide spectrum of possibilities, from mere disposition statements

to full court transcripts.  In some states, such as Pennsylvania, individuals can obtain computer-

generated summary dispositions that identify their criminal history but are not original

documents.  As another example, while the New York State Office of Court Administration

provides criminal background reports (for a fee exceeding $50), they are not certified and thus

may not be considered "official."  To comply with the 30-day letter mandate, an individual thus

could be relegated to obtaining official certificates of disposition from each court.

111.    Additionally, each state maintains its own repository of criminal records.  For

many people seeking their criminal records, this is the most obvious source of retrieval,

especially since many repositories have automated features and can be accessed on-line.

However, many criminal records that appear in the FBI database are not accessible to applicants

through their state repositories. Indeed, well over 10% of criminal records nationwide are in what

the Department of Justice classifies as "Closed Record States," where criminal records are

unavailable to individuals due to strict limitations on production.  In some other states where

records are not completely closed, disposition information will not be disclosed even upon

request by the subject of the record.

### 4.  The 30-Day Letter Caused Unnecessary Delay Resulting in Denial of Employment

112.    Additionally, the delay created by the 30-day letter—and the series of events that

it triggered, including follow-up letters with further directives—was itself a significant barrier to

employment.  The delay imposed by this process harmed class members who should have been

hired—and paid—months earlier, which had a significant impact on the many applicants struggling with financial hardship in the economic climate of high unemployment.

### C. The "Adjudication" Criteria Created a Barrier to Employment that is Neither Job-Related nor Consistent with Business Necessity

113.   The few applicants who made it past the 30-day letter faced a criminal background screen that was arbitrary and unfair, and which failed to distinguish those individuals who present a legitimate threat to the public safety or the integrity of the counting process.

114.   Nearly all felonies, even if decades old, even if committed as a juvenile, and even where expunged or dismissed through deferred adjudication, probation, or similar diversion programs, led to exclusion from hiring by Census.  Many misdemeanors also led to exclusion. Even the most petty offenses—such as "abusive language," "unlawful assembly," or "liquor possession by a minor"—could lead to exclusion if the applicant was unable to document the event, or if more than one such violation was on the person's record.  In the limited places where the criteria allowed for discretion, Census officials applied *ad hoc* standards, unguided by professional principles, and based largely on gut instinct.

115.   Census's adjudication policy was far too over-inclusive to meet the standards of job-relatedness and consistency with business necessity.  For example, screening out applicants with any felony conviction, regardless of the nature of the crime, where the person was on parole or probation, or in prison, within the past ten years, simply cannot be justified as being necessary to protect the public or the process.  This was especially true for those applicants whose charges were dismissed through an adjournment or diversionary program.

116.   Census did not have any legitimate process or policy to determine whether individuals convicted of crimes decades ago had made positive changes in their lives such that they no longer posed a risk to others.  Its employment screening process provided no real opportunity for applicants to provide proof of rehabilitation, such as documentation of successful

33

participation in drug treatment programs, educational achievements or relevant employment, or to submit certificates of relief from disabilities, which in many states create a presumption of rehabilitation.

117.    Further, Census applied the same screening factors to office clerks as enumerators, even though clerks had no interaction with the public.  Screening clerks for danger to the public was, on its face, not job-related.

### D. There are Less Discriminatory Alternatives that Would Have Better Achieved Census's Legitimate Hiring Interests

118.    As discussed above, the 30-day letter and adjudication criteria created significant barriers to employment that deterred or excluded many properly qualified persons, including disproportionate numbers of African American and Latino applicants.  There are less discriminatory alternatives that would have better achieved Census's legitimate hiring interests in protecting the public and the integrity of the counting process.  Among the less discriminatory alternatives, a simple resolution to this problem would have been for Census to cease using the 30-day letter and to have granted eligibility to all qualified applicants with arrests only and to those with convictions who did not present a legitimate threat to the public safety or the integrity of the counting process.  Such a process would have included the following steps:

(1)    All applicants with a record of an arrest over one year old at the time of application and no record of criminal conviction, as well as those applicants with juvenile adjudications or adult convictions that have been expunged or sealed, should be given the same consideration as applicants whose names do not appear in the FBI database, unless Census provides the applicant with documented evidence that the individual has been convicted of a crime of violence or dishonesty that is a valid basis for excluding them from consideration;

34

(2)    All applicants with an FBI record of conviction for a crime that by its nature does not pose a legitimate threat to the public safety or the integrity of the counting process should be given the same consideration as applicants whose names do not appear in the FBI database;

(3)    Consistent with (1) and (2) above, all applicants whose criminal history may pose a legitimate threat to the public safety or the integrity of the counting process should be given a written description of the conviction(s) (or pending charge) that form the basis for presumptive exclusion; and

(4)    Census should ask each presumptively excludable applicant in (3) if they contest the identified conviction(s), and, for charges pending less than a year, whether a disposition has occurred.  Each such individual should be given a meaningful opportunity to demonstrate that they do not present a current threat, including being given the chance to submit evidence of rehabilitation, an explanation of events leading to the conviction, or information regarding other mitigating factors.  Census should then promptly evaluate such evidence.

## CLASS ACTION ALLEGATIONS

119.   Plaintiffs are all members of the Class, which includes applicants who applied for temporary employment with the United States Census Bureau, who, under Defendant's criminal records policy, were sent a 30-day notice to produce official court documentation or fingerprints, and who were thereafter barred from employment during the process of temporary hiring for the 2010 decennial census.

120.   The members of the Class are so numerous that joinder of all of them is impracticable.  Census recruited for decennial positions throughout the United States and screened all of the approximately 3.8 million applicants using the FBI database to hire around 1.4 million temporary employees.  Approximately 700,000 applicants were excluded from consideration by use of the 30-day letter, and approximately 20,000 applicants have been rejected

through application of the "adjudication" criteria.  An additional unknown number of applicants who were ultimately deemed "eligible" were effectively denied employment through the unnecessary delay caused by the 30-day letter process.  Others were actually hired, but then terminated based on application of the "adjudication" criteria.

121.    There are questions of law and fact common to the Class, and these questions predominate over any questions affecting only individual members.  Defendant acknowledges that Census had a *single, uniform* criminal background check procedure that was used for *all* decennial applicants.  Common questions include, but are not limited to: (1) Whether it was Defendant's policy and practice to deter or exclude temporary job applicants with criminal histories who have never been convicted or who should have been eligible for employment based on valid factors assessing legitimate threat to public safety or the integrity of the process; (2) Whether Defendant's policy and practice to deter or exclude job applicants based on criminal history had a discriminatory disparate impact on African American and Latino applicants; (3) Whether Defendant's policy and practice to deter or exclude job applicants based on their criminal history records is job-related and consistent with business necessity; (4) Whether Defendant's policy and practice to exclude job applicants based on its "adjudication" criteria is job-related and consistent with business necessity; (5) Whether there was a less discriminatory policy and practice that would have met Defendant's legitimate needs; and (6) What equitable and injunctive relief for the Class is warranted.

122.    Plaintiffs' claims are typical of the claims of the Class: (1) Each of the Plaintiffs applied for a temporary position in the 2010 census; (2) Each was processed through the same application procedure; (3) Each was subjected to the same pre-screening device; (4) Each was constructively or actually denied the position; and (5) Each has the same discrimination claim based on disparate impact.  All of these claims are shared by each and every class member.

123.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have no conflict with one another or any class member. Plaintiffs are committed to the goal of having Census revise its hiring policy and practice to reduce or eliminate its discriminatory impact on African American and Latino applicants.

124.    Plaintiffs have retained counsel competent and experienced in complex class actions, employment discrimination litigation, and the intersection thereof.

125.    Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b) due to: (1) the risk of inconsistent or varying adjudications with respect to individual class members through the prosecution of separate actions; (2) Defendant's refusal to act on grounds that apply generally to the class, so that final injunctive or declaratory relief is appropriate respecting the class as a whole; and/or (3) the predominance of questions of law and/or fact common to class members over any questions affecting only individual members, and the superiority of a class action to other methods for fairly and efficiently adjudicating this controversy.

**CLAIM FOR RELIEF**
**(Title VII of the Civil Rights Act of 1964,**
**42 U.S.C §§ 2000e *et seq.*)**

126.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

127.    Plaintiffs bring this claim on their own behalf and on behalf of the Class.

128.    Defendant's policy and practice of using employment screens that deter or exclude applicants with arrest or irrelevant conviction records from obtaining employment opportunities, has harmed, and continues to harm, Plaintiffs and the Class, and constitutes unlawful discrimination on the basis of race, ethnicity, color, and/or national origin in violation of 42 U.S.C. §§ 2000e *et seq.*

129.    Defendant's policy and practice of using employment screens that deter or exclude applicants with arrest or irrelevant conviction records from obtaining employment opportunities

37

had a disparate impact on African Americans and Latinos and is neither job related nor consistent with business necessity. Even if Defendant's policy and practice of denying employment opportunities based on applicants' criminal history records could be justified by business necessity, a less discriminatory alternative exists that would have equally served any legitimate purpose.

130.    Plaintiffs and the Class have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and the injunctive relief sought in this action is the only means of securing complete and adequate relief. The practices identified above have been in place since at least the initiation of hiring for the 2000 decennial census, and Census maintains a permanent staff of approximately 50 full-time CHEC employees yearly to conduct background checks on its applicants for employment. Plaintiffs and the Class they seek to represent are now suffering, and will continue to suffer, irreparable injury from Defendants' discriminatory acts and omissions.

131.    Defendant's conduct has caused, and continues to cause, Plaintiffs and the members of the Class substantial losses in earnings and other employment benefits.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and the Class pray for relief as follows:

132.    Certification of the case as a class action on behalf of the proposed Class;

133.    Designation of Representative Plaintiffs Evelyn Houser, Anthony Gonzalez, Ignacio Riesco, Precious Daniels, Felicia Rickett-Samuels, Chynell Scott, Vivian Kargbo, and Scotty Desphy as representatives on behalf of the Class;

134.    Designation of Representative Plaintiffs' counsel of record as Class counsel;

135.    A declaratory judgment that the practices complained of herein are unlawful and violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*;

136.    A preliminary and permanent injunction against Defendant and all officers, agents,

successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful policies, practices, customs and usages set forth herein, consistent with the less discriminatory alternative described above;

137.   An order that Defendant institute and carry out policies, practices, and programs that provide equal employment opportunities for all Class members who would be eligible under application of the Uniform Guidelines for Employee Selection Procedures and related EEOC Guidance, and that Defendant eradicate the effects of past and present unlawful employment practices;

138.   Because it is no longer possible to restore Plaintiffs and Class members to their rightful positions at Census as applicants or employees for the 2010 decennial count, an order for payment of lost wages and benefits;

139.   Back pay accruing as a result of a delay in hiring Plaintiffs and Class members caused by the illegal policies and practices alleged herein;

140.   Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law, including but not limited to 42 U.S.C. §§ 2000e-5(k) & 2000e-16;

141.   Pre-judgment and post-judgment interest, as provided by law; and

142.   Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

Dated:  New York, NY
        September 21, 2012

Respectfully submitted,

By: _____

**OUTTEN & GOLDEN LLP**
Adam T. Klein
Justin M. Swartz
Lewis M. Steel
Ossai Miazad

Amber C. Trzinski
Sally J. Abrahamson**
3 Park Avenue, 29th Floor
New York, NY 10016
Telephone:  212-245-1000

**and**

**LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW**
Ray P. McClain*
Jane Dolkart*
1401 New York Ave., NW
Washington, DC  20005

**COMMUNITY SERVICE SOCIETY**
Judy Whiting
Paul Keefe
105 East 22nd Street
New York, NY  10010

**COMMUNITY LEGAL SERVICES, INC.**
Sharon Dietrich*
1424 Chestnut Street
Philadelphia, PA  19102

**LATINOJUSTICE PRLDEF**
Jackson Chin
99 Hudson Street, 14th Floor
New York, NY 10013

**CENTER FOR CONSTITUTIONAL RIGHTS**
Darius Charney
666 Broadway 7th Floor
New York, NY 10012

**INDIAN LAW RESOURCE CENTER**
Robert T. Coulter*
602 North Ewing Street
Helena, MT 59601

**PUBLIC CITIZEN LITIGATION GROUP**
Michael T. Kirkpatrick*
1600 20th St. NW
Washington, DC  20009

*Admitted pro hac vice*
** *Pro hac vice forthcoming*

**Attorneys for Plaintiffs and the Putative Class**

# Exhibit A

REDACTED

BC-1892
(11-2008)



**UNITED STATES DEPARTMENT OF COMMERCE**
**Economics and Statistics Administration**
**U.S. Census Bureau**
Washington, DC 20233-0001

February 16, 2010

Precious A. Daniels
REDACTED

Detroit, MI  48206

Dear Applicant,

The Census Bureau processes all applicants for temporary census jobs through a pre-appointment name check against the Federal Bureau of Investigation (FBI) Criminal Justice Information Services Division's criminal file and reviews the forms you completed at the time of application. Your application was potentially flagged as disclosing information pertaining to a conviction, court martial, or pending charges. If you disclosed such information, Census requests a detailed explanation of the self-disclosure, as well as any and all court documents related to the arrest or conviction. However, if you did not disclose any adverse information on your application, your name check most likely resulted in a tentative match between you and an arrest record in the FBI criminal history index. Because this identification is based on descriptors only, there is a chance that this record does not concern you. Therefore, you may do one of the following:

A. If you do not dispute the identity of the arrest record in question, provide OFFICIAL COURT documentation on any and all arrest(s) and/or conviction(s) in your past;

B. If you wish to dispute the identity of the arrest record in question, you may provide a set of original fingerprints. Call 1-888-360-5561 to obtain a fingerprint card and return envelope from the office in which you applied. If you send a fingerprint card that shows a match with the criminal history record in question, and you did not provide the requested court documentation, you will be made ineligible for hire.

Please affix an address label provided below to the return envelope of any correspondence. Use the second address label for any additional information that needs to be sent in a separate envelope. For your application to remain active, you must return all documents within 30 days of the date appearing above. The Census Bureau will not reimburse you for costs associated with obtaining your fingerprints or court documentation. Also, providing any of the above information does not guarantee that you will be hired by the Census Bureau.

Sincerely,
Census Hiring and Employment Check Staff
Administrative and Management Systems Division
U.S. Census Bureau