UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                                              )
EVELYN HOUSER, ANTHONY                    )
GONZALEZ, IGNACIO RIESCO,                  )
PRECIOUS DANIELS, FELICIA                    )
RICKETT-SAMUELS, CHYNELL SCOTT,     )
VIVIAN KARGBO, and SCOTTY                   )
DESPHY, on behalf of themselves and all others  )
similarly situated,                                        )        10-cv-3105 (FM)
                                                              )
                        Plaintiffs,                       )        SUPPLEMENTAL
                                                              )        DECLARATION OF
            v.                                              )        MARC BENDICK, JR., Ph.D.
                                                              )
REBECCA BLANK, Acting Secretary,        )
United States Department of Commerce,      )
                                                              )
                        Defendant.                      )
_____ )

I, Marc Bendick, Jr., Ph.D. declare as follows:

## I.  Introduction and Summary

1.      I am an employment economist who previously submitted a declaration in
this case, dated June 28, 2013 (hereinafter, *Bendick Declaration*).

2.      Paragraphs 23-26 of that declaration explained that it used national
statistics to

> conservatively estimate that African Americans applicants for the Census jobs had
> arrest records, and therefore received "30 day letters," at 2.5 times the rate that
> white applicants received them.  However, this figure is not based directly on
> counts of the race of individual actual job applicants.  For African Americans,
> these estimates can be confirmed by examining the racial identification of the
> …job applicants to whom "30 day letters" were actually sent….On April 1, 2013,
> I drew a random sample of 1,500 names,…[and] defendants…have requested the
> F.B.I. to provide copies of the arrest records …for these 1,500 persons. When
> those copies are received, I…am to compute the African American representation

1

within that sample….When I…complete these calculations, I would like to submit a supplemental declaration.

3.      I have now received and analyzed this sample, and the present declaration presents my findings.  Based on these analyses, I have reached six principal conclusions:

(a)  The citizenship requirement for Census temporary employment makes it appropriate to modify my previous estimates of African American and Hispanic representation among job applicants.  Replacing estimates in the *Bendick Declaration*, a reasonable, conservative estimate is that African Americans constituted 12.5% of applicants and Hispanics constituted 9.6%. (See Section II below.).

(b)  In the sample of 1,500 arrest records, 40.7% were for African Americans (including 1.1% who were both African American and Hispanic), and 12.8% were for Hispanics (including the same 1.1% who are both African American and Hispanic).  After accounting for the 1.1% overlap between these two groups, the proportion of arrest records for persons who are African American, Hispanic, or both is 52.4%.  (See Sections III and IV below.)

(c)  African Americans are represented in the sampled arrest records at 3.3 times their estimated representation among all applicants, while Hispanics are represented at 1.3 times their estimated representation among all applicants.  (See Sections III and IV below.)

(d)  In the sample of arrest records, differences in arrest rates between African Americans and non-African Americans, and between Hispanics and non-Hispanics, are both highly "statistically significant." The difference for African Americans corresponds to 31.8 standard deviations, or a probability that a

2

difference this large arose by chance alone is less than one in many billions. The difference for Hispanics corresponds to 4.1 standard deviations, or a probability that a difference this large arose by chance alone of less than one in 10,000. The results for both groups are statistically significant beyond a shadow of a doubt. (See paragraphs 15 and 21 below).

(e) African Americans passed the "30 day letter" stage of applicant screening at 30.3% the rate for non-African Americans, while Hispanics passed it at 75.0% the rate for non-Hispanics. Under the EEOC's "80% Rule," both rates indicate a the serious adverse impact of a substantially different rate of selection. (See paragraphs 16 and 22 below.)

(f) When the Census Bureau sent 849,125 "30 day letters" to job applicants, a reasonable, conservative estimate is that 354,594 letters went to African Americans (including 9,331 persons who were both African American and Hispanic), and 108,688 went to Hispanics who were not African American. When 88.9% of these letters were not responded to, an estimated 315,234 African Americans (including about 7,978 persons who were both African American and Hispanic) and 96,624 Hispanics who were not African American were eliminated from further consideration for employment. These figures replace their counterparts in the *Bendick Declaration*. (See Section V below.)

4. The remainder of this declaration documents the analyses underlying these conclusions.

## II.  Adjusting Applicant Representation for U.S. Citizenship

5.      To analyze the sample of 1,500 arrest records, I first modified estimates of the expected representation of African American and Hispanics presented in the *Bendick Declaration*.

6.      Recruiting information posted online during hiring for 2010 Census temporary positions told job applicants that they might qualify for employment if:[1]

- You are a U.S. citizen

- You are a legal permanent resident, or a non-citizen with an appropriate work visa, and you possess a bilingual skill for which there are no available qualified U.S. citizens.

In preparing the *Bendick Declaration*, I assumed that Spanish language skills commonly triggered waiver of the citizenship requirement, as described in the second part of this quotation.  Subsequently, I became aware that this waiver may not be very common.[2] Therefore, it is reasonable and conservative to limit the estimated representation of African Americans and Hispanics among qualified applicants to U.S. citizens.

---

[1] U.S. Census Bureau, *United States Census 2010, It's In Your Hands*, posted during the hiring period at http://2010census.gov/2010censusjobs, p. 2.

[2] For example, in a letter to Judge Maas dated four days after I signed the *Bendick Declaration*, defendants argued that named plaintiff Ignacio Riesco:

> …is a non-U.S. citizen with Spanish language abilities, and could only have been hired if, any time after he applied for a 2010 decennial census position, his LCO needed Spanish speaking applicants and an insufficient number of U.S. citizens with that language ability were available for hire. This was never the case.

(Letter to the Honorable Frank Maas from Natalie N. Kuehler, U.S. Department of Justice, July 2, 2013, p. 2)

Consistent with this example, the Census Bureau has reported that non-citizens accounted for only 3,487 (0.4%) -- of its 2010 Census temporary hires [Karen S. Seebold, *2010 Census Recruiting and Hiring Assessment* (Washington: U.S. Bureau of the Census, October 27, 2011), p. 9].

4

7.      According to data from the Census Bureau (in its capacity as a statistical agency, not an employer), at the time of hiring for the 2010 Census, 63.8% of Hispanics age 18 or older residing in the U.S. were citizens, while the comparable figure for non-Hispanics was 95.9%.[3]  The ratio of the figure for Hispanics divided by the figure for non-Hispanics is 66.5%.  That means that Hispanics were citizens at 66.5% the rate of non-Hispanics.

8.      In paragraph 15 of the *Bendick Declaration*, I concluded that 14.5% of qualified applicants for Census 2010 temporary hiring were Hispanic. When 14.5% is multiplied by 66.5%, the result is 9.6%.  That is, limited to U.S. citizens, the previously-estimated 14.5% expected Hispanic representation among qualified job applicants becomes 9.6%.

9.      The same Census Bureau data cited in paragraph 7 reported that 95.2% of Black persons age 18 or older residing in the U.S. were citizens, while the comparable figure for persons who were non-Black (including nearly 50 million non-Black Hispanics) [4] was 90.3%.  The ratio of the figure for Blacks divided by the figure for non-Blacks is 105.4%.  That means that Black persons were citizens at 105.4% the rate for non-Black persons.

10.     In paragraph 15 of the *Bendick Declaration*, I concluded that 11.9% of qualified applicants for Census 2010 temporary hiring were African Americans.  When 11.9% is multiplied by 105.4%, the result is 12.5%.  Thus, limited to U.S. citizens, the

---

[3] Computed by the author from U. S. Census Bureau, *Citizen Voting Age Population*, csv data file downloaded on July 15, 2013 from www.censu.gov/rdo/data/voting_age_population_by_citizenship_by_race_cvap.html.

[4] According to the 2010 Census, 94.0% of U.S. Hispanics are white, and 2.5% are African American [Karen Humes, Nicholas Jones, and Roberto Ramirez, *Overview of Race and Hispanic Origin:2010*, 2010 Census Brief C2010BR-02 (U.S. Census Bureau, March 2011), Table 2].

previously-estimated 9.6% expected African American representation among qualified job applicants becomes 12.5%.

11.    This 12.5% figure for African Americans and 9.6% figure for Hispanics replace their counterpart estimates in the *Bendick Declaration*.

### III.  African American Representation in the Sample of Arrest Records

12.    Plaintiffs' counsel provided to me a data set containing 849,125 names of job applicants to whom "30 day letters" were sent.[5]   I assigned a random number for each name using the "=RAND( )" function in EXCEL software and selected the names with the lowest 1,500 numbers as my random sample.  I analyzed race as recorded in the 1,392 useable records among the 1,500 records provided.[6]

13.    The racial composition of the arrest records in this sample are reported in the table below.  According to this table, 40.7% of the records were for African Americans.

---

[5] I understand this data set is the one documented in *the Declaration of Maria Kozhevnikova,* dated June 27, 2013, paragraph 9.   This direct count of 849,125 letters supersedes the figure of 854,454 cited in paragraph 32 of the *Bendick Declaration*, which was based on the *Deposition of Thomas L. Mesenberg* taken Dcember 21, 2012, Exhibit 5 (USA43541).

[6] I excluded 10 records for which race was "unknown" and 97 additional  records for which a corresponding name was not included in the data set of names from the 2000 Census described in paragraph 18 and footnote 8 below.  These two exclusions left 1,392 arrest records in the sample I analyzed.

**Supplemental Table One**
**Racial Representation in a Sample**
**of 1,392 F.B.I. Arrest Records**

|  | Number | % |
|---|---|---|
| White Alone | 801 | 57.5% |
| Black Alone or in Combination with Any other Race | 566 | 40.7% |
| Asian Alone | 9 | 0.6% |
| American Indian Alone | 16 | 1.1% |
| Total | 1,392 | 100.0% |

14.    What is the probability that an African American representation as high as 40.7% would be found in a random sample of 1,392 arrest records if the actual African American representation was 12.5%, the estimated African American representation among all applicants?  This question is equivalent to asking: What is the probability that there is no adverse impact against African Americans from higher arrest rates for African Americans than non-African Americans?

15.    As paragraph 38 of the *Bendick Declaration* explained, differences are commonly considered "statistically significant" if, when the difference is expressed in statisticians' units called "standard deviations," the difference translates to more than 2 to 3 standard deviations.  In the sample of 1,392 applications, the difference between 40.7% and 12.5% translates into 31.8 standard deviations.[7]  This number means that the

---

[7] Paragraph 38 of the *Bendick Declaration* reported very much large numbers of standard deviations (501 for African Americans and 260 for Hispanics) than the 31.8 for African Americans in this paragraph and the 4.1 for Hispanics in paragraph 21 below. Standard deviations are very influenced by the size of the sample being analyzed, with larger samples generating

probability a difference this large would have arisen by chance alone is less than one in many billions.  By this test, the difference in arrest rates between African Americans and non-African Americans is statistically significant beyond a shadow of a doubt.

16.    As paragraphs 39-41 of the *Bendick Declaration* discussed, racial differences can also be analyzed using the "80% Rule."  In the sample of 1,392 arrest records, the African American rate of "passing" the "30 day letter" stage of applicant screening is 30.3% the rate for non-African Americans.[8]  Since 30.3% is smaller than 80%, the adverse impact of a higher arrest rate for African Americans is confirmed under the "80% Rule."  As paragraph 39 of the *Bendick Declaration* explains, the EEOC and its sister enforcement agencies would declare such a numerical finding a "serious discrepancy" and "a substantially different rate of selection."

## IV.  Hispanic Representation in the Same Sample

17.    Paragraphs 25 and 26 of my Declaration of June 28, 2013 also stated:

The representation of Hispanics in the same sample of 1,500 applicants can be estimated using data prepared by the Census Bureau (in its capacity as a statistical agency, not as an employer) of the probability that each of the 1,000 most common names in the U.S. are held by a person who is Hispanic....When I receive

---

larger numbers of standard deviations for the same difference in rates.  The standard deviations in the *Bendick Declaration* were calculated as if the sample were all 845,454 "30 day letters." The standard deviations in the present declaration were calculated from a sample of 1,392 arrest records.

[8] If 40.7% of letter recipients were African Americans but African Americans represented 12.5% of all applicants, they received letters at a rate 3.3 times their representation among non-African American applicants.  African Americans therefore "passed" this stage of applicant screening, in the sense of not receiving a "30 day letter," at 1/3.3 = 30.3% the rate of non-African Americans.

The relative pass rate for African Americans would be even lower than 30.3% if the non-African American comparison group were restricted to the "most favored group," which in this case would be whites excluding Hispanics.

these data and complete these calculations, I would like to submit a supplemental declaration.

18.    I have now estimated this number, using the proportion Hispanic of each name in the names data from the 2000 Census referred to in the previous paragraph[9]  For example, the 2000 Census data reports that when a person is named Hernandez, there is a 93.8% probability that person is Hispanic, while for a person named Smith, the probability is only 1.6%.  Therefore, to calculate the Hispanic representation in the sample of arrest record, I counted an arrest record for Hernandez as .938 of a Hispanic person and .062 of a non-Hispanic person, and I counted each Smith as .016 of a Hispanic person and .984 of a non-Hispanic person.

19.    According to this analysis, Hispanics accounted for 12.8% of the 1,392 arrest records analyzed.

20.    What is the probability that a Hispanic representation as high as 12.8% would be found in a random sample of 1,392 arrest records if the actual Hispanic representation was 9.6%, the estimated Hispanic representation among all applicants? This question is equivalent to asking: What is the probability that there is no adverse impact against Hispanics from higher arrest rates for Hispanics than non-Hispanics?

---

[9]  However, instead of analyzing only the 1,000 most common names, I used a more comprehensive version of the same Census data set, which included all names encountered at least 100 times nationwide during the 2000 Census, a total of 151,671 names. This larger data file is publicly released by the Census Bureau as "File B" at www.census.gov/genealogy/www/data/2000surnames/index.html.  It is described in Bruce Word et al., *Demographic Aspects of Surnames from Census 2000* (downloaded July 7, 2013 from www.census.gov/genealogy/www/data/2000surnames/index.html).

    With this Census data set, I could match 93.3% (that is, 1,400) last names in the random sample of 1,500 arrest records. Names with no match are excluded from my analysis.

21.     In the sample of 1,392 applications, the difference between 12.8% and 9.6% translates into 4.1 standard deviations.[10]  This number means that the probability a difference this large would have arisen by chance alone is less than one in 10,000.  By this test, the difference in arrest rates between Hispanics and non-Hispanics is statistically significant beyond a shadow of a doubt.

22.     In terms of the "80% Rule," the Hispanic rate of "passing" the "30 day letter" stage of applicant screening is 75.0% the rate for non-Hispanics.[11]  Since 75.0% is smaller than 80%, the adverse impact of the higher arrest rate for Hispanics is confirmed under the "80% Rule."   Again, the EEOC and its sister enforcement agencies would declare such a numerical finding a "serious discrepancy" and "a substantially different rate of selection."

23.     The 40.7% figure for African Americans in paragraph 13 above and the 12.8% figure for Hispanics in paragraph 19 above both include the 1.1% of arrest records which were for persons who are both African American and Hispanic  After accounting for the 1.1% overlap between these two groups, the proportion of arrest records for persons who are African American, Hispanic, or both is 52.4%.

---

[10] Footnote 7 above discusses the implications of sample size in calculating this figure.

[11] If 12.8% of letter recipients were Hispanic but Hispanics constituted 9.6% of all applicants, they received letters at a rate 1.333 times their representation among non-Hispanic applicants. Hispanics therefore "passed" this stage of applicant screening, in the sense of not being screened out by receiving a "30 day letter," at $1/1.333 = 75.0\%$ the rate of non-Hispanics.

The relative pass rate for Hispanics would be even lower than 75.0% if the comparison group were restricted to the "most favored group," which in this case would be white non-Hispanics (and thereby exclude African Americans).

### V.  The Number of African Americans and Hispanics
### Adversely Affected by "30 Day Letters"

24 .    According to paragraph 12 above, the Census Bureau sent 849,125 "30 day letters" to job applicants based on having received arrest records for them.  In the sample of arrest records, African Americans accounted for 40.7% of records.  Multiplying 849,125 by 40.7% generates the estimate that 345,594 of these "30 day letters" were sent to African Americans (including 9,331 person who are both Hispanic and African American[12]).

25.    In parallel, according to paragraph 19 above, Hispanics accounted for 12.8% of the arrest records triggering the 849,125 letters.  Multiplying 849,125 by 12.8% generates the estimate that 108,688 of these "30 day letters" were sent to Hispanics who were not African American.

26.    When 88.9% of these letters were not responded to, this process eliminated an estimated 315,234 African Americans (including about 7,978 persons who were both African American and Hispanic) and 96,624 Hispanics who were not African American.

27.    These figures should replace their counterparts in the *Bendick Declaration*.

---

[12] 9,574 is the product of 354,594 multiplied by 2.7% (which is the proportion of African Americans in the sample of arrest records who are also Hispanic).  Slightly different number for this overlap group are generated when the figure is based on the estimated number of Hispanic "30 day letters" multiplied by 2.5% (which is the proportion of Hispanics who are also African American according to the Census source cited in footnote 4 above) or 1.1% (which is the proportion of persons who are both Hispanic and African American in the sample of arrest records).

\* \* \* \* \* \* \* \*

I declare under penalty of perjury that the foregoing is true and correct.    Executed at Washington, D. C., on  July ___19___, 2013.

_____
Marc Bendick, Jr., Ph.D.

12