Expert Report of Shawn D. Bushway in
*Houser et al. v. Pritzker*,
10-cv-3105 (FM)

## I.    Introduction and Executive Summary

1.   I was retained by counsel for the defense to provide expert analysis and opinions in the case of Houser et al. v. Pritzker (S.D.N.Y. Case No. 10-cv-3105). Specifically, I was asked to estimate the probability that an individual from a nationally (U.S.) representative sample has an arrest record, broken down by race/ethnicity.  I was also asked to compare my estimates to the estimates by Dr. Marc Bendick, Jr. in both his initial, supplemental, and second supplemental declaration, and in any subsequent declaration, if one is filed.

2.   In this report, I start by evaluating the methods and data used by Dr. Bendick to support his conclusions regarding the alleged impact of Census' background check procedures on African Americans and Hispanics.  I then present a different approach using an alternative source of data, the U.S. Bureau of Labor Statistics' National Longitudinal Survey of Youth, 1997 cohort (NLSY97),[1] to estimate the probability that an individual will have at least one arrest by the time he or she is 26 years of age.  I compute nationally representative estimates for African Americans, Hispanics and whites.  I also compute estimates for these race/ethnic groups for males and females separately.

3.   I reach five main conclusions:

---

[1] http://www.bls.gov/nls/nlsy97.htm

(a) I conclude that Dr. Bendick's use of annual counts of arrests as a proxy for the percentage of the U.S. population that has at least one arrest is inconsistent with accepted standards in the field of criminology. I also conclude that his approach leads directly to an over-estimate of racial disparity in the probability that members of the U.S. population have at least one arrest.

(b) I conclude that Dr. Bendick's results greatly overstate the amount of disparity between the population of African American and non-African Americans who have at least one arrest in their past. Using the NLSY97, I find that there is a modest 13% difference in the probability that an African American will have at least one arrest relative to non-African Americans. These estimates suggest that African Americans make it past the thirty day letter stage at a rate that is 92.7% the rate of non-African Americans. This estimate is above the 80% rate advocated by Dr. Bendick as a standard, and is far higher than the 16.7% estimate provided by Dr. Bendick.

(c) Using the NLSY97, I conclude that that there is no statistically significant or substantively meaningful difference between Hispanics and whites in the probability that they will have an arrest by age 26. I estimate that Hispanics only have a 4.5% higher likelihood of having at least one arrest by age 26. This difference is not statistically significant, and it suggests that Hispanics will make it past the thirty day letter stage at a rate that is 97.5% the rate of whites. Once again, this rate is far higher than the rate of 71.1% reported by Dr. Bendick.

(d) I conclude that the numbers calculated by Dr. Bendick in his second supplemental declaration lead directly to the conclusion that 74.1% of the African American applicants for Census jobs have at least one arrest on their record when they apply for a job. It is my opinion that this estimate is unrealistically high, and inconsistent with all existing data.

(e) I conclude that Dr. Bendick's failure to break down his results by gender and race leads to misleading results. Using the NLSY97, I found no substantively meaningful or statistically significant difference between the probability of at least one arrest among white, Hispanic and African American women. I do find statistically significant differences between men, particularly between African American men and white men. However, it is my understanding that none of the plaintiffs are African American men.

## II. Background

4. I am the owner and manager of Shawn D. Bushway Consulting, L.L.C., 14 Mountainwood Drive, Glenville, New York, 12302. I am also a Professor of Criminal Justice and Professor of Public Administration and Policy at the University at Albany (SUNY) in Albany, New York. I obtained a Ph.D. in Public Policy Analysis and Political Economy in 1996 from the H. John Heinz III School of Public Policy and Management at Carnegie Mellon University. I have authored or co-authored over 50 peer reviewed articles in addition to numerous book chapters, commentaries and reports. I am currently an Executive Counselor on the Executive Board of the American Society of Criminology. Attachment A to this report provides my academic resume.

3

5. My work as a criminologist has included serving as an expert witness in two negligent hiring cases, once for the plaintiff[2] and once for the defense.[3] I have also consulted with the plaintiffs' bar and private employers about the use of criminal history records by employers in the employment-decision context. I have testified before the E.E.O.C. about the use of criminal history records by employers.[4]

6. For my work in this case, I am being compensated at a rate of $400 an hour for my time while preparing the report along with out-of-pocket expenses. I receive $600 an hour for my time while testifying under oath.

## III.    Estimating the Lifetime Risk of At Least One Arrest

7. In this case, plaintiffs argue that Census' hiring process obligated African Americans and Hispanics to provide documentation in response to the "thirty-day letter" more often than whites. The starting question for this analysis is whether African Americans and Hispanics are more likely to have an arrest record than are whites. The plaintiffs in this case allege that African Americans and Hispanics are arrested at "rates substantially higher than whites." (Bendick Initial Report, ¶¶ 16, 22, 31). Dr. Bendick states that he intends to ask whether the "empirical data support this statement concerning race and ethnic differences in arrest rates." (Initial Report, ¶ 17).

---

[2] Maria D. v. Comcast; KROLL Backgrounds America (et al.) Sacramento County Superior Court 03AS05745 (California). I was listed as an expert for the plaintiffs, and was deposed by the defense.

[3] Jeffrey Stauffer vs. Paul Eugene Williford and World Publishing Company (District Court in and for Tulsa County, State of Oklahoma, Case No. CJ-2007-6590.) I filed a report for the defense and was deposed by the plaintiff.

[4] http://www.eeoc.gov/eeoc/meetings/11-20-08/bushway.cfm

8. Dr. Bendick states that the "ideal data from which to address this issue would be individuals' lifetime arrest records, which could then be analyzed to compute the rates at which job applicants from different demographic groups would be required to provide the contested documentation." (Initial Report, ¶ 18). A person acquires an arrest record when he or she is arrested at least one time. Criminologists refer to the presence of a record as "prevalence" or "participation," and are quick to distinguish this feature from "frequency," which is the rate of activity of active offenders.[5]   As Blumstein and Graddy (1982) make clear[6], racial differences in participation rates may be very different than the racial differences in frequency rates.  For example, African Americans may have the same probability of at least one arrest as whites, but a different frequency of arrest than whites.[7]  Therefore, it is important to use statistics that do not conflate frequency with participation in the search for a valid estimate of the probability that an individual will have at least one arrest in his or her lifetime.

9. Dr. Bendick claims that the ideal data – individuals' lifetime arrest records – are "not systematically available." (Initial Report, ¶ 18).  He then asserts, without citation, that "[i]n their absence, researchers typically analyze racial and ethnic patterns of arrest by comparing the demographic characteristics of persons

---

[5] Blumstein, A., J. Cohen, J. Roth, and C.A. Visher (eds.) *Criminal Careers and "Career Criminals"* (1986) Report of the National Academy of Sciences Panel on Research on Criminal Careers; Washington, D.C.: National Academy Press. Vol. 1, p. 12.

[6] Blumstein, A. and E. Graddy (1982). "Prevalence and Recidivism in Index Arrests: A Feedback Model" *Law & Society Review*, 16:2:265-290. Blumstein and Graddy (1982) sometimes refer to frequency as incidence. Later criminologists have mainly used the term frequency rather than incidence.

[7] For example, African Americans may have a higher recidivism rate than do whites.  P. Gendreau, T. Little, C. Goggin (1996). A Meta-Analysis Of The Predictors Of Adult Offender Recidivism: What Works! Criminology 34:4:575-608.  See page 583.

arrested to the demographic characteristics of the arrest-relevant population."
(Initial Report, ¶ 19). Dr. Bendick therefore reports estimates using annual totals
of the aggregate number of all arrests of individuals who were either African
American or non-African American in 2010 from the F.B.I.'s Uniform Crime
Report. He then compares the racial make-up of total arrests with the racial
make-up of the population. (Bendick Table 2, Initial Report at 15).

10. Counts of arrests are the combination of the number of people who have been
arrested in prior years, and individuals for whom this was their first arrest.
Counts of total arrests also include multiple arrests of the same person, which
will lead to "double," "triple," or even "quadruple"-counting with respect to repeat
offenders. But the number for people who were arrested in prior years, or those
arrested more than once in the given year, should not contribute to lifetime
participation rates, since those individuals are already participants. Without
lifetime data, it is not possible to distinguish between individuals who were
already arrestees and those who are not. Accordingly, Dr. Bendick's use of
annual estimates from aggregate arrest count data without some type of
adjustment for the probability that a person in the count already had a previous
arrest will conflate participation and frequency, and likely lead to misleading
conclusions regarding estimates of racial disparity. I demonstrate this possibility
in Section IV using arrest counts from the NLSY97. I believe that the use of
annual counts of arrests in the U.S. is a poor substitute for the desired statistic:
the percentage of the U.S. population with at least one arrest.

11. I also believe that Dr. Bendick's assertion that researchers interested in racial differences in the percentage of the U.S. population who have an arrest record "typically" resort to annual counts of arrest from the F.B.I. is incorrect. (Initial Report, ¶ 19). There is a strong tradition of research in criminology which uses statistics on cohorts[8] and artificial cohorts[9] to create estimates of the lifetime probability of at least one arrest precisely because of concerns about conflating prevalence and frequency. In a well-known example (Christensen 1967), Christensen created a method by which he generated credible estimates of the percentage of the U.S. population with a criminal arrest record from the type of annual count data reported by the F.B.I. and used by Dr. Bendick.[10] Similar techniques have been used more recently to create estimates of the lifetime prevalence of incarceration and felony conviction.[11] Therefore, I do not agree that criminologists readily accept annual counts of arrest as an appropriate proxy for the percentage of the U.S. population which has an arrest record.

12. I also do not agree that data does not exist which more closely approximates the desired "ideal." (Initial Report, ¶ 18). Since 1997, the U.S. Bureau of Labor Statistics, as part of the National Longitudinal Survey of Youth, has annually collected information on criminal involvement (among other topics) from a

---

[8] Wolfgang, M. 1983. "Delinquency in two birth cohorts." *American Behavioral Scientist* 27: 75-86.

[9] Blumstein ,A. and E. Graddy (1982) ibid, Tillman, R. (1987). The Size of the Criminal Population: The Prevalence and Incidence of Adult Arrest. *Criminology* 25: 3: 561-580.

[10] Christensen, R. (1967). Projected percentage of U.S. population with criminal arrest and conviction records. In Institute for Defense Analysis (ed.), Task Force Report: Science and Technology (pp.216-228). Washington, D.C.; U.S. Government Printing Office. The paper shows that the gender comparison using lifetime estimates differ systematically from gender comparisons using annual counts.

[11] Bonczar, T. P. (2003). Prevalence of Imprisonment in the U. S. Population, 1974-2001.Washington, D.C.: U.S. Department of Justice.: Pettit, B. & Western, B. (2004). Mass imprisonment and the life course: Race and class inequality in U.S. incarceration. *American Sociological Review*, 69, 151-169. Manza, J. and C. Uggen. (2006). *Locked Out: Felon Disenfranchisement and American Democracy*. New York: Oxford University Press.

nationally representative sample of youth (the "NLSY97"). There are currently 15 rounds or waves of data available for analysis by researchers. Wave 15 was collected in 2011. In each "wave," individuals were asked if they had been arrested since the date of last interview.[12] This question allows researchers to estimate the percentage of the sample that experiences at least one arrest during their time in the sample. Brame, Turner, Paternoster and Bushway (2012)[13] were the first to use this dataset to generate an estimate of the probability that someone will have an arrest by a given age. Brame et al. (2012) found that 30% of Americans have at least one arrest by the time they turned age 23. This number was higher than the previous estimate of 22% reported by Christensen (1967), who used official record data from the F.B.I. Brame et al. (2012) discusses the issue of missing data in the NLSY97, which arises when people who are originally in the sample in Round 1 do not respond in every subsequent round, which raises questions about the possibility that attrition will create a non-representative sample. However, as documented in Moore et al. (2000), the

---

[12] The "arrested-since-date-of-last-interview" question is named YSAQ-441. The question reads as follows "Since the date of last interview on [date of last interview], have you been arrested by the police or taken into custody for an illegal or delinquent offense (do not include arrests for minor traffic violations)?" There has been extensive research on the best way to collect valid self-report data from respondents on questions about crime. *See* for example papers by Tourangeau, R. & Smith, T. W. (1996). Asking Sensitive Questions: The Impact of Data Collection Mode, Question Format, and Question Context. Public Opinion Quarterly, 60(2), 275-304; and Turner, C. F., Ku, L., Rogers, S. M., Lindberg, L. D., Pleck, J. H., & Sonenstein, F. L. (1998). Adolescent Sexual Behavior, Drug Use, and Violence: Increased Reporting with Computer Survey Technology. Science, 280(5365), 867-873. doi: 10.1126/science.280.5365.867. NLSY97 uses interviewer administration of responses for most of the questions. However, for sensitive questions such as involvement in delinquency or sexual behavior, respondents in NLSY97 answer the question without letting the interviewer know the response. Respondents listen to the questions through a headset followed by direct administration of answers into a computer. This approach has been shown to lead to valid responses on these types of sensitive questions. (https://www.nlsinfo.org/content/cohorts/nlsy97/intro-to-the-sample/interview-methods/page/0/0/#interviewproc ).

[13] Brame, Robert; Michael Turner, Raymond Paternoster and Shawn Bushway. (2012). "Cumulative Prevalence of Arrest from Ages 8-23 in a National Sample." Pediatrics 129:1:21-27.

BLS has done an excellent job of attracting and retaining subjects, such that the sample is comparable to other nationally representative datasets. I conduct sensitivity analysis to test how these results are affected by missing data.[14] In this report, I examined the NLSY97 data from Wave 1 through Wave 15. (The NLSY97 data utilized people born in 1980 through 1984). From this, I determined whether members of the sample had at least one arrest by the time they turned 26.[15] All data in this analysis are publically available from the U.S. Bureau of Labor Statistics ("BLS"). I use the self-weighting cross-sectional sample

13. According to the NLSY97 dataset, there were 6,748 first round respondents, including 1,106 African American respondents, and 5,642 non-African American respondents. There were also 921 Hispanic respondents and 4,746 non-African American/non-Hispanic respondents. For convenience, I will refer to these latter respondents as white. I was able to categorize the arrest record by the time the cohort turned 26 using data through Wave 15 for 89.5% of these respondents,

---

[14] Missing data is also a problem in the aggregate data used by Dr. Bendick, because every police agency does not report arrests in each year. Dr. Bendick relies on the missing data analysis conducted by the Bureau of Justice Statistics. He does not assess whether his results are sensitive to the assumptions made by the Bureau of Justice Statistics about the nature of the missing data.

[15] This data allows me to estimate the percentage of people who have at least one arrest by age 26. According to data I requested from the Census Bureau (see table below), the median age of the sample that took the non-supervisory test (D267) was approximately 42 as of 9/30/10. Ideally, I would have data until at least age 42. However, because arrest activities peak in the late teens and early 20's, (Christensen 1967, Tillman 1987), I am confident that I have captured the majority of people who will have at least one arrest by age 42. Moreover, there is no reason to believe that racial differences in the rate at which individuals acquire records between the ages of 26 and 42 is different than the rate at which they acquire records before age 26. I will present information later in the report showing that the rate at which people acquire first arrests from ages 20 to 26 (in their twenties) does not differ by race.

| SEX | Below 18 | 18-19 | 20-29 | 30-39 | 40-49 | 50-59 | 60-69 | 70 and abc | Total |
|---|---|---|---|---|---|---|---|---|---|
| M | 231 | 49,774 | 512,549 | 267,873 | 265,271 | 295,096 | 228,385 | 109,670 | 1,728,849 |
| F | 263 | 45,608 | 537,977 | 379,504 | 430,611 | 436,487 | 246,862 | 80,760 | 2,158,072 |
| Total | 494 | 95,382 | 1,050,526 | 647,377 | 695,882 | 731,583 | 475,247 | 190,430 | 3,886,921 |
| Cumulative | | 95,876 | 1,146,402 | 1,793,779 | 2,489,661 | 3,221,244 | 3,696,491 | 3,886,921 | |

leading to an analysis sample of 6,037 respondents.[16]  There are 5,030 respondents for the white versus Hispanic comparisons.

14. Dr. Bendick presents estimates of African American arrests and non-African American arrests in Table 2 of his report (Initial Report at 15).  Because of the nature of the data he used, he was not able to differentiate between African Americans and Hispanics.  Although the NLSY97 can distinguish between these groups, in the interest of replication, Table 1 below includes my analysis of the number of African American and non-African American respondents who reported at least one arrest by the time they turned 26.

15. The NLSY cross-sectional household sample is based on a self-weighting design which leads to valid point and interval estimates.  Due to clustering, the standard error estimated under the assumption of simple random sampling will be too small.  The Moore *et al.* 2000 Technical Report discussed this issue, and suggests adjusting results for clustering using design effects.  Therefore, I used a standard error design effect multiplier of 1.22 to account for clustering.[17]

---

[16]  For the remaining 10.5% of the cases, I was not able to definitively determine whether or not they had at least one arrest by the time they were 26.  This is because there is missing data from the respondent, usually because the respondent did not answer questions from the BLS during a given wave.  Brame *et al.* (2012) spend considerable time addressing the issue of how missing data could affect the conclusion.  In general, the fewer assumptions one is willing to make about the nature of the missing data, the wider the uncertainty bounds around each estimate.  When there is more uncertainty around each estimate, it is more difficult to claim that any two estimates are different from each other.

[17]  I used the mean DEFT (the square root of the design effect) for the binary variables in the sample, as reported on p. 95 , row 1 of TABLE 5.49 of Moore et al. (2000).  All standard errors have been multiplied by 1.22.

**Table 1**

**Probability of at Least One Arrest by Age 26 for NLSY97 Sample in 2009/10, by Race and Ethnicity**

| # | Race | N Respondents | N with at least 1 arrest | % w/ at least 1 arrest by age 26 | 95% C.I. | Z statistic (Between Minority and Non Minority Groups) |
|---|------|---------------|--------------------------|----------------------------------|----------|--------------------------------------------------------|
| 1 | Non-African American | 5,007 | 1,651 | 33.0% | {31.4%,34.6%} | -2.48* (Row 1 vs. Row 2) |
| 2 | African American | 1,030 | 390 | 37.9% | {34.3%,41.5%} | |
| 3 | Total | 6,069 | 2,041 | 33.8% | {32.4%,35.3%} | |
| | | | | | | |
| 4 | White | 4,196 | 1,373 | 32.7% | {31.0%,34.5%} | -.777 (Row 4 vs. Row 5) |
| 5 | Hispanic | 834 | 287 | 34.4% | {30.5%,38.3%} | |
| 6 | Total | 5,030 | 1,660 | 33.0% | {31.4%,34.6%} | |

*Significant at conventional .05 level with missing at random assumption

16. In sum, 33% of non-African Americans report at least one arrest by age 26. By comparison, 37.9% of African Americans report at least one arrest by the time they turn age 26 in the NLSY97. The difference is of modest size (4.9 percentage points, or a 13% difference). This result is statistically significant at the 5% level. However, this conclusion is dependent on the assumptions one is willing to make about the nature of the missing data. The 37.9% to 33% numbers are valid if one is willing to assume that the individuals whom I am not able to categorize (missing) using the NLSY97 are identical to the people whom I am able to categorize. This is a strong assumption. Under less stringent

11

assumptions about the nature of the missing data, detailed in the footnote herein, this result is not statistically significant.[18]

17. Dr. Bendick used his estimates of racial disparity to generate an estimate of the rate at which African Americans in the U.S. population will receive a thirty-day letter by the U.S. Census Bureau. I can also use my estimates for a similar calculation. As noted, I found that 37.9% of African American 26 year olds in the NLSY97 have a criminal history record, and 62.1% did not. This means that 62.1% of the African American applicants did not receive a 30-day letter, assuming the application pool looks like the nationally representative sample from the NLSY97. I also found that that 33% of non-African American 26 year olds in the NLSY97 have a criminal history record, which means that 67% of the non-African American applicants did not receive a 30-day letter. The ratio of these two rates (62.1/67) is 92.7%, meaning that I predict that all other things being equal,[19] African Americans would not receive 30 day letters at a rate that is 92.7% that of non-African Americans. This ratio is higher than the standard of

---

[18] Because of non-response, I am unable to identify the arrest status of 11.3% of the non-African American sample and 6.9% of the African American sample. If, following Brame et al. (2012), I assume that all of these uncertain respondents were arrested, 40.5% of the Non-African Americans would have an arrest by age 26, and 42.1% of the African American sample would have an arrest by age 26. In contrast, if I assume that none of the missing people had an arrest, 29.3% of the non-African Americans would have an arrest, and 35.3% of the African Americans would have an arrest. This creates missing bounds of {29.3% to 40.5%} for non-African Americans, and {35.3% to 42.1%} for African Americans. These bounds clearly overlap, which means that for some types of differential non response by race, it is possible that African Americans have fewer people with at least one arrest than do the non-African American sample. For example, suppose that all of the missing non-African Americans have an arrest, and none of the missing African Americans have an arrest. These assumptions would imply that 40.5% of non-African Americans have at least one arrest, and 35.3% of African Americans have at least one arrest. This is unlikely to be true, but even with more plausible assumptions, the differences between African Americans and non-African Americans is much smaller than the difference that exists when we assume that all missing respondents are equally likely to be missing, regardless of race. As a result, a conservative stance would be state that there is no difference by race (see Brame et al. 2012).

[19] That is, the prospective applicant must be eligible for hire, meaning that Local Census Office requirements such as test score, geography, citizenship, availability to work, ability to drive (required in some areas) and so forth, were also met.

80% proposed by the E.E.O.C. and advocated by Dr. Bendick.  The ratio is also much higher than the very low estimate of 16.7% presented by Dr. Bendick on page 7 of his second supplemental declaration.

18. Dr. Bendick was not able to generate nationally representative estimates for Hispanics, and instead cobbled together an "average estimate" from 18 different estimates from different samples, none of which were nationally representative. By contrast, the NLSY97 allows me to identify a nationally representative sample of Hispanics.  I generated estimates for whites (non-Hispanic, non-African American) and Hispanic respondents in rows 4-6 of Table 1.  According to my estimates, 32.7% of the white respondents had at least one arrest by age 26, and 34.4% of the Hispanic respondents had at least one arrest by age 26.  This difference is smaller than the difference reported for African Americans and non-African Americans (1.7 percentage points or 4.5%).  This difference is not statistically significant at the 5% level even when I am willing to make the strong assumption that the non-respondents are identical to respondents.

19. Thus, I estimate that 67.3% of whites and 65.6% of Hispanics would not receive a 30 day letter.[20]  This produces a ratio of 97.5, meaning that Hispanics will not receive 30 day letters at a rate that is 97.5% that of whites.  This is substantially higher than the 80% guidance provided by the E.E.O.C. and advocated by Dr. Bendick.  It is also higher than the estimate of 71.1% presented by Dr. Bendick on page 7 of his second supplemental declaration.  I therefore conclude that there is no evidence of a difference in the probability that Hispanics and non-

---

[20] Again, assuming all other things being equal, meaning that the applicant is otherwise eligible for hire pursuant to the Local Census Office's particular requirements.

Hispanics will have at least one arrest by age 26 and thus there is no basis for the conclusion that the use of arrest records will lead to the hiring of fewer Hispanics relative to whites.

## IV.   Comparing My Results with Dr. Bendick's Results

21. In his initial declaration, Dr. Bendick compared the representation of African Americans and whites among all arrests in 2010 with the representation of African Americans and whites in the overall U.S. population in 2010.  In his Table 2 (Initial Report at 15), Dr. Bendick concludes that African Americans are over-represented in the arrest population by a factor of 2.3 to 1, and whites are under-estimated in the arrest population by a factor of .9 to 1.

22.  I believe my results from Table 1 are more directly responsive to the question being asked in this case than the over-representation ratios presented by Dr. Bendick.  However, in this section I transform my results from Table 1 into the same format presented by Dr. Bendick to make the two sets of results directly comparable.  Specifically, in Table 2, I report the relative representation of the different groups in the overall NLSY97 sample (column "e"), and in the NLSY97 sample with at least one arrest by age 26 (column "c").  This allows me to compare the proportional representation of a group in the overall population versus the population of people with at least one arrest by age 26.  I then calculate the ratio of the two numbers in column "f", and report the comparable number from Dr. Bendick's report in column "g".

23. In row 1, I report the ratios for non-African Americans, and in row 2, I report the results for African Americans.  The disproportionate representation among those

14

with at least one arrest is .97 to 1 for non-African Americans, and 1.17 to 1 for African Americans. Non-African Americans are slightly under-represented among those with at least one arrest and African Americans are over-represented among those with at least one arrest. The relative ratio of the two groups is 1.21. These numbers are much smaller than the same numbers Dr. Bendick advances. For example, Dr. Bendick reports that African American arrests are disproportionately represented among arrests relative to the representation of African Americans in the U.S. population by a ratio of 2.3 to 1, and the relative ratio of the two groups is 2.5 to 1. My estimate is less than half the size of the estimate from Dr. Bendick. I believe the difference comes from the fact that Dr. Bendick is mistakenly looking at the racial disparity in annual aggregate counts of arrests, instead of the lifetime probability that the respondent will have at least one arrest, as I have discussed.

24. In row 4, I report the proportion of the sample with at least 1 arrest who are white and the proportion of the NLSY97 sample who are white. The answers are nearly identical (82.7 vs. 83.7), which means there is no disproportionality for whites (.99). There are slightly more Hispanics in the population of people with at least 1 arrest (17.3%) compared to the overall population (16.3%). This creates an over representation in the population with at least one arrest of 1.07 to 1, and ethnic disproportionality of 1.09. This result is much smaller than the "conservative"[21] estimate of 1.7 to 1 reported by Dr. Bendick.

---

[21] Bendick Initial Report, Paragraph 30.

15

**Table 2**

**Representation, by Race and Ethnicity, in Overall NLSY97 Sample, and in the Sample of People with at Least One Arrest by Age 26.**

| # | Race | At Least 1 Arrest by Age 26 | | NLSY97 Sample (1st wave) | | Ratio of Column c to Column e | Dr. Bendick's Estimate |
|---|---|---|---|---|---|---|---|
| | | # | % | # | % | | |
| | (a) | (b) | (c) | (d) | (e) | (f) | (g) |
| 1 | Non African American | 1,651 | 80.9% | 5,642 | 83.6% | .97 to 1 | .9 to 1 |
| 2 | African American | 390 | 19.1% | 1,106 | 16.4% | 1.17 to 1 | 2.3 to 1 |
| 3 | Total | 2,041 | 100% | 6,748 | 100% | Row 2/Row 1 1.21 to 1 | Row 2/Row 1 2.5 to 1 |
| | | | | | | | |
| 4 | White | 1,373 | 82.7% | 4,746 | 83.7% | .99 to 1 | -- |
| 5 | Hispanic | 287 | 17.3% | 921 | 16.3% | 1.06 to 1 | -- |
| 6 | Total | 1,660 | 100% | 5,667 | 100% | Row 5/Row4 1.08 to 1 | 1.7 to 1 |

25. It is reasonable to ask why the two analyses produce such different results. I believe the main reason is the quality of the data in each report. I used a nationally representative longitudinal survey. Dr. Bendick used the number of arrests reported by police through the Uniform Crime Reporting Program. I am studying an individual at a fixed age and asking whether they have an arrest record, using data that was collected prospectively over a 15 year period. Dr. Bendick is simply counting the aggregate number of arrests in the U.S. in a given

16

year. His method does not take into account the fact that many people can—and do—accumulate many arrests in a given year and over their lifetimes. Dr. Bendick's use of counts confounds frequency with participation. Not only is my data closer to the "ideal" data that Dr. Bendick admits would produce an accurate result, but I believe my results demonstrate that Dr. Bendick's approach inflates any existing disparity. [22]

26. To make this point more concrete, I utilized one wave of data from the NLSY97 (Wave 13, collected primarily in 2009) to illustrate how the use of annual counts of arrests will generate an estimate of the disparity between racial groups that is larger than what I saw with the same data when I estimated the probability that members of the sample will have an arrest record. I counted the number of arrests reported by people still in the sample for this one wave. I then calculated the percent of the total number of arrests accounted for by the members of the group. For example, in column "c" of row 1, I calculated the percent of all arrests in Wave 13 that are accounted for by African Americans (26.3%). In column "e", I then calculated the percent of the population in Wave 13 who are African American (17.1%). The ratio of these two numbers is reported in column "f". For African Americans in Wave 13, the racial disproportionality in the number of arrests is 1.54 to 1 and the ratio for non-African Americans is .89 to 1, for a

_____

[22] An alternative—but highly unlikely—possibility is that the difference stems from the fact that the NLSY data currently only allows one to generate an estimate up to age 26. If, for example, individuals of different racial groups were to accumulate their first or "virgin" arrest at a varying (and different) rate over the life course, then it is possible that the data at age 26 will differ from the data at age 40, the data at age 60, and so on. But I am not aware of any literature which supports this conclusion. Nevertheless, to test this idea, I recalculated all of the statistics for the sample at age 20. Not surprisingly, the sample has a lower probability of acquiring one arrest by age 20. For example, 22.8% of the sample had at least one arrest by age 20, while the number is 33.8% by age 26, an almost 50% increase. But, the disproportionate representation of African Americans in the sample with at least 1 arrest at age 20 is 1.18 to 1, nearly identical to the rate of 1.17 to 1 reported in Table 2 for the age 26 sample. Based on this evidence, I see no reason to believe that the ratio will change dramatically after age 26.

relative ratio of 1.73 to 1. By comparison, the relative ratio I report in Table 2 for the probability that someone will have an arrest record by age 26 is 1.21 to 1 for African Americans relative to non-African Americans. The ratio in Table 3 below for Hispanics versus whites using counts of arrests in one wave is 1.2 to 1, which again, is higher than the rate reported in Table 2 using the data from the longitudinal sample (1.08 to 1).

27. In Section III, I set out to replicate the results of Dr. Bendick's report using a data source, the NLSY97, which I believe has many of the features of the "ideal" data source identified by Dr. Bendick for this question (the data are collected by a U.S. government statistical agency, cumulative over a lifetime, and the data allows for estimates of participation and frequency). As I have stated, I believe that the NLSY97 provides more appropriate data than the annual counts of arrest utilized by Dr. Bendick. In this section, I converted my results into the same form as reported by Dr. Bendick, and provide a side-by-side comparison of the estimated disproportionality. For both African Americans and Hispanics, my estimates are substantially smaller than the estimates provided by Dr. Bendick. In each case, I find that—all other eligibility requirements being equal—minorities will be receive 30 day letters from Census at a ratio relative to whites that is higher than the 80% E.E.O.C. guidance advocated by Dr. Bendick, while Dr. Bendick reports numbers that are substantially lower than the 80% standard. In Table 3, I tested Dr. Bendick's method by analyzing the difference between estimates from the NLSY97 data generated using total counts of arrest in Wave 13 only, and my earlier, preferred estimates. I use Wave 13 because it was collected in 2009 and

18

2010, the same period during which the U.S. Census Bureau was making temporary hires for the 2010 Census. As I predicted, the racial disproportionality identified when I use counts of arrest is higher than when I use measures of the number of people with at least one arrest, indicating that Dr. Bendick's method over-exaggerates racial disproportionality in the estimate of interest.

28. The primary reason for this difference is that minorities in Wave 13 report a higher frequency of arrests, conditional on reporting at least one arrest. For example, 41 African Americans report a total of 74 arrests (1.81 arrests per person) while 140 non-African Americans report 207 arrests (1.48 arrests per person). This racial difference in the number of arrests per arrestee, while interesting, is not relevant to the discussion about the racial differences in the probability that an individual will have at least one arrest, because Dr. Bendick's focus is on the 30-day letter, which was triggered by matching a rap sheet to an individual with as little as one arrest (Initial Report, ¶ 40). Based on this analysis, I conclude that Dr. Bendick's failure to focus on the probability that an individual has at least one arrest—in favor of aggregate counts of arrests—leads him to overestimate the amount of racial disparity that actually exists in the percentage of the population which has at least one arrest.

**Table 3**

**Representation by Race and Ethnicity, in the Overall NLSY97 Sample and the Number of Arrests in Wave 13**

| # | Race | Number of Arrests in Wave 13 | | NLSY97 Sample (13th wave) | | Ratio of Column c to Column e |
|---|------|------|------|------|------|------|
| | | # | % | # | % | |
| | (a) | (b) | (c) | (d) | (e) | (f) |
| 1 | African American | 74 | 26.3% | 954 | 17.1% | 1.54 to 1 |
| 2 | Non African American | 207 | 73.7% | 4,618 | 82.9% | .89 to 1 |
| 3 | Total | 281 | 100% | 5,572 | 100% | Row 1/Row 2 1.73 to 1 |
| | | | | | | |
| 4 | Hispanic | 40 | 19.3% | 773 | 16.7% | 1.16 to 1 |
| 5 | White | 167 | 80.7% | 3,868 | 83.3% | .97 to 1 |
| 6 | Total | 207 | 100% | 4,641 | 100% | Row 4/Row 5 1.2 |

## V.    Dr. Bendick's Over-Estimate of the Number of African Americans With An Arrest Record

29. On page 2 of Dr. Bendick's second supplemental declaration, he concludes that 12.5% of the applicants for Census jobs are African American and 43.1% of the criminal history records (from a sample of 1,500 drawn from the overall pool of all records) were for African Americans.  He uses these numbers to conclude that there is a substantial disproportionality in the rate at which African Americans have arrest records.

20

30. On page 8 of his second supplemental declaration, he states that 849,125 "30 day letters" were sent to job applicants. Using the same logic as applied by Dr. Bendick on page 8, Dr. Bendick's numbers imply that 365,973 African Americans received a "30 day letter" (43.1% of the total number of 30 day letters). Since a person needs at least one arrest to receive this letter, it is reasonable to believe that that 365,973 of the African American applicants have at least one arrest. According to page 2 of Declaration of Maria Kozhevnikova, there were 3,949,268 applicants for temporary Census jobs. As noted, Dr. Bendick has concluded that 12.5% of the applicants were African American, meaning that he believes that there were 493,659 African American applicants (.125 x 3,949,268). With these two numbers from Dr. Bendick's declarations, I can generate an estimate for the probability that an African American applicant for a temporary job at the U.S. Census Bureau in 2010 will have at least one arrest. That estimate is 74.1% (365,973 / 493,659). In other words, the numbers provided in Dr. Bendick's declarations lead directly to the conclusion that 74.1% of the African American applicants to the U.S. Census Bureau had a criminal history record, meaning that they had at least one arrest.

31. Based on my familiarity with the criminology literature, I believe that this estimate of the percentage of African Americans who have an arrest record is simply not credible. In my own analysis using the NLSY97 data, I calculated the probability that African Americans would have at least one arrest by age 26 to be 37.9%. In order for Dr. Bendick's estimates to be correct, my estimate would have to increase from 37.9% to 74.1% (a 36.2 percentage points increase or a 97.6%

21

increase) as the sample ages past 26.  Based on data provided by the Census Bureau (*see* footnote 15) the median age for an applicant is approximately age 42.  An increase of 36.2 percentage points requires one to assume that the number of people with at least one arrest would have to almost double from age 26 to age 42.  Based on the pattern in the data, I do not believe that this is realistic.

32. For example, another way to think about this question is to "age up" my sample using previous estimates.  In Figure J7 on page 222 of Christensen (1967), Christensen provides the curve estimating the percent of the U.S. population of men that has at least one arrest by a given age, from age 10 to 80.  During the period from age 25 to age 40, the rate for males increases from approximately 35% to 45%, a total increase of 28.6%.  When I apply that same 28.6 percent increase to my estimate of 37.9% by age 26, I get an estimate of 48.7% by age 40, an estimate that is far lower than the estimate of 74.1% that I generated based on the information provided by Dr. Bendick in his second supplemental report.

33. Another factor to consider in evaluating Dr. Bendick's estimate is the gender mix of the applicant pool.  According to data I requested from the Census Bureau, (*see* footnote 15), 55% of the applicant pool consisted of women.  It is well-known among criminologists that women are arrested less often than men.[23]  My estimates were based on an NLSY97 sample that was 48.7% women, and the prevalence estimate would be lower if the population of interest was 55%

---

[23] Snyder, Howard (2012).  Arrest in the United States 1990-2010. Bureau of Justice Statistics, Office of Justice Programs, U.S. Department of Justice, Washington D.C. NCJ 239423.

women.  Moreover, the racial differences in arrests would be different if one took into account gender and race simultaneously.  In the next section, I examine this phenomenon by redoing the analysis from Section III by race/ethnicity and gender.

## VI.   Differences in the Estimates of the Probability of at Least One Arrest Between Males and Females, by Race and Ethnicity

34. Dr. Bendick's analysis ignores critical differences in arrests by gender.  Racial differences in the probability of possessing an arrest record need not be identical for men and women, and it is possible that the racial differences for men are different than the racial differences for women.  In what follows, I replicate my analysis from Section III for racial groups broken down by gender and race/ethnicity.  In Section III, I used Dr. Bendick's racial and ethnic categories in an attempt to replicate his estimates using the NLSY97.[24]  In this section, I make full use of the racial and ethnic information in the NLSY97 to identify African Americans, Hispanics and whites (non African American, non Hispanic) as three separate and distinct groups:

**Table 4**
**Probability of at Least One Arrest by Age 26 for NLSY97 Sample, by Gender and Race**

| # | Race | Gender | N Resp. | N with at least 1 arrest | % w/ at least 1 arrest by age 26 | 95% C.I. | Z statistic (rel. to White) |
|---|------|--------|---------|--------------------------|----------------------------------|----------|------------------------------|
| 1 | White[a] | F | 2,012 | 452 | 22.5% | {20.2%,24.7%} | -- |
| 2 | Hispanic | F | 407 | 76 | 18.7% | {14.1%,23.3%} | -1.38 |
| 3 | African American | F | 505 | 108 | 21.4% | {17.0%,25.7%} | -.43 |
| 4 | Total | F | 2,924 | 636 | 21.8% | {19.9%,23.6%} | -- |
| | | | | | | | |
| 5 | White[a] | M | 2,184 | 921 | 42.2% | {39.6%,44.7%} · | -- |

---

[24] Because of the data that he used, Dr. Bendick was not able to distinguish between arrests of Hispanic African Americans, and non-Hispanic African Americans.  The NLSY97 allows for this distinction, and I take advantage of this fact in this section.

| 6 | Hispanic | M | 427 | 211 | 49.4% | {43.6%,55.2%} | 2.26* |
|---|---|---|---|---|---|---|---|
| 7 | African American | M | 502 | 273 | 54.4% | {49.1%,59.7%} | 4.07* |
| 8 | Total | M | 3,113 | 1,405 | 45.1% | {43.0%,47.3%} | -- |
| | | | | | | | |
| 9 | Total | Both | 6,037 | 2,041 | 33.8% | {32.4%,35.3%} | -- |

[a] White is non-Hispanic, non-African American respondents. *Significant at conventional .05 level

35. Table 4 includes my estimates of the number of respondents in each race/gender category who report at least one arrest by the time they turn 26. The results in rows 1-4 present the comparison of results by race for females. The results are striking. According to this analysis, white women are actually more likely to have at least one non-traffic arrest by the time they turn age 26 than are Hispanic and African American women (22.5% vs. 18.7% and 21.4%).[25] The differences are substantively small and not statistically significant. The result is clear and unambiguous – there is no difference across racial/ethnic groups in the chance of having at least one arrest by age 26 for women. On the basis of this evidence, I conclude that there is no basis for the conclusion that more African American or Hispanic women would have been sent 30-day letters by the Census Bureau.

36. The results in rows 5-8 present the comparison of results by race/ethnicity for males. Unlike the situation with females, minority men are more likely to have at least one arrest than white men, and the differences are larger than the differences in Table 1. This makes sense, since Table 1 combines the estimates for men and women, and Table 4 shows that women have no differences.

37. Among men, whites have the lowest probability of having at least one arrest, at 42.2%, by age 26, which is almost twice the rate of white women. By comparison, the same number for Hispanic men is 49.4% (7.2 percentage points or 17.2% higher than white men). This difference is statistically different than the

[25] As in Table 1, these estimates assume that non-respondents in the NLSY97 are missing at random.

24

estimate for white males at standard levels (.05).[26]  The result showing no significant difference between Hispanics and whites in Table 1 was driven by the similarities between white and Hispanic women.  Once I focus only on men, the ethnic differences between whites and Hispanics become larger, and significant.

38. In terms of magnitude, I find that 50.6% of Hispanic men will not be sent a thirty day letter if the application pool looks like the U.S. population.  I find that 57.8% of white males will not receive a thirty day letter if the application pool looks like the U.S. population.  The ratio of these two rates (50.6/57.8) is 87.5%, meaning that I predict that, all other things being equal,[27] Hispanic males will make it past the thirty day letter stage at a rate that is 87.5% that of white males.  This is greater than the 80% guidance advocated by Dr. Bendick.

39. In row 7, I report my estimate that 54.4% of the sample of African American men has at least one non-traffic arrest by age 26, which is 12.2 percentage points and 29% higher than the rate for white males.  This difference is substantively meaningful and statistically significant at the .05 level.[28]  In terms of magnitude, I find that 45.6% of African American men will not receive a thirty day letter if the application pool looks like the U.S. population.  The ratio of this rate with the rate of white males (45.6/57.8) is 78.9%, which is just under the 80% standard

---

[26] Because the result is close, assumptions about the missing data could be meaningful here.  Accounting for the ambiguity caused by missing data in the manner of Brame et al. (2012) will lead to wider bounds and a conclusion of non-significance. Manski, C. F. (2003).  Partial Identification of Probability Distributions. New York: Springer-Verlag.

[27] That is, the prospective applicant must be eligible for hire, meaning that Local Census Office requirements such as test scores, geography, citizenship, availability to work, ability to drive (required in some areas) and so forth, were also met.

[28] This difference is large enough such that it is not reliant on any one set of assumptions about the nature of the missing data in the NLSY97.

advocated by Dr. Bendick. However, it is my understanding that none of the plaintiffs are African American males.

40. Table 4 makes clear that racial and ethnic differences in the probability that individuals will have an arrest record are concentrated among men. Dr. Bendick's analysis did not differentiate to account for this effect. Indeed, the annual arrest counts he relied on are not broken down by both race and gender.[29] In contrast, the NLSY97 allows me to provide nationally representative estimates of the percentage of the population that will have at least one arrest by age 26 for both men and women, by race and ethnic group. Accordingly, as in Section IV, in this section I conclude that Dr. Bendick's reliance on annual arrest counts leads to misleading results.

Respectfully submitted,

October 28, 2013
Albany, New York

Dr. Shawn D. Bushway

---

[29] Researchers can study men vs. women, or African American vs. non- African American, but not both simultaneously (*e.g.* Snyder 2012).