# Exhibit A

**EXPERT REPORT OF DR. KATHLEEN K. LUNDQUIST**

**in**

*Houser et al. v. Blank*
**(SD NY Case No. 10-cv-3105)**

**June 28, 2013**

**APT*Metrics, Inc.***
**One Thorndal Circle**
**Darien, CT 06820**
**(203) 655-7779**

**EXPERT REPORT OF DR. KATHLEEN K. LUNDQUIST**
in

*Houser et al. v. Blank*

I was retained by counsel for the plaintiffs to provide expert analysis and opinions in the case of *Houser et al. v. Blank* (SD NY Case No. 10-cv-3105). This report analyzes the policies, procedures, and criteria used to perform criminal background screening of job applicants for temporary positions with the Census Bureau in the conduct of the 2010 United States Decennial Census ("2010 Census"). Specifically, I was asked to examine whether the Census Bureau's development and use of criminal background checks is consistent with professional standards and federal guidelines concerning the validity and appropriate use of employee selection procedures.

**EXECUTIVE SUMMARY**

At issue in this case is discrimination against African Americans and Hispanics in the use of criteria for and implementation of criminal background checks to screen out job applicants for three 2010 Census temporary positions (address canvasser, enumerator, and clerk).

I reviewed the criminal background check process used by the Census Bureau and also conducted original research to examine the job-relatedness of the criteria used by the Census Bureau.[1]

---

[1] I conducted focus groups with a multidisciplinary panel to independently establish what the criminal background exclusions should have been relative to the job requirements for the three Census positions. The results indicated that over one-quarter of the Census Bureau's exclusionary crimes were not job-related, and over 80% of those that were job-related used exclusionary time periods that were too long (i.e., overly stringent) relative to the job requirements, exacerbating adverse impact. See attached technical report "Validation of 2010 U.S. Census Temporary Employee Criminal Background Check Adjudication Criteria."

1

The criminal background check process used by the Census Bureau consisted of checking the applicant against the FBI's database of criminal records, gathering additional information from the candidate, as needed, (i.e., 30-Day Letter, fingerprints, More letter) and applying *adjudication criteria* to the criminal history information to determine whether the candidate would be excluded from further consideration in the selection process. Approximately 800,000 applicants were diverted to the process which required further information from the candidate before they could be evaluated one way or the other to proceed in the selection process.

The criminal background check process was complex and changed over time: There were six different sets of standards applied to applicants' criminal backgrounds (depending on the timeframe), different standards were applied to the same job (depending on the timeframe), the same standards were applied to different jobs, and the process involved numerous steps.  This is symptomatic of a development process that was not rigorous; the complexity and implementation of the criminal background check process introduced significant issues concerning reliability, validity, and adverse impact.  In addition, the Census Bureau did not investigate and/or did not implement less adverse alternatives as required by the *Uniform Guidelines*.

One of the major steps in the Census Bureau's process was the "30-Day Letter," which an applicant received if his or her identifying information yielded one or more tentative matches in the FBI's criminal history database.  Generally, the 30-Day Letter asked applicants to submit "OFFICIAL COURT documentation for any and all arrests and/or convictions in your past."  If an applicant disputed his or her identification in the FBI database, the applicant could

2

obtain and submit fingerprint cards to prove that he or she was incorrectly matched to an arrest or conviction record.  Unfortunately, the applicant was not informed of the nature or location of the crime(s) which produced the tentative/partial match in the FBI database, leading to confusion and delay in the process such that applicants missed the unreasonable deadlines imposed by the Census Bureau to exonerate himself or herself.  Once matched to a record in the FBI database, correctly or incorrectly, less than 10% of applicants ever moved beyond this step to receive a final determination of hiring eligibility, and less than 1% would actually be made eligible for hire.  Although the issuance of the letter itself was not a formal decision point in the selection process, the *de facto* impact of the 30-Day Letter was to essentially 'screen-out' over 800,000 applicants.

The 30-Day Letter placed significant logistical, cost, and time burdens on applicants, many of whom had no relevant criminal convictions whatsoever.  Applicants were flagged based on what were sometimes partial (i.e., unreliable) matches to an FBI database that the Census Bureau admits was substantially incomplete.  A number of applicants were diverted based on arrests, rather than convictions, as the FBI database often did not include dispositions of the arrest record.  Further, some candidates were diverted to the 30-Day Letter process for a large number of crimes that would not have failed the Census Bureau's screening criteria; these applicants were diverted for no justifiable or job-related reason.

These issues were compounded by the fact that the process required candidates to submit "OFFICIAL COURT documentation" within a 30-day period, which the Census Bureau concedes may not have been sufficient to obtain the requested documentation.  Consequently, applicants were unjustifiably ensnared in a process that was problematic (i.e., unreliable and

3

not job-related) in the best case, and, in the worst case, impossible to comply with. This raises serious concerns about the reliability and validity of the criminal background check process more broadly because a very large proportion of applicants were screened out by a process in which actual criminal behavior was never assessed.

The methods used to develop the criminal background check screening criteria were not systematic or consistent with legal guidelines and did not meet professional standards concerning the design and development of procedures used to make hiring decisions.  The Census Bureau staff who created the criminal background check criteria lacked relevant training and experience, did not utilize a process even loosely resembling a validation study, and could not recall how the exclusionary time periods for the various crimes were derived.

In addition, there was no meaningful awareness of or consideration given to the potential for adverse impact, and certainly no consideration whatsoever of equally valid, less adverse alternatives relative to the criteria that were used to screen candidates. The adverse impact associated with criminal background checks was completely foreseeable given published statistics on arrests and convictions and the Equal Employment Opportunity Commission's guidance (1990, 2012) on criminal background checks.  Hiring eligibility decisions were also based on arrests rather than convictions for dozens of crimes without any supporting evidence that the alleged conduct actually occurred.

Finally, I compared the Census Bureau's approach for retrieving criminal histories to services provided by private firms for other employers in both the public and private sectors. My review indicated that use of a private firm to execute the criminal history search likely would have resulted in a more reliable and job-related process for a number of reasons:

4

- Such firms focus on conviction records rather than arrest records;

- The actual criminal records which are the basis for excluding a candidate are shared with the candidate and a dispute resolution process is available to the candidate;

- The disproportionate burden on African American and Hispanic applicants for producing exonerating information would have largely been eliminated because these firms retrieve court records themselves, and

- It would have likely been feasible for one or several firms in concert to handle the applicant volumes and timing requirements of the Census Bureau.

Based on my findings, it is my professional opinion that the criminal background check process used for the address canvasser, enumerator and clerk temporary jobs for the 2010 Census lacked sufficient reliability and validity to be considered job-related. Moreover, the lack of validation and disregard for adverse impact and less adverse alternatives is inconsistent with federal regulatory guidelines and accepted professional practices.

**BACKGROUND & INVESTIGATION**

**Professional Experience**

I am an Industrial/Organizational Psychologist currently employed as President and CEO of APT*Metrics*, Inc., in Darien, Connecticut. My work experience over the past 30 years has been in the areas of Industrial Psychology and Psychometrics, focusing on such areas as the analysis of job content and job requirements, the validation of employee selection procedures, and the design of related human resource processes. I have been a Fellow with the Psychological

5

Corporation, a Summer Research Fellow with the Educational Testing Service (ETS), and a Research Associate with the National Academy of Sciences.

Throughout my professional career, I have extensively researched, designed, and conducted statistical analyses and provided consultation in the areas of job analysis, test validation, performance appraisal, and research design. I have performed consulting work in these areas for major corporations in the banking, financial services, technology, retail, electronics, aerospace, pharmaceutical, telecommunications, and electric utility industries, as well as for federal, state, and local agencies and not-for-profit organizations. I am licensed as a psychologist in the State of Connecticut. My qualifications are set forth in my curriculum vita, which is attached to this report as Attachment A.

I have consulted with both plaintiffs' and defendants' counsel in employment discrimination cases and have testified as an expert witness in numerous such cases. I have served as an expert on selection procedure validation for both the U.S. Department of Labor and the U.S. Department of Justice, and have served as a member of the expert panel on work analysis and assessment for the U.S. Department of Labor's National Skill Standards Board, chairing its Endorsement Review Panel. I have also presented invited testimony to the U.S. Equal Employment Opportunity Commission concerning the state of the art in selection procedure development. Most recently, I have been appointed by the U.S. State Department to serve a three-year term as a member of the Examiner's Board for the Foreign Service.

I have also served or am currently serving as a court-appointed expert to help carry out the provisions of consent decrees in employment discrimination class actions involving

Abercrombie & Fitch, Bank of America, Dell, the FBI, Ford, Kodak, Morgan Stanley, and Sodexo, and I previously served for five years as a court-appointed expert in The Coca-Cola Company class action employment discrimination settlement. My role in these settlements has included reviewing and modifying where necessary the company's human resources practices, including the company's approach to selection, promotion, and compensation. A list of cases in which I have testified at trial or in deposition in the last four years is also contained in Attachment A.

.I have been assisted in this work by Drs. Joshua Sacco, Jessica Keeney, Toni Locklear, and David Coole, Industrial Psychologists employed by APT*Metrics*.

**Investigation and Documents Reviewed**

The data and documents I reviewed to form my opinions in this case are listed in Attachment B.  I reviewed information produced by the parties in this case relevant to the criminal background check procedures and criteria developed and implemented by the Census Bureau.  I also reviewed the depositions (and associated exhibits) of current and retired U.S. Census Bureau employees who were involved in aspects of the 2010 Census operations that in some way concerned criminal background checks.  In addition, I reviewed the depositions (and associated exhibits) of the plaintiffs in this case. I also relied on the professional and scientific literature in forming my opinions, listed in Attachment C.

7

**OVERVIEW OF THE US CENSUS BUREAU AND THE 2010 DECENNIAL CENSUS**

Every ten years the U.S. Census Bureau counts (or "enumerates") every resident in the United States.  All residents receive a form in the mail or a visit from an *enumerator*. Residents are asked to answer a few questions about themselves and their households, such as: name, sex, age, race, ethnicity, relationship to the person who owns or rents the residence, and whether the housing unit is owned or rented.

The Decennial Census is mandated by the Constitution and was designed to determine the number of seats each state has in the U.S. House of Representatives. As such, an accurate count is critical to ensuring a representative government. The Census is important for other purposes as well, including government program funding.  Census data are also commonly relied upon by businesses, media, students and teachers, charities, and researchers.

A Decennial Census was conducted, and completed (as required) in 2010.  Given the importance of the Decennial Census, substantial effort is devoted to obtaining quality data and maintaining the integrity of that data.  The mission statement of the U.S. Census Bureau is:

> *The Census Bureau serves as the leading source of quality data about the nation's people and economy. We honor privacy, protect confidentiality, share our expertise globally, and conduct our work openly.  We are guided on this mission by our strong and capable workforce, our readiness to innovate, and our abiding commitment to our customers.*

The Census Bureau undertakes a number of operations that depend on temporary staff to collect the information it needs.  One such operation is *address canvassing*, a field operation that ensures the Census Bureau's address list and maps are as accurate as possible. During

8

address canvassing, census workers travel each street, road, and path looking for living quarters, updating the information in a hand-held computer.

Most households that receive census questionnaires return them by mail; however, there are millions of addresses from which no return mail is received. Non-responses to the census questionnaire can result for a variety of reasons (e.g., because the address is vacant, no longer exists, or the occupants have simply not completed the questionnaire). The *non-response follow-up* operation is conducted to collect information on these housing units.  The non-responding addresses are visited by census workers who determine the status of each address in their assignment and complete a questionnaire for each address.  The Census Bureau also conducts operations designed to count harder-to-reach populations, such as those living in areas affected by natural disasters, rural areas with non-city style addresses, group quarters (e.g., nursing homes, correction facilities), military quarters, and homeless shelters. Census workers visit these locations, distribute questionnaires, and in some cases interview respondents on location.

**U.S. Census Bureau Temporary Jobs**

The Census Bureau relied on temporary employees for a significant part of its Decennial Census operations due to the significant need for staff during a short, defined time period every ten years.  These temporary employees were hired for three distinct roles during the 2010 Census operations.  The key job responsibilities required for each of these three roles are presented in Table 1.

The first role is that of an *address canvasser*, a role which was used relatively early in the Census field operations.  Address canvassers are responsible for ensuring that the Census has

9

an accurate listing of physical addresses to which Census questionnaires will be sent.  After initial training, address canvassers are sent out to confirm existing addresses or add new addresses to the Census' master database of physical addresses.  This is accomplished by going to specific locations and entering information into a hand-held electronic device that is specifically designed for recording GPS coordinates.  At times, the address canvassers may have to knock on doors to verify addresses or the number of housing units located at a particular address.[2]  There were approximately 150,000-160,000 address canvassers hired during the 2010 Census (Mesenbourg Deposition, p. 19).

The second role is a non-response follow-up enumerator (also sometimes referred to as an *enumerator* in the depositions and exhibits).  This role exists during the non-response follow-up phase of the Census operations, which is designed to collect responses from people who did not respond to the Census questionnaires delivered by mail.  The enumerator role involves the following responsibilities: locating listed households, contacting the residents in person (e.g., by knocking on doors or ringing doorbells) or via phone, explaining the purpose of the Census, conducting interviews with household members or other knowledgeable people such as neighbors (via phone, outside the residence, or inside the residence if invited inside), and accurately recording the information provided.  There were approximately 550,000 enumerators hired in the 2010 Census.[3]

---

[2] The evidence in the record is contradictory on this point.  For instance, the Acting Director of the Census Bureau indicated "…there should have been no reason why they had to knock on anyone's door to do that…they would get to the front of the housing unit, hit the clicker, and they were done…" (Mesenbourg Deposition, p. 24).  In contrast, a Los Angeles Regional Director indicated that address canvassers knocked on doors to verify addresses (Christy Deposition, p. 188).

[3] This approximation was obtained by subtracting 150,000 address canvassers (Mesenbourg Deposition, p. 19) from 700,000 (an approximation of a number reported in the Kozhevnikova Declaration, Table 2).

The third role, that of *clerk*, was used throughout the 2010 Census operations.  Clerks were located in Local Census Offices (LCOs) throughout the U.S., and performed administrative duties such as: preparing assignment sheets, checking address lists, data entry, routine clerical tasks, maintaining records and files, scheduling, and providing administrative assistance in the hiring process and testing job applicants.  The clerks also had access to personnel records, including social security numbers. There were approximately 74,000 clerks involved in the 2010 Census (Kozhevnikova Declaration, Table 2).

**Criminal Background Checks Used by the Census Bureau**

The hiring strategy of the Census Bureau for the 2010 Census was to hire individuals currently living in the neighborhoods in which they would be working, so that they would be familiar with the area and representative of the population (Mesenbourg Deposition, p. 26). The Census Bureau used criminal background checks for these positions to minimize the risks posed by applicants with a criminal history.

**The Census Criminal Background Check Process**

The criminal background check process used by the Census Bureau consisted of checking the applicant's identifying information against the FBI's database of criminal records, gathering additional information from the candidate, as needed (i.e., 30-Day Letter, fingerprints, More Letter), and applying adjudication criteria to the criminal history information to determine whether the candidate would be excluded from further consideration in the selection process.  An overview of this process is presented in the figure below:[4]

---

[4]  A more detailed description of this process is presented in Figure 1.



The Census Bureau electronically submitted each applicant's name, social security number (SSN), and date of birth[5] (DOB) (e.g., Hamilton Deposition, p.178) to the FBI's criminal history database ("FBI database").   The FBI queried its database with the identifying information submitted for each candidate, and  electronically sent the Census Bureau the 'rap sheets' (i.e.,  individual arrests and/or conviction records) for applicants found in the database, based on a complete or partial match to the identifying information.  Due to the difficulty of obtaining exact matches, multiple rap sheets could be returned for a given candidate, for example, due to common names and/or missing information (Christy Deposition, p. 75).

---

[5] Other sources indicate that additional criteria such as gender (e.g., Mesenbourg Deposition, p. 65) and place of birth (Brown Deposition, p.25) were also used.

When the FBI identified at least one rap sheet for a candidate, the candidate was diverted out of the normal selection process into a criminal background check process. The Census Bureau screened the rap sheets matched to each of the applicants to determine whether some (if any) actually related to the applicant in question by comparing information on the rap sheet to information in the application, such as SSN, name, and DOB. Then the Census Bureau adjudicators used *name check adjudication criteria* to determine whether to request additional clarifying information from the applicant (Bettwy Deposition, pp. 104-105). If, however, the arrest records were complete and unambiguous, the adjudicators could make a hiring eligibility determination.

The mechanism for requesting the additional information from applicants was commonly referred to as the "30-Day Letter." Though there were several versions of the 30-Day Letter, the variations were relatively minor for the purposes of my evaluation (one example is presented in Exhibit 1). As can be seen in the exhibit, the letter informs the applicant that there was a tentative match against the FBI database. The applicant is then given two options:

- If the applicant did not dispute his or her identification in the criminal database, he or she was asked to provide "OFFICIAL COURT documentation on any and all arrest(s) and/or conviction(s) in your past" (Bettwy Exhibit 9, USA43538; capitals in original).

- Alternatively, the applicant could provide his or her fingerprints to the Census Bureau, which would allow the FBI to definitively match the applicant to a single record in its database (if a match exists). This required the applicant to call the Census Bureau to request a fingerprint card, take that card to a police station to obtain a set of fingerprints (which would typically entail a non-reimbursable cost to the applicant), and return those fingerprints to the Census Bureau. The

version of the letter in Exhibit 1 also indicates that "if you send a fingerprint card that shows a match with the criminal history record in question, and you did not provide the requested court documentation, you will be made ineligible for hire" (Bettwy, Exhibit 9 USA43539; Patterson Deposition, p. 208).[6]

As the name implies, applicants had 30 days to provide the documentation requested in the 30-Day Letter to the Census Bureau,[7] or they would be deemed ineligible for hire. An additional version of the 30-Day Letter, one that was implemented in late May 2010, informed applicants that most temporary jobs were already filled (Mesenbourg Exhibit 4 USA43540).

It is important to note that applicants were not informed of the actual records returned by the match against the FBI database. That is, the applicants were not provided with any specific information about the nature, timing, or location of the potentially matched arrest records; they only received the general information provided in the 30-Day Letter itself, (i.e., that a tentative match had been made in the FBI database). In addition, Census Bureau staff did not provide any information to applicants who might have inquired about the records that triggered the match (Mesenbourg Deposition, pp. 185-187). The non-response rate to the 30-Day Letter was approximately 92% (Mesenbourg Exhibit 5 USA43541).

Once the applicant provided the requested information, one of four outcomes was possible: the applicant was deemed either eligible or ineligible for hire (based on a comparison of the applicant's rap sheet to the adjudication criteria), the applicant could be deemed ineligible for hire after submitting a fingerprint card, or the applicant was sent a "More Letter,"

---

[6] This statement was not included in an earlier version of the 30-Day Letter (Bettwy Exhibit 9, USA43538). Note that this version of the letter was implemented in January 2010, which means it would have been sent to a very large proportion of the overall population of 30-Day Letter recipients. This is pertinent to the degree of burden placed on applicants, which is discussed in later sections of this report.

[7] A 15-day grace period was applied (Patterson Deposition p. 150) although it does not appear that applicants were informed of this grace period.

requesting additional information.  The request for more information would occur when there was no disposition for a given arrest on the applicant's rap sheet, or if additional information was needed (e.g., due to ambiguity about whether a conviction was for a felony or misdemeanor; Brown Exhibit 3 USA5362; also, Patterson Deposition p. 211-212).  These More Letters were customized to the individual applicant's circumstances (e.g., asking for three character references or employment history, depending on the circumstances).  Two examples of More Letters are provided in Exhibit 2. The More Letter generally required the applicant to respond within 15 days (Patterson Deposition, p. 232).

Another mechanism for receiving a 30-Day Letter was to self-admit to having a criminal background on the job application form.[8]  This happened if the applicant responded affirmatively to either question 28 or 29 below, taken from the job application:

> 28. **During the last 10 years, have you been convicted, been imprisoned, been on probation, or been on parole?** (Includes felonies, firearms or explosives violations, misdemeanors, and all other offenses).  If "YES", use Item 32 to provide date, explanation of the violation, place of occurrence, and the name and address of the police department or court involved.
>
> 29. Are you **now** under charges for **any** violation of law? If "YES", use Item 32 to provide date, explanation of the violation, place of occurrence, and the name and address of the police department or court involved.

The application also indicated:

> **When answering questions 28 through 31 you may omit:** 1) traffic fines of $300 or less; 2) any violation of law committed before your 16th birthday; 3) any violation of law committed before your 18th birthday if finally decided in juvenile court or under a Youth Offender law; 4) any conviction set aside under Federal Youth

---

[8] This policy started in January, 2010, for non-response follow-up enumerator hiring (Mesenbourg Exhibit 3 USA43539, Mesenbourg Deposition pp. 115-116); earlier versions of the 30-Day Letter were not triggered based solely on self-admit information.

> Corrections Act or similar state law, and 5) any other conviction for which the record was expunged under Federal or state law. **NOTE**: you must include convictions resulting from a plea of nolo contendere (no contest).
>
> **Important note about questions 28 through 31.**  We will consider the date, facts, and circumstances of each event you list. In most cases you can still be considered for Federal jobs.  However, if you fail to tell the truth or fail to list all relevant events, this failure may be grounds for not hiring you, for firing you after you begin work, or for criminal prosecution [18 U. S. C. 1001]….
>
> (Mesenbourg Deposition, p. 61; Mesenbourg Exhibit 1 USA5597; bold and capitalization from original)

Candidates who self-admitted to a criminal history were sent a 30-Day Letter to obtain further information.  Such candidates were also screened through the FBI database.

**Adjudication Criteria**

Once the applicant submitted the documentation requested by the 30-Day Letter, adjudicators then applied *adjudication criteria* to determine whether the candidate was eligible to be hired based on the criminal history detailed in the rap sheets.  The adjudication criteria were similar, but not identical to, the criteria used to evaluate candidates at the name check adjudication phase described previously (Brown Deposition, p. 56; Brown Exhibit 3 USA5278), though it is not clear why the criteria were different (Brown Deposition, p. 59).  Based on a comparison between the materials provided by the applicant and the adjudication criteria, the applicant would be deemed eligible or ineligible for hire, or would be sent a More Letter (described above). These decisions were reviewed by a second-level adjudicator (i.e., a supervisor), using the same standards as the initial adjudicator (Bettwy Deposition, pp. 95-96).

There were six different versions of the adjudication criteria used at various points in time; versions 1 through 3 and 4 through 6 were most similar to each other.  Attachment D

16

presents the first version of the adjudication criteria as an example, and Table 2 summarizes the differences across the versions.  Different versions of the adjudication criteria coincided with hiring activity for the three temporary jobs: versions 1 - 3 were mainly applied to address canvassers, versions 4 – 6 mainly to enumerators, and all versions to clerks.

Of the 854,454 applicants who received a 30-Day Letter, only 104,740 (12%) received a final eligibility determination, and of those, 52,370 (6% of the total) reached the second-level determination (Bettwy Exhibit 6, USA43541).  Of this last group, less than 200 were actually hired based on an adjudication decision (as opposed to a misidentification; Kozhevnikova Declaration, Table 1).

**FRAMEWORK FOR EVALUATING CRIMINAL BACKGROUND CHECK PROCEDURES**

Professionally-developed selection procedures serve a legitimate business purpose; specifically, they allow employers to base hiring and promotion decisions on solid, job-related information. Job-related or "valid" procedures are designed to predict which applicants will be able to successfully perform the job. Assessing an applicant's skills or suitability for a position requires a procedure that measures the person's behavior reliably (i.e., consistently and free from extraneous influences) and validly (i.e., measures those things that are most important to the job).

While most selection procedures are designed to determine which applicants will be better-performing employees, some selection procedures are specifically designed to screen-out applicants who are unsuitable for the job (e.g., medical or psychological evaluations or possession of required licenses).  Criminal background checks are designed to screen-out applicants who pose a risk.  That is, the intention of criminal background checks is to identify

17

unsuitable applicants (i.e., from a job performance and/or safety perspective, broadly) and eliminate those applicants from the hiring process (Society for Human Resource Management; SHRM, 2012).

According to a recent SHRM survey (2012), the overwhelming majority of employers use criminal background checks to screen at least some of their employees.  Besides compliance with state regulations, employers cite the need to conduct criminal background checks to reduce legal liability for negligent hiring, to ensure a safe work environment, and to prevent criminal activity.   In certain fields such as financial services or pharmacy jobs, regulatory requirements often mandate background screening of job applicants.[9]

**Professional and Legal Standards**

Professional and legal standards provide a framework for how federal agencies (and often courts) determine the proper use and job relatedness of selection procedures, including:

- The *Principles for the Validation and Use of Employee Selection Procedures* (1987, 2003) authored by the Society for Industrial and Organizational Psychology ("SIOP Principles");

- the *Standards for Educational and Psychological Tests* (1985, 1999) published by the American Psychological Association et al. ("APA Standards"), and

- the federal *Uniform Guidelines on Employee Selection Procedures* ("Uniform Guidelines") (EEOC et al., 1978).

---

[9] Sources: http://www.fdic.gov/regulations/laws/safe/check.html and http://codes.ohio.gov/oac/4729-4-04

18

Additionally, the federal Equal Employment Opportunity Commission (EEOC) has provided guidance for employers specific to the use of criminal background checks (EEOC, 1987, 1990 & 2012). These standards and guidelines articulate several key concepts in evaluating selection procedures:

- **Adverse impact.** The *Uniform Guidelines* (EEOC, 1978) require employers to evaluate the relative impact of a selection procedure on the employment opportunities of racial, ethnic, and gender minorities. The *Guidelines* define adverse impact as practically significant differences in the passing rates of majority and minority groups on a test or other selection procedure (§1607.4). If a selection procedure is found to have adverse impact, then evidence of its job relatedness (typically through a validation study) is required to justify its use. Employers are expected to maintain applicant flow data to determine if the selection procedure has an adverse impact on minorities; however, both the *Guidelines* (§1607.4D) and the EEOC's (2012) guidance on the use of arrest and conviction records indicate that federal enforcement agencies may infer adverse impact based on other relevant information (e.g., conviction data, labor market statistics, impact of the selection procedure when used elsewhere under similar circumstances) when applicant data is not maintained. As will be discussed below, the EEOC (2012) has presented national data that establish criminal record exclusions are expected to have adverse impact based on race and national origin, particularly for African Americans and Hispanics.

19

- **Validity.** According to the *Uniform Guidelines*, selection procedures must be validated if they have adverse impact when used as a basis for any employment decision (§1607.3). Validation is an empirical process for establishing whether a selection procedure provides meaningful information for predicting future job performance to ensure that such inferences are accurate and job-related. As explained in the *APA Standards*,

  > Validity is … the most fundamental consideration in developing and validating tests. The process of validation involves accumulating evidence to provide a sound scientific basis for the proposed score interpretations (1999, p. 9).

  In this case, the interpretation of interest is whether candidates who engaged in the exclusionary conduct identified by the Census Bureau's criminal background check procedures will present a risk to public safety, data integrity, or effective job performance. Thus, if the evidence shows that the criminal background check procedures identify criminal conduct related to the job, inferences about safe and effective job performance based on the background check procedures would be justified. If the evidence, however, demonstrates that the criminal background check procedures do not measure criminal conduct related to the job, then inferences about safe and effective job performance based on the background check procedures would not be justified (Binning & Barrett, 1989; Guion, 1991; Schmitt & Landy, 1993; *SIOP Principles*, 2003).

- **Reliability.** A selection procedure cannot be valid if it is not also reliable (Pedazhur & Schmelkin, 1991). For a selection procedure to be valid or job-

20

related, it must first be reliable or relatively free from measurement error. Measurement error is produced by factors that influence candidates' scores, but are unrelated to the attributes being measured by the selection procedure (Guion, 1998; Horst, 1968; Lord & Novick, 1968). Reliability refers to whether a selection procedure measures whatever it is measuring consistently (e.g., Crocker & Algina, 1986; Murphy & Davidshofer, 1998). To ensure reliability, there must be standardization in the execution of the selection procedure, including, for example, the way specific criteria are used to evaluate the candidate (Conway, Jako, & Goodman, 1995; Guion, 1998; Campion, Palmer, & Campion, 1997) to minimize the extent to which extraneous factors impact the results. If the evidence shows that the selection procedure measures characteristics needed to perform critical and important aspects of the jobs — and the characteristics are measured reliably — predictions about job performance based on the selection procedure are justified (Tenopyr, 1977). Without reliability, interpretations about job performance are undermined since the selection procedure's results were contaminated by factors unrelated to the candidates' ability to perform the job. Hence, a selection procedure must be BOTH reliable and valid to be job-related.

- **Validity must be demonstrated, not just asserted.** It is important to note that an organization's subjective judgment that a selection procedure measures important job attributes is insufficient to establish job-relatedness.

> Any claim of validity made for a selection procedure should be documented **with appropriate research evidence** built on the principles discussed in this document. Promotional literature or testimonial statements should not be used as evidence of validity (SIOP *Principles*, 2003, p.4, emphasis added).
>
> Under no circumstances will the general reputation of a test or other selection procedures, its author or publisher, or casual reports of its validity be accepted in lieu of evidence of validity. Specifically ruled out are…nonempirical or anecdotal accounts of selection practices or selection outcomes (*Uniform Guidelines* §1607.9, 1978).

Instead, validity must be demonstrated explicitly for the jobs in question.

- **Less adverse alternatives.** Under the *Uniform Guidelines*, an employer is expected to consider alternatives with equivalent validity and select the alternative that will achieve its objectives with the least adverse impact (§1607.3b). This includes a consideration of alternate procedures (e.g., using a different selection process, which in this situation could mean using a different set of criminal history exclusion criteria or a different method of implementing the background check process), as well as alternate methods of using scores on the identified selection procedure (e.g., in the case of background investigations, reducing the amount of time since a criminal offense occurred as an exclusionary criterion).

**EEOC Guidance**

The EEOC has issued a number of policy statements and guidance on the use of criminal history screens (1987, 1990 & 2012).  In the 2012 guidance, the EEOC cites national statistics

showing that racial minorities have substantially higher arrest rates than non-minorities, leading to a presumption of adverse impact in the use of criminal records screens.

There is considerable data supporting these racial differences in criminal histories. According to Bureau of Justice Statistics (BJS; Snyder & Mulako-Wangota 2013), between 2000 and 2010, Blacks were arrested at a rate averaging 2.4 times the rate of Whites[10].  Other BJS statistics based on data from the 75 largest counties in 2006 (Cohen & Kyckelhahn, 2006) indicate that Blacks and Hispanics outnumber Non-Hispanic White felony defendants relative to their representation in the population at a rate of  7.5 and 3.1, respectively.[11]  In addition, the Federal Justice Statistical Tables indicated that for a sample of approximately 60,000 convicted offenders for a one-year period from 2005-2006, 48% of convicted offenders were Hispanic, almost triple their representation in the overall population.[12]  Relatedly, 2009 BJS data (West, Sabol, & Greenman, 2009) indicates that Hispanics had a federal and state imprisonment rate 2.5 times that of Whites.  While these data are imperfect indicators of arrest or conviction rates for Hispanics (as data on Hispanics are often grouped with Whites), the data strongly suggest that Hispanics are arrested and convicted at a significantly higher rate than Whites.  The same general pattern of results is also reported by Dr. Bendick, a labor economist retained by the plaintiffs in this matter (Bendick Declaration, pp. 13 – 16, 18 – 22).  For the purposes of our

---

[10] The BJS indicates this data covered 77% of the U.S. population for that time period; however, it is important to note that Hispanics are included with Whites in this comparison, so this Black-White comparison is a conservative estimate of the Black-Non-Hispanic White comparison if Hispanics are arrested at a higher rate than Whites.

[11] These statistics were calculated by computing the Black, Hispanic, and Non-Hispanic White rates in the felony defendant population relative to these three groups' representation according to the 2010 Census (as reported at: http://quickfacts.census.gov/qfd/states/00000.html).  Then, both of the first two rates were divided by the third to yield the Black and Hispanic ratios relative to Non-Hispanic-Whites based on their representation in the overall population.  This is an inexact index of actual arrests or convictions because it only measures felony defendants in 2006 in the 75 largest counties.

[12] The 2010 Census indicated that 16.7% of the overall U.S. population was Hispanic (US Census State and County Quick Facts: http://quickfacts.census.gov/qfd/states/00000.html).

analyses, selection procedures that have statistically large subgroup differences are also likely to have adverse impact under most circumstances[13] (Newman, Jacobs, & Bartram, 2007; Sackett & Ellingson, 1997).

In accordance with the federal regulatory guidelines described above, employers can justify the use of criminal background procedures that demonstrate adverse impact if they are job related. In its guidance, the EEOC (2012) recommends two approaches for demonstrating job relatedness: validation of the criminal records screens using methods consistent with the *Uniform Guidelines* (if feasible) or use of a "targeted screen" which considers the following factors:

1. **Nature and Gravity of the Crime:**  indicated by the harm caused (e.g., property loss), the legal elements of the crime (e.g., knowledge, purpose), and/or classification as a felony or misdemeanor;

2. **Time Elapsed:**  the time that has passed since the offense or conduct and/or completion of the sentence; and

3. **Nature of the Job:**  job title, duties and essential functions, circumstances under which job is performed (e.g., level of supervision, direct contact with vulnerable populations), and environment in which duties are performed (e.g., office setting, private home).

---

[13] The degree of adverse impact is a function of the size of the subgroup difference and the cutoff used to make pass/fail decisions about job applicants.  In this context, the cutoff is directly related to how stringent the criteria were that was used to make decisions (i.e., the length of the exclusionary time period and the actual crimes that were considered exclusionary).

24

These three factors are known as the "Green factors" because they were first identified by the Eighth Circuit in *Green v. Missouri Pacific Railroad* (1977).

According to EEOC guidance, the appropriate length of time that should be considered when excluding applicants on the basis of a criminal conviction depends on the particular facts and circumstances of a case; research findings on recidivism may also inform the appropriate exclusionary period. A robust finding in the criminology research literature is that an individual's risk of re-offense or re-arrest peaks shortly after the initial arrest and then declines with time clean (Beck & Shipley, 1997; Kurlychek, Bushway, & Brame, 2011; Maltz, 1984). The highest probability of re-arrest is within the first three years after arrest or release, with the majority of rearrests occurring within one year (Beck & Shipley, 1997). Furthermore, studies have demonstrated that the risk of re-arrest eventually approximates that of a person in the general population or a person without a criminal record (Blumstein & Nakamura, 2009; Kurlychek, Brame, & Bushway, 2007). In other words, there is a point in time after a person commits a crime at which he or she poses no greater risk than the general public. Kurlychek, Brame, and Bushway (2006; 2007) found that this length of time is about six or seven years.

Employers may be able to use aspects of research studies like these to inform reasonable exclusionary periods. Blumstein and Nakamura's (2009; 2012) research, for example, shows that the time period it takes for the risk levels of offenders and non-offenders to converge depends on the type of crime, with violent offenders requiring a longer time period to reach redemption than non-violent offenders. Importantly, Blumstein and Nakamura's (2012) estimates of redemption time are calculated based on the likelihood of repeating the

*same type* (as opposed to any type) of crime, which permits prediction of potentially *job-related* offenses.

### Arrest vs. Conviction Records

EEOC guidance (1990; 2012) bars employers from using arrest records alone to make employment decisions.[14] The crime databases often used to conduct criminal background checks contain inaccurate arrest information – roughly half of arrest records in the FBI database, for instance, are out-of-date or have missing dispositions (Rodriguez & Emselleum, 2011). Moreover, arrest records provide no proof that the underlying criminal conduct actually occurred.[15] Conviction records offer more reliable evidence of conduct due to more stringent evidentiary standards. While acknowledging that conviction records are also subject to some level of inaccuracy (e.g., multiple reporting of same incident, reporting expunged records), the EEOC condones their use granted employers conduct targeted screens and individualized assessments.

## EVALUATION OF CENSUS BUREAU'S CRIMINAL BACKGROUND CHECK PROCESS

The criminal background check process was complex and changed over time: there were six different sets of standards applied to applicants' criminal backgrounds (depending on the timeframe), different standards were applied to the same job (depending on the timeframe), the same standards were applied to different jobs, and the process involved numerous steps.

---

[14] The 2012 EEOC guidance states that "an employer may make an employment decision based on the conduct underlying the arrest if the conduct makes the individual unfit for the position in question. The conduct, not the arrest, is relevant for employment purposes." In other words, arrests do not establish that criminal conduct occurred, but may trigger an inquiry into the conduct underlying the arrest.

[15] For instance, the Bureau of Justice Statistics report cited earlier (Cohen & Kyckelhahn, 2006), indicated that 32% of felony defendants arraigned in state courts in the 75 largest counties did not result in a conviction.

26

This is symptomatic of a development process that was not rigorous; the complexity and implementation of the criminal background check process introduced significant issues concerning reliability, validity, and adverse impact.  In addition, the Census Bureau did not investigate and/or did not implement less adverse alternatives as required by the *Uniform Guidelines*.  These issues are discussed in the sections below, and are summarized in Table 3.

**Unreliability of the FBI Database**

The FBI database used by the Census Bureau was an unreliable indicator of actual criminal activity.  The inadequacy of the database for the way it was used by the Census Bureau is illustrated by the Attorney General's 2006 Report on Criminal History Background Checks (Mesenbourg Exhibit 24) which provides the following description of the FBI criminal database:

> The FBI maintains an automated database that integrates criminal history records, including arrest information and corresponding disposition information, submitted by state, local, and federal criminal justice agencies (p. 13)
>
> …[T]he FBI's [database] is not a complete national database of all criminal history records in the United States. **Many state records, whether from law enforcement agencies or courts, are not included or have not been updated.** For example, not all the state criminal history records or associated fingerprints meet the standards for inclusion…Because of inconsistent state reporting requirements, some criminal history records involve offenses that are not submitted to the FBI…many criminal history records may contain information regarding an arrest, but are missing the disposition of that arrest. Currently, **only 50 percent of…arrest records have final dispositions.** The records of more recent arrests, however, have a higher rate of completeness. (pp. 16-17, **emphasis added**)

The Census Bureau was aware that the FBI database was incomplete (e.g., Mesenbourg Deposition, p. 145, "the FBI information that came back we knew sometimes can be incomplete, sometimes can be incorrect, may show an arrest, but not a….disposition").

27

Moreover, the FBI database has a higher rate of missing dispositions for older records (Mesenbourg Exhibit 24, p. 17), which are exactly those that are likely to be (1) less job-related because the alleged conduct occurred less recently; and (2) problematic for applicants to obtain, because obtaining older court records could be very difficult (Groves Deposition, pp. 176-177) or impossible.

The use of the FBI database to match applicants to arrest records was the first major step in the criminal background check process.  Applicants whose information matched a record in the FBI database were channeled into the 30-Day Letter process. While these applicants were not definitively screened-out on the basis of a match to the database, they were effectively 'screened-off'; that is, approximately 1% or less would survive this process to be hired based on a misidentification or a review of their actual criminal backgrounds (Kozhevnikova Declaration, Table 1).

**30-Day Letter: Burden on Applicants, and Adverse Impact and Validity Implications**

As described earlier, the next step in the process involved sending a 30-Day Letter to applicants based on complete or partial matches.  The 30-Day Letter was a problematic aspect of the screening process for a number of reasons.

First, the letters placed the burden of obtaining official court records or fingerprint cards on the applicants themselves, rather than having the Census Bureau assume responsibility for gathering such criminal background information.  That is, applicants were made responsible for obtaining official court documents, and this would have occurred (mainly due to missing dispositions in the FBI database) even in situations where charges were dismissed or the applicant was found not guilty of any charges.

28

To ensure further consideration in the selection process, applicants were required to pay to obtain the relevant documents and/or to have law enforcement complete a fingerprint card, a non-reimbursed cost.  Such applicant cost expenditures are likely to disproportionately impact minority groups such as African Americans and Hispanics who are more likely to be economically disadvantaged.   Email correspondence between Census Bureau employees indicated they perceived there to be a "high cost to applicants to pay law enforcement…" (Vitrano Exhibit 19; USA21196) to have their fingerprint cards completed.

Even more troubling from a validity standpoint, some applicants were entangled in the 30-Day Letter process for crimes that were not disqualifying under any circumstances.  For example, the name check adjudication criteria says "send a letter if the applicant has a single misdemeanor arrest within the last 3 years…with or without disposition information" (Brown Exhibit 3 USA5284; emphasis changed from original).  This means that an arrest for any of following minor crimes (17 misdemeanors) could trigger a 30-Day Letter, even though a single conviction for any of the crimes WOULD NOT EXCLUDE the applicant from being hired (Brown Exhibit 3 USA5284 & USA5332):

- drunk;
- drunk and disorderly;
- liquor law violation;
- infrequent use or possession of marijuana;
- possession of marijuana paraphernalia;
- possession of marijuana;
- bad check;
- infrequent, irregular but deliberate delinquency in meeting financial obligations;
- disorderly conduct;
- disturbing the peace;
- making a threat;
- resisting arrest;
- abusive language;

29

- unlawful assembly;
- vagrancy;
- loitering, or
- trespassing

A similar concern is that applicants were sent a 30-Day Letter for any felony **arrest** in the past 10 years; however, from January 2010 forward they were only disqualified for felony **convictions** (Brown Exhibit 3 USA5279; Mesenbourg Exhibits 17-19, 21-22).

Other versions of the name check adjudication criteria indicate the following situations that could also trigger a letter, even though they would not result in disqualification:

- any pattern of arrests (three or more) in the last 15 years;

- any arrest for violation of probation or failure to appear when there is no previous arrest shown within the last 10 years, and

-  any pattern of arrests for a set of 18 crimes irrespective of the disposition.

Similarly, self-admitting on the application to almost any conviction in the last 10 years would also yield a 30-Day Letter (under some timeframes; Patterson Deposition, p. 227), diverting an applicant into the 30-Day Letter process for a large number of crimes that would not necessarily be disqualifying.  However, less than 10% of these applicants would ultimately receive a final hiring determination, and less than approximately 1% would ever be made eligible for hire based on a misidentification or an adjudication of their actual criminal history (Kozhevnikova Declaration, Table 1).  Further, the training for the name check adjudication criteria prominently indicated, "when in doubt, send a letter" (e.g., Mesenbourg Exhibit 15, USA12164; Patterson Deposition, p. 123), which would seem to contribute to an overly broad

30-Day Letter net.[16] Hence, applicants were diverted into a process from which they would be very unlikely to survive as viable job candidates based on inaccurate or invalid criteria.  In part, this low survival rate is also likely attributable to the amount of time required for the adjudication process, which was stated to be six weeks or longer (USA60676).[17,18]  This is consistent with the notion that the process "…is designed to…exclude applicants if there is even a possibility they have a criminal history" (emphasis added, USA60675).

Once diverted to the 30-Day Letter process, it would have been difficult or impossible for applicants to produce the required documentation for the adjudication process within the time frame permitted.  Failure to produce the documentation in the required timeframe eliminated the applicant from further consideration for the jobs.  Various Census Bureau officials acknowledged it could be difficult for applicants to obtain official court documents within the required timeframes.  For instance, the former Director of the Census Bureau, Dr. Groves, said he agreed that "it could well be a real problem for applicants who had an FBI hit that was 10 years old, for example, or 5 years old to get a certified copy of the disposition within 30 days" (Groves Deposition, pp. 176-177).  Despite the fact that the Census Bureau itself admitted the 30-day requirement could be a challenge, the Acting Director of the Bureau indicated that he did not consider changing the time limit (Mesenbourg Deposition, pp. 301),

---

[16] Similar instructions were provided to adjudicators regarding the More Letter (e.g., Mesenbourg Exhibit 18, USA12157); indeed, the Acting Director of the Census Bureau did not understand why that guidance would have been provided (Mesenbourg Deposition, p. 244).

[17] This document (Business Case Analysis, Census Hiring and Employee Check (CHEC) – Employment Credentialing Business Case and Implementation Support Project; USA60665 through USA60751) was received the evening of June 26, 2013; consequently, this discussion and all subsequent references to pages within this document are based on a preliminary analysis and may be addressed in a supplemental report, if one is issued.

[18] That is, due to the temporary nature of the jobs, at least some applicants who were channeled into the 30-Day Letter process would have been bypassed by other applicants whose applications did not have these associated delays.  The report indicates this would happen "[F]or most applicants…" (USA60676).  This is consistent with data indicating that applicants who received the 30-day letter had an average time from application to hire of 8.5 months vs. 4.2 months for those who did not (Kozhevnikova Declaration, Table 1).

was not aware of whether anybody determined how much time would actually be required to obtain court documents (also corroborated in Patterson Deposition pp. 150-151; pp. 156-157), and indicated he did not know whether that information would even be important to know (pp. 189).[19]    Similarly, the head of the Census Hiring and Employment Check (CHEC) office, which administered the background check process, indicated that she knew the non-response rate to the 30-Day Letter was approximately 93% in 2000, that she was not aware of anybody who had looked into this issue, and that she did not believe it was a problem (Patterson Deposition, p. 127-128; pp. 137-138).

The inability to obtain court documentation within the required timeframes puts applicants who may have a non-disqualifying criminal background at a considerable disadvantage.  Given that African Americans and Hispanics are considerably more likely to be matched to the FBI database (through correct or incorrect matches), the challenges in obtaining court documents within the requisite timeframe is likely to disproportionately impact these groups as well.

Other procedural or operational validity concerns also plagued the process.  Based on internal Census Bureau emails, many California applicants were unable to obtain fingerprint cards due to a "lack of availability of our paper process in California law enforcement which is totally electronic" (Vitrano Exhibit 19; USA21196).  Thus, a Los Angeles Census office offered free fingerprinting to applicants who were tentatively matched to criminal history records (Vitrano Exhibit 19; USA21196).   The inability of certain applicants to obtain fingerprint cards

---

[19] Similarly, Ms. Patterson provided "speculation" (Patterson Deposition p. 153) that people would simply keep these documents for future use.

makes the process of exoneration non-standard and can be expected to produce adverse impact, especially given that the population of California has a Hispanic population rate of more than twice the U.S. overall[20].

Any burdens placed on applicants due to the FBI matching process were described as having more impact on Hispanics by the Census Bureau's own admission, as this group was identified as having more common surnames than other ethnicities (Patterson Exhibit 20 USA21041). The fingerprinting machine was installed in the Los Angeles office at least in part because of "the high rate of background check failures of persons with Hispanic surnames in Los Angeles…" (Vitrano Exhibit 18, USA21171).  Further, the Census' decision to burden applicants with obtaining court documentation contributed to an unreliable criminal background check process.

In my professional opinion, the implementation of the 30-Day Letter in the criminal background check process eroded the extent to which the overall process yielded valid, job-related predictions concerning the likelihood of criminal or otherwise undesirable behavior on the job.  In particular, rather than accurately measuring criminal background, the process was contaminated by also measuring:

- applicants' ability to discern which court documents might be relevant without any specific direction, which could be problematic in certain situations where cases were sealed, dismissed, occurred as a juvenile, were not obviously arrests, or otherwise expunged;

---

[20] Source: http://quickfacts.census.gov/qfd/states/06000.html "State & County QuickFacts" [US Census Bureau]

- applicants' ability to obtain a paper-based fingerprint card in locales that do not provide such cards;

- applicants' ability and willingness to expend financial resources to obtain fingerprint cards and/or official court documents;

- applicants' ability to obtain court documents which may be unavailable, very old, located in distant locations, or otherwise difficult or impossible to obtain within 30 days, and

- applicants having a common name (which would result in more FBI database matches).

Most critically, all of these challenges were not equally imposed on all applicants, but merely on those whose identifying information resulted in a potential match in the FBI's incomplete criminal database.  In addition, a 2007 report indicated that 31.9% - 46.3% of matches in the FBI database were misidentifications, suggesting that hundreds of thousands of applicants were channeled into the 30-Day Letter process based on misidentifications.[21]  The report describing these results that was submitted to the Census Bureau indicated "it is understood that a high percentage of false positives (incorrectly associating an applicant with a criminal history record for another person) will occur, particularly in the case of common names" (USA60676), posing a "significant risk that qualified applicants will be erroneously denied employment" (USA60677). Given that African Americans and Hispanics are more likely to have criminal histories, it also follows that these two groups were more likely to be ensnared

---

[21] It is possible the false positive rate was different when hiring for the 2010 Census occurred, as these misidentification rates were reported in 2007 based on data from 1997-1998; the 2007 report suggested the rate for the decennial census may actually be higher (USA60677).

in the 30-Day Letter process,[22] and thus disproportionately disadvantaged as a result of how the Census implemented the criminal background check process.

**Disregard for Adverse Impact and Less Adverse Alternatives**

There is no evidence in the record indicating that the Census Bureau broadly investigated the adverse impact of its criminal background check process. In fact, race information was not gathered as part of the 2010 census application process even though the Census gathered such information in 1990 and 2000 for Decennial Census hiring (Jackson Deposition, p. 110); hence the Census Bureau could not directly evaluate the adverse impact of its background screening process in 2010. In addition, there seemed to be a general disregard for the completely foreseeable adverse impact that was caused by the criminal background process.

For instance, Ms. Patterson indicates she was "responsible in conjunction with management for ensuring that the Bureau did not intentionally violate any EEO policies" (Patterson Deposition, p. 60) concerning hiring for the 2010 Census (Patterson Deposition, p. 62); however, when asked directly about any concern for a disproportionate impact against African Americans and Hispanics, she indicated her role was to "administer the program to ensure the public safety and integrity" (Patterson Deposition, pp. 253-254). Similarly, Ms. Patterson also indicated that nobody within the office that designed and administered the criminal background check process (the CHEC office) was responsible for reviewing policies and procedures to ensure EEOC compliance (Patterson Deposition, pp. 62-64), and that she did not

---

[22] Dr. Bendick, Plaintiffs' labor economist, estimated the Hispanic-Other and African American-Other differences for representation in the 30-Day Letter process to be 260 and 501 standard deviation units, respectively (Bendick Declaration p. 26). Typically, anything larger than 2-3 standard deviations is considered statistically significant; the size of the difference here is over 100 times larger.

review the EEOC criminal background check enforcement guidance between 2000 and 2010 (Patterson Deposition, p. 251).

She further explained that the procedures were "in the same vein as suitability guidelines throughout the Federal Government, which are compliant with EEO regulations" (Patterson Deposition, p. 63).  This testimony is inconsistent with other testimony which indicates Ms. Patterson and her colleague Mr. Bettwy were involved in modifying the federal Office of Personnel Management (OPM) suitability guidelines for the 2010 Census in particular (Bettwy Deposition, p. 110).  Finally, the head of the Census Bureau's EEO office, who presumably might have identified adverse impact concerns regarding the criminal background check process, was not known to have had input into the adjudication criteria (Mesenbourg Deposition, p. 284).

**Lack of Proper Validation Procedures**

The *Uniform Guidelines* require validation evidence for selection procedures that yield adverse impact.[23]  Based on the earlier discussion, one may conclude that the criminal background check process for the 2010 Census temporary hiring process did in fact have adverse impact as defined by federal regulatory guidelines.  Nonetheless, there is no evidence that any validation study was conducted (the *Uniform Guidelines* §1607.14 provides detailed guidance on technical standards for validation studies); further, Ms. Patterson, who played a key role in developing the original version of the standards, indicated that she did not even

---

[23] In addition, the EEOC notified the Census Bureau about the presumed adverse impact in a letter dated July 10, 2009, which was sent to Mr. Mesenbourg, the Acting Director of the Bureau at the time (Mesenbourg Exhibit 6).

know what validation methodology was despite having an undergraduate degree in industrial/organizational psychology (Patterson Deposition pp. 34-36).

Mr. Bettwy indicated that he and Ms. Patterson constructed the initial set of adjudication criteria[24] themselves, using the OPM criteria as a starting point (Bettwy Deposition, pp. 130-131).[25] He also indicated that they did consider the relationship between the job responsibilities and the various crimes. They then diverged from the OPM criteria and made their own determinations about what time periods or pattern of convictions might be applied to the various crimes. When asked about how those determinations concerning the length of exclusions were made, Mr. Bettwy indicated, "I don't know. I don't recall where we came up with the numbers" (Bettwy Deposition, p. 109). Similarly, Mr. Mesenbourg, the Acting Director of the Census Bureau during the early versions of the adjudication criteria, also did not seem to know where the time limits originated (e.g., Mesenbourg Deposition, pp. 247-249). There is no indication in the record that external experts were consulted and no ratings were gathered to evaluate supposed linkages between the crimes and critical job functions, nor concerning the exclusionary time periods used relative to the crimes. It should be noted that these criteria are, in effect, cutoff scores on the background check selection process. In contrast with the practice of the Census, professional standards indicate that "when cutoff

---

[24] Based on the available evidence in the record, it is not clear who developed the name check adjudication criteria, why those criteria were different from the adjudication criteria, whether the two originated from a common source, at what time the differences were introduced, or whether the name check adjudication criteria always evolved to mirror changes in the adjudication criteria.

[25] I understand that the Court has ruled that the OPM adjudication criteria cannot be used by the defendants in this case (proceedings before the honorable Frank Maas, United States District Court Magistrate Judge, March 12, 2013); the OPM criteria are simply mentioned here for completeness and to facilitate understanding of how the initial version of the 2010 Census adjudication criteria originated.

scores are used, the researcher should document their rationale or justification" (*SIOP Principles*, p. 47).

Moreover, any criminal background criteria that were applied to both clerks and either of the other two jobs would require great scrutiny. The job duties for clerks were substantially different from those of the other two roles (e.g., see Table 1), especially given the duties related to public contact (e.g., Patterson Deposition, p. 322). Certainly, even a cursory consideration of job-relatedness would have raised concerns about using the same exclusionary criteria for clerks as compared to the other two jobs, as the former, on its face, requires the performance of very different job tasks.

To summarize, the process used to create the adjudication criteria was casual (though the Census asserts it to be  job-related), validation certainly did not occur, there was no documentation produced concerning how the supposed "nexus or a correlation between those responsibilities and [the crimes…]" (Bettwy Deposition, pp. 105-106) was established, no record produced of those specific judgments having ever been made, the qualifications of those who created the criteria were inappropriate for the task, and the number of people who created the criteria was too low to ensure reliable judgments.

**Validity and Adverse Impact of Adjudication Criteria**

I conducted a validation study to directly evaluate the job-relatedness of the crimes used by the Census Bureau to exclude applicants, as well as the exclusionary time periods applied to the crimes.[26]  In contrast with what was done by the Census Bureau, this approach

---

[26] See attached technical report "Validation of 2010 U.S. Census Temporary Employee Criminal Background Check Adjudication Criteria."

demonstrated the feasibility of a validation study that was consistent with professional practice and federal guidelines on validation methodology.

The methodology used a panel of independent, multidisciplinary participants to render judgments about the Census Bureau's adjudication criteria. The panel used the list of crimes specified by the Census Bureau to construct exclusion criteria for each of the three jobs, allowing a direct comparison to what was done for 2010 Census temporary hiring.

The results indicated that 25-28% of the crimes (depending on the job) were not related to the temporary job requirements. Further, for those crimes that were job-related, 85% of the exclusionary time periods were too long (i.e., too stringent) and, overall, by a fairly wide margin. A large portion of the cases where exclusionary time periods were too long were for crimes that the Census Bureau had designated as permanently disqualifying. In contrast, the average exclusionary period determined by the panelists for these crimes was approximately 10 years across the crimes and jobs examined. These findings support the conclusion that the 2010 Census hiring process used hiring standards that were too stringent relative to job requirements. Not only were a sizable portion of the crimes not job-related, but those that were job-related utilized cutoffs that were too stringent. Research indicates that raising the cutoff score of a selection instrument that demonstrates subgroup differences exacerbates adverse impact (Newman, Jacobs, & Bartram, 2007; Sackett & Ellingson, 1997). Consequently, this study raises serious concerns about the validity and unnecessarily high adverse impact associated with the adjudication criteria used by the Census Bureau.

**Applicants Disqualified Based on Non-Convictions: Validity Concerns**

A review of the adjudication criteria revealed numerous crimes for which applicants could be disqualified even if they were not convicted.  For example, in the earlier versions of the 2010 adjudication criteria there were a sizable number of crimes (34 in version 1 and 31 in version 2 of the adjudication criteria) that were exclusionary based on a certain number of charges in a time period regardless of the outcome of the charge.[27]  Disqualifying applicants based on charges that may not have resulted in convictions absent proof of the underlying conduct is clearly inconsistent with the EEOC's guidance.  In addition, lacking proof that the alleged conduct underlying an arrest actually occurred also raises significant concerns about job-relatedness (i.e., validity) because it measures arrests as opposed to criminal behavior – actual behavior which would hinder job performance may or may not have occurred.  If the behavior did not occur, there is no reason to expect any prediction of unsafe job performance to be accurate.

In addition, despite the EEOC guidance discussed earlier, all the versions of the adjudication criteria specified that applicants under pending charges (i.e., without a conviction) were ineligible for hire (Mesenbourg Exhibits 16 – 19, 21 & 22).[28]  Five of the six versions of the adjudication criteria did not consider the type of crime at all for pending charges, which appears to directly contradict the EEOC guidance discussed above.  Further, since all pending charges were included under the same policy, applicants currently charged with very minor

---

[27] The criteria are defined as: "…favorable with not guilty/dismissed disposition OR unfavorable if more than 3 <u>charges</u> within the last 7 year period/with disposition" (Mesenbourg Exhibit 16 USA1545; capitalization and emphasis changed from original).

[28] Only version 5 of the adjudication criteria (Mesenbourg Exhibit 21) specified certain pending charges that were <u>not</u> disqualifying; for the other five versions all pending charges were disqualifying.

crimes and/or those whose alleged crimes were not otherwise exclusionary would nonetheless be excluded from hire on the basis of these arrests.

**Exceptions to the Adjudication Criteria**

Census background screening criteria were relaxed in some situations based on the Census Bureau's stated inability to recruit enough Native Americans to work on Indian reservations, thus indicating that the criteria as applied more broadly contained too many crimes relative to the job requirements (i.e., they were not valid). For example, the CHEC office overrode adjudication standards that would have excluded Native Americans for such charges as driving while intoxicated (DWI) and domestic violence charges (Brown Deposition p. 115; Mesenbourg Deposition, p. 209-211). The Bureau indicated these exceptions were made because it was critical to have Native Americans performing non-response follow-up operations on Indian reservations, and the Census Bureau was otherwise unable to secure a sufficient number of such enumerators due to the high rate of DWI exclusions in this group (Brown Deposition p. 115). This calls into question whether these crimes truly warranted disqualification from the hiring process based on job-relatedness, as the Census did not follow its own policies in this situation.

**Inadequate Expertise of Census Bureau Staff who Developed the Adjudication Criteria**

Professional standards dictate that individuals responsible for developing and validating selection procedures should have appropriate expertise or training. The qualifications of individuals performing these activities are critical to the validity and reliability of the selection procedures. If an employer lacks the internal expertise required to properly develop and

41

validate selection procedures, then external expert(s) should be consulted per professional guidelines:

> "Standard 3.5 - When appropriate, relevant experts external to the testing program should review the test specifications. The purpose of the review, the process by which the review is conducted, and the results of the review should be documented.  The qualifications, relevant experiences, and demographic characteristics of expert judges should also be documented." (*APA Standards*, 1999, pp. 33-34).

As noted earlier, initial versions of the adjudication criteria were developed by Mr. Bettwy and Ms. Patterson.  Mr. Bettwy has approximately 75 college credits (with an emphasis in accounting; Bettwy Deposition pp. 16-17) and he took several courses in the U.S. Federal Government on rap sheets and how to make decisions about the results of background investigations; Mr. Bettwy also indicated he had some exposure to recidivism studies, though no specific training in the area (Bettwy Deposition, p. 107).

Ms. Patterson has a bachelor's degree in industrial/organizational psychology, no continuing education or coursework towards a graduate degree, no courses in criminal law, recidivism rates, re-entry issues, or validation methodology (Patterson deposition pp. 34-35). Ms. Patterson also indicated that OPM did not have any input into the criteria, that she did not ask anyone outside the Census Bureau for input into modifications that were made to the adjudication criteria, did not consult anyone with background and knowledge in recidivism rates, and was not aware of any studies of the effectiveness of the 1990 or 2000 Census adjudication criteria (Patterson deposition, pp. 289-291).  Further, Ms. Patterson did not even know what the term "validation methodology" (Patterson Deposition, p. 36) meant, a topic that would normally be extensively covered in any undergraduate industrial/organizational

curriculum.  On the other hand, Ms. Patterson had some relevant experience as an EEO officer, though her educational background is not that of someone who is appropriately qualified to construct such critical and complex adjudication criteria along with Mr. Bettwy.

Finally, Mr. Bettwy indicated he did not know where the time limits in the adjudication criteria (which indicated the amount of time that must have passed in order to consider an applicant eligible for hire) came from, though he appeared to have created them (Bettwy Deposition, p. 109).  Given how pivotal the time periods are, this lack of awareness of their basis is very problematic. As noted earlier, exclusionary time periods are analogous to cutoff scores on an assessment, which partially determines the degree of adverse impact. Overall, the Census Bureau did not appear to utilize staff that was appropriately qualified and competent to properly construct job-related adjudication criteria.

**Comparison of Census Background Check Process to Those Used by Private Organizations**

Private organizations conduct criminal background checks in ways that would have mitigated many of the reliability and validity issues created by the Census Bureau's process.  In particular, private employers often outsource their criminal background check procedures to companies who specialize in conducting such background checks.[29]  These processes differ from the Census Bureau's process in several important respects.

First, these companies are required under the Fair Credit Reporting Act (FCRA) to provide specific feedback to applicants about the specific criminal records that were attributed to the applicant (Federal Trade Commission: "Using Consumer Reports: What Employers Need

---

[29] That is, these firms provide the criminal histories, though they generally would not implement the actual decision-making process based on those histories, though they may assist with decision-making in an advisory capacity.

to Know"). This provides the applicant with an opportunity to dispute the accuracy of the specific information contained in these records.  In contrast, the Census Bureau, which does not appear to be governed by the FCRA (according to a Federal Trade Commission letter[30]), did not provide any information to applicants about the records that were attributed to them, leading to a host of issues, as discussed earlier.[31]

The Census Bureau provided various reasons for why they could not provide these records to applicants such as privacy concerns, tentative matching, because the "FBI criminal history may not be complete and may not be current" (Mesenbourg Deposition, p. 229), the required workload (Mesenbourg Deposition pp. 229-230), "the uncertainty of the match criteria" (Mesenbourg Deposition, pp. 232), and because the rap sheet is the property of the FBI (Patterson Deposition, p. 164). There was also no consideration of an alternative, such as redacting any supposedly private information from the rap sheets (Mesenbourg Deposition, pp. 233).

Certainly, providing the problematic tentatively matched arrest records would have resulted in a much more reliable process because the applicants would have known which court records were in question.  In addition, rather than placing the considerable burden on applicants of locating court documents "for any and all arrests" (Patterson Exhibit 12 USA43538; without identifying the arrests), background check companies typically undertake this effort themselves and focus on convictions rather than arrests.  For instance, we contacted ADP's Screening and Selection Services division, which indicated that they employ 'court

---

[30] Source: http://www.ftc.gov/os/statutes/fcra/pickett.shtm

[31] The Census Bureau provided specific feedback to job applicants concerning credit checks for other positions during the 2000 Census specifically to comply with the FCRA (Vitrano Exhibit 2, USA12725).

runners' to collect court records, which are generally returned within 48 hours. That is, these 'runners' locate the relevant court documents rather than requiring the applicant to do this at their own time and expense. Due to the large volumes they handle, background check companies are very likely to be much more adept than applicants at obtaining court documents that may be very old, in far-flung locations relative to where an applicant currently resides, or from court systems that do not provide such records electronically. This is especially true given that the applicants were not given any specific information about which supposed criminal matters required additional information.

Third, private background check firms often have help desks that applicants can call to provide additional information that will allow the background check firms to further investigate the alleged criminal records attributed to an applicant. That is, if an applicant wishes to dispute the completeness or accuracy of criminal background records, the applicant can call the background check firm and provide additional information, which the firm will then use to further research the issue. For instance, ADP indicated that in the case of a dispute, "we will reinvestigate the disputed information free of charge…" (see Exhibit 3). This is in contrast to the Census Bureau's applicant call center which was not equipped to provide additional information concerning specific arrests or how to obtain old or otherwise inaccessible court documents (Mesenbourg Deposition, pp. 185-187).

Thus, in summary, the use of a private background check firm would have likely resulted in the following outcomes: no financial or time investment to applicants to obtain court documents; obtaining more accurate (i.e., more reliable) information on the entire applicant pool because fewer applicants would be eliminated by the entanglements of the 30-Day Letter

45

process; and considerable reduction of obstacles to applicants who could not obtain or were unclear about what court records were actually required.  In my professional judgment, this alternative approach would have enhanced the reliability and job-relatedness (i.e., validity) of the criminal background check process by eliminating the influence of extraneous factors, such as applicant cost, success in obtaining court records, confusion about what is required, or an inability to obtain paper-based fingerprints in states such as California.

The Census Bureau did not appear to make any meaningful effort to carefully consider use of an outside firm (e.g., Groves Deposition, p. 171).  There were various rationales presented for this (mainly cost and performance concerns), although the Census budget director and the acting head of the Census Bureau indicated they were not aware of any cost estimates (or efforts to determine cost estimates) relative to making criminal background suitability determinations (Jackson Deposition, p. 64; Mesenbourg Deposition, pp. 192-193; Patterson Deposition, p. 186), and the budget director had no recollection of anyone from the relevant Census office ever requesting funding to involve outside firms in the process (Jackson Deposition, p. 138).[32]  In addition, an analysis for the 2000 Census indicated that "the utilization of an experienced agency to acquire criminal history information saved the Census Bureau, both in time and money.  The reasonable fees charged as well as the efficiency of the agency in acquiring information, enabled the DANC staff to better meet its goal of a quick and efficient name check" (Patterson, Exhibit 14; USA12696).[33]  Similarly, when we contacted various background check firms, they provided annual volumes that suggest they may have been able

---

[32] The 2010 Census was budgeted at $12 billion, and came in $2 billion under budget (Jackson Deposition p. 118 & p. 127).

[33] This was done for a limited sample of applicants, not for the entire 2000 Census operation.

to handle the Census Bureau's applicant volume, either independently (i.e., with enough advance planning), or by spreading the volume across a few firms. [34]

The apparent failure to consider using outside firms to gather the criminal histories that would be evaluated in the adjudication process is especially surprising given that numerous aspects of the Census are re-evaluated from a process improvement perspective and that there was a *dress rehearsal* Census in 2008 as well as some test censuses (Patterson Deposition, p. 89) in which the CHEC office was involved.[35]  The inattentiveness to this issue suggests either lack of awareness and/or concern for obtaining accurate criminal background results on the Census' applicant pool in a way that would not disadvantage minorities or burden the applicants themselves.

---

[34] Information from the First Advantage website (http://www.fadv.com/screening-and-assessment/employment-background-screening/), indicates that the firm provides over 9 million employment background screening verifications annually.  While this may include a variety of different types of screening services, these types of volumes that claim to be handled would certainly seem to suggest that it was worth researching whether the volumes required by the Census could have been handled (e.g., over 800,000 in a month or more; Mesenbourg Deposition p. 144; USA60684), especially because multiple firms could have been used to divide the workload.  Similarly, ADP's Screening and Selection Services division indicated they screened 3.6 million applicants in 2012; Intellicorp indicted they screened approximately 3.4 million applicants in 2012.

[35] None of these trials apparently included any analysis of the criminal background criteria or process (e.g., Brown pp. 39-40).

**CONCLUSION**

It is my professional opinion that the criminal background check process used for the address canvasser, enumerator, and clerk temporary jobs for the 2010 Census lacked sufficient reliability and validity to be considered job-related.  Moreover, the lack of validation and disregard for adverse impact and less adverse alternatives is inconsistent with federal regulatory guidelines and accepted professional standards.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed this 28th day of June 2013 in Darien, CT.

Kathleen K. Lundquist, Ph.D.

49

**Rate of Compensation**

My firm is being compensated for the studies involved in forming my opinions, my review and analysis of evidence and depositions, and my testimony at a rate of $550 per hour. APT*Metrics* is being compensated for the time of additional members of the staff at their normal billing rates, ranging from $50 to $350 per hour. Out of pocket expenses incurred in connection with APT*Metrics* assistance in this case are also being reimbursed.

# Attachment A. Kathleen K. Lundquist Resume

**KATHLEEN KAPPY LUNDQUIST**

APT*Metrics*, Inc.
One Thorndal Circle
Darien, CT  06820
Business:  (203) 655-7779

**EDUCATION**

| | | | |
|---|---|---|---|
| Ph.D. | Psychometrics | Fordham University | 1979 |
| M.A. | Psychometrics | Fordham University | 1976 |
| B.A. summa cum laude | Psychology | College of Mt. St. Vincent | 1974 |

**PROFESSIONAL EXPERIENCE**

1995 to Present    ***APT*METRICS*, INC.***

*President and CEO.*  Founded and manages the firm, which provides consulting services in the design and validation of employee selection procedures, performance management, downsizing and executive assessment for Fortune 100 clients in the aerospace, banking, pharmaceutical, telecommunications, consulting and utility industries.  Project experience also includes a variety of public sector employers.  Conducts litigation support activities, including serving as an expert witness for both plaintiffs and defendants.

1990 to 1995    ***HRSTRATEGIES***

1991 to 1995    *Vice President.*  Responsible for managing the New York Regional Office of HRStrategies, providing consulting services in skills assessment, survey design, test development, and validation projects for clients primarily in Fortune 100 companies.

1990 to 1991    *Managing Principal.*  Opened the New York Regional Office of HRStrategies.

6/26/2013

| 1989 to 1990 | **HEWITT ASSOCIATES** |
|---|---|

*Consultant.*  Provided assistance to clients in the design and implementation of performance management and other human resource programs.  Special expertise in the areas of construction and validation of selection systems and management of large scale research projects.

| 1979 to 1989 | **SOUTHERN CALIFORNIA EDISON** |
|---|---|

| 1987 to 1989 | *Manager, Human Resources Measurement and Development.* Responsible for managing, promoting, and administering research and development programs related to selection, training, and organizational development.  Areas of responsibility included (1) internal management consulting, (2) development and validation of selection procedures, (3) design and administration of corporate training programs, and (4) employee development programs such as career counseling, performance management, and educational assistance.  Directed a professional staff of forty and administered a budget of $3.5 million.  Interfaced with all levels of management, legal counsel, and federal and state EEO compliance agencies. |
|---|---|

*Special project assignment 1988.*  Managed a corporate task force to implement a flexible benefits package;  reported directly to the Corporate Treasurer.

As the chief *Industrial Psychologist* for the corporation, responsibilities also included (1) managing the behavioral reliability and psychological assessment programs, (2) testifying at grievances, arbitrations, and trials, and (3) serving in an oversight capacity for Employee Assistance Program and certification of mental health provider network.

| 1985 to 1986 | *Manager, Human Resources Measurement.*  Responsible for all selection procedure development, test validation, and administration of testing program for over 15,000 people annually.  Directed a professional staff of seven psychologists and a total staff of 19. |
|---|---|

6/26/2013

1983 to 1985    *Project Administrator, Selection Task Force.* Responsible for design and execution of company-wide studies to validate new selection procedures for major entry-level jobs. Completed criterion-related and content validation studies covering 92 percent of entry-level hiring activity. Directed a staff of 12 and administered a budget of $400,000.

1979 to 1983    *Industrial Psychologist.* Responsible for test development, validation, and internal consulting on personnel research issues. Responsibilities included:

- Design and analysis of adverse impact studies on all aspects of personnel selection.
- Development and presentation of supervisory training programs in selection system development.
- Supervision of psychological screening program for nuclear power plant workers.
- Technical supervision of test administration and the application of testing policy.
- Development of research project studying the recruitment and retention of women in non-traditional jobs.
- Coordination of company participation in industry-wide test validation studies.

1978 to 1979    **EDUCATIONAL TESTING SERVICE**

*Senior Research Assistant.* Conducted special research studies involving item analysis and IRT calibration of large scale test databases. Developed instructional workshops on the use of item response theory. Provided technical assistance to state and local education agencies on program evaluation.

1978    **NATIONAL ACADEMY OF SCIENCE**

*Research Associate to the Committee on Ability Testing.* Provided staff assistance to the blue ribbon panel studying test bias. Wrote position papers in the area of employment testing. Represented the Committee at relevant meetings.

1974 to 1975    **HARCOURT BRACE JOVANOVICH**

*Research Assistant.* Participated in the development of the Metropolitan Achievement Test, including item writing and statistical analyses.

6/26/2013

**TEACHING**

| | |
|---|---|
| 1986 to 1989 | *California School for Professional Psychology.*  Graduate faculty. Taught Personnel Assessment, Statistics, and Advanced Multivariate Methods for doctoral candidates in Organizational Psychology.  Mentored Doctoral dissertation. |
| 1980 to 1988 | *University of San Francisco.*  Graduate faculty.  Taught Statistics and Advanced Research Design for Human Resources & Organizational Behavior major.  Mentored Masters theses. |
| 1977 | *Long Island University.*  Adjunct Faculty.  Taught graduate courses in Statistics and Research Methodology. |
| 1976 to 1978 | *Mercy College.*  Adjunct Faculty.  Taught Introductory Psychology, Theories of Personality, Statistics and History of Psychology. |

**SPECIAL INTEREST AREAS**

Diversity Measurement, Skills Assessment, and Pay Equity.

**FELLOWSHIPS**

| | |
|---|---|
| 1976 to 1977 | *Fordham University.*  Teaching Fellowship.  Responsible for the development and evaluation of individualized, self-paced instruction in General Psychology, as well as courses in Statistics and Applied Psychology. |
| 1976 | *Educational Testing Service.*  Summer Research Fellowship. Investigated gender and ethnic bias in testing methods. |
| 1975 to 1976 | *Fordham University.*  Graduate Research Assistant.  Assisted Drs. Anne Anastasi and John Walsh in graduate courses on Statistics and Computer Utilization. |
| 1974 to 1976 | *Harcourt Brace Jovanovich.*  Fellowship in Psychometrics. Conducted a review of tests for gender bias in content.  Also participated in test administration and validation of a general intelligence test for minority group job applicants. |

6/26/2013

**PUBLICATIONS**

Ashe, R. L., & Lundquist, K. K. (2010).  The Legal Environment for Assessment.  In J. C. Scott & D. H. Reynolds (Eds.), Handbook of Workplace Assessment (pp. 643-669). San Francisco: Jossey Bass.

Goldstein, I. L., & Lundquist, K. K. (2010).  A Five-Year Journey with Coca-Cola.  In  J. Outtz (Ed.), Adverse Impact: Implications for organizational staffing and high stakes selection (pp. 473-501) .  New York: Routledge.

Lundquist, K. K. (2009).  *Validation of performance appraisals: Ongoing questions in a new light post Ricci and the FPA.*  Paper presented at the American Employment Law Conference, October 2009.

Lundquist, K. K. (2009).  Does affirmative action still work?  *Diversity Executive,* May, 2009.

Lundquist, K. K. (2008).  Beyond affirmative action: The changing face of recruitment. *Talent Management*, Vol. 4, No. 1, 18-23.

Lundquist, K. K., Scott, J. C., & Curtis, J. R. (1995).  Selection techniques for a diverse workforce.  In American Bar Association (Eds.), *Equal Employment Opportunity Laws 30 Years Later*.  Washington, D.C.: American Bar Association.

Lundquist, K. K., & Jones, D. P. (1992).  Skill-Based Job Analysis.  *Technical & Skills Training*, February/March, 1992, 7-12.

Jones, D. P. & Lundquist, K. K. (1991).  *Construction and skilled trades selection system: Job analysis report.*  Washington, D.C.:  Edison Electric Institute.

Jones, D. P. & Kappy, K. A., (1990*).  Construction and skilled trades selection system: Final technical report*.  Washington, D.C.:  Edison Electric Institute.

Kappy, K. A., (1979).  Differential effects of decreased testing time on the verbal and quantitative aptitude scores of males and females.  Unpublished doctoral dissertation, Fordham University, May 1979.  (Mentor:  Dr. Anne Anastasi)

6/26/2013

**PRESENTATIONS**

| | |
|---|---|
| 2011 | Lundquist, K. K.  Diversity: Beyond the Requirements. Presentation at the Southern Connecticut Society for Human Resource Management, November 2011. |
| 2011 | Lundquist, K. K.  Addressing the subjectivity challenge. Presentation at the American Employment Law Conference, Ojai, CA, October 2011. |
| 2010 | The Power of Measurement: Evaluating your diversity success. Presentation at the annual conference of DiversityBusiness.com, Washington, D.C., April 2010. |
| 2010 | Lundquist, K. K., & Ashe, R. L., Jr.   Trends in Employment Law: *Ricci* and Beyond.  Workshop presented the annual Society for Industrial and Organizational Psychology conference, Atlanta, GA, April 2010. |
| 2009 | Lundquist, K. K.  Validating performance appraisals: Ongoing questions in a new light.  Presentation at the American Employment Law Conference, Dana Point, CA, October 2009. |
| 2009 | Lundquist, K. K., Scott, J. C., & Puma, M. J.  "How to make lemonade …": A recipe for moving forward after your corporate restructuring.  Webinar presented by Talent Management Magazine, September 2009. |
| 2009 | Lundquist, K. K., Goldstein, H. & Perkins, W.  The *Ricci* case in a Nutshell.  Presentation at the Metropolitan Association of Applied Psychologists (METRO), New York, NY, September 2009. |
| 2009 | Dichter, M. S., Evans, P. C., Painter, A. M., Stillman, N. G., & Lundquist, K. K.  "Understanding *Ricci,* the New Haven Firefighters Case: Implications for your employment decisions and diversity practices.  Webinar presented by Morgan Lewis & Bockius LLP, August 2009. |
| 2009 | Lundquist, K. K. & Geier, J. A.  The *Ricci* case or How to test in turbulent times.  Presentation at the Northeast Region Corporate Industry Liaison Group, New York, NY, June 2009. |
| 2008 | Lundquist, K. K., & Scott, J. C.  Testing the Test: Validation, Litigation & Risk Management.  Webinar presented by Talent Management Magazine, November 2008. |

6/26/2013

| | |
|---|---|
| 2008 | Lundquist, K. K.  The Power of Measurement: Tracking your Diversity Success.  Invited presentation at Nyckeltalsinstitutet AB, Stockholm, Sweden, April 2008. |
| 2007 | Lundquist, K. K.  The Power of Measurement: Evaluating your Diversity Success.  Presentation at the SHRM Workplace Diversity Conference, Philadelphia, PA, October 2007. |
| 2007 | Lundquist, K. K.  How to determine if your company's tests pass muster.  Presentation at the Workforce Opportunity Network sponsored by ORC, Dallas, TX, October 2007. |
| 2007 | Lundquist, K. K., Casellas, G. F., & Moan, J. P.  Toward Innovation: New Insights for the Multicultural Workplace.  Presentation at the Southern Connecticut Society for Human Resource Management, September 2007. |
| 2007 | Lundquist, K.  K.  Innovative approaches to testing.  Testimony at the U.S. Equal Employment Opportunity Commission meeting on employer testing and screening, Washington, D. C., May 16, 2007. |
| 2007 | Ashe, R. L., Jr., & Lundquist, K. K.  Building Legal Defensibility into your HR Processes.  Workshop presented the annual Society for Industrial and Organizational Psychology conference, New York, NY, April 2007. |
| 2007 | Lundquist, K. K. & Casellas, G. F.  Toward Innovation: Reflections on the Coca-Cola Experience.  Presentation at the Chief Diversity Officer Forum, Greensboro, NC, March 2007. |
| 2006 | Lundquist, K. K. & Casellas, G. F.  Human resource process audits: The whys, the hows and the wherefores.  E-seminar presented by Workforce Performance Solutions magazine, November 2006. |
| 2006 | Lundquist, K. K.  Latest issues in employment litigation.  Presentation at the Middle Atlantic Personnel Assessment Council conference, Princeton, NJ, November 2006. |
| 2006 | Lundquist, K. K.  Latest issues in employment litigation.  Presentation at the Metropolitan New York Association of Applied Psychology, New York, June 2006. |

6/26/2013

2006        Lundquist, K. K.  Current areas of challenge in HR practices: How to avoid costly class action settlements.  Presentation at the Personnel Testing Council of Metropolitan Washington, Washington, D. C., June 2006.

2006        Casellas, G. F. & Lundquist, K. K.  Measuring progress in diversity: Practical and legal considerations for the journey.  Presentation at the annual Diversity Conference of The Conference Board, New York, May 2006.

2006        Lundquist, K. K.  Making your case: Judicious tips for communicating with judges, juries and attorneys.  Presentation at the Society for Industrial and Organizational Psychology conference, Dallas, April 2006.

2006        Lundquist, K. K.  Employee selection and testing: What you must know.  Presentation at the Pacific Employment Law Conference, Seattle, May 2006.

2006        Lundquist, K. K.  21st Century Employee Selection.  Presentation at the American Bar Association, Section of Labor and Employment Law, Equal Employment Opportunity Committee, La Jolla, California, April 2006.

2005        Lundquist, K. K.  Testing: What's New and What's Scary or How to Avoid the Snake Oil Salespeople.  Presentation at the 24th Annual Davis, Wright, Tremaine Employment Law Seminar, Seattle, October 2005.

2005        Lundquist, K. K.  Diversity Measurement in Organizations:  The changing challenge.  Presentation at the annual convention of the American Psychological Association, Washington, D. C., August 2005.

2005        Lundquist, K. K.  Recipe for Workplace Success:  Personality is the secret ingredient.  Presentation at the annual convention of the International Council on Hotel, Restaurant and Institutional Education, Las Vegas, July 2005.

2005        Testing: What's New and What's Scary or How to Avoid the Snake Oil Salespeople.  Presentation at the National Employment Law Council Conference, Chicago, April 2005.

| | |
|---|---|
| 2005 | Lundquist, K. K., Curtis, J. C., & Snyder, D. W.  Blind Judgment: An attempt to reduce adverse impact in the interview.  Panel discussion at the Society for Industrial and Organizational Psychology conference, Los Angeles, April 2005. |
| 2004 | Put to the Test: The New Scrutiny of Employee Testing and Selection Procedures.  Presentation at The American Employment Law Council, Twelfth Annual Conference, Palm Beach, Florida, October 2004. |
| 2004 | Lundquist, K. K. & Scott, J. C.  Legal considerations when auditing your performance management system.  Panel discussion at the Society for Industrial and Organizational Psychology conference, Chicago, April 2004. |
| 2002 | The Evolving Definition of Work.  Presentation to the Connecticut Quality Improvement Association, Wallingford, CT, October 2002. |
| 2002 | In the Line of Fire: From the HR Process Design Perspective.  Presentation to the Equal Employment Advisory Council's Training Program on Employment Discrimination Class Actions, Alexandria, Virginia, April 2002. |
| 2002 | What I/Os Need to Know About the Skill Standards Movement.  Panel discussion at the Society for Industrial and Organizational Psychology conference, Toronto, April 2002. |
| 2001 | The Litigation Landscape: How it Affects our Role as I/O Psychologists.  Presentation to the Society for Industrial and Organizational Psychology Doctoral Consortium, San Diego, California, April 2001. |
| 2000 | Pay Equity: The New Discrimination Frontier.  Workshop presented by Economic Research Services, Atlanta, Georgia, October 2000. |
| 2000 | Use and Abuse of Experts.  The American Employment Law Council, Eighth Annual Conference, Hot Springs, Virginia, October 2000. |
| 1999 | Compensation Disparities and Organizational Realities.  American Bar Association, Section of Labor and Employment Law, Equal Employment Opportunity Committee, Boca Raton, Florida, March 1999. |
| 1997 | Downsizing: Lessons from the Firing Line.  Georgia State University, Human Resources Round Table, Atlanta, Georgia, January 1997. |

6/26/2013

| | |
|---|---|
| 1997 | Recent developments in employment litigation.  Workshop presented with R. Lawrence Ashe, Jr., Esq. at the Society for Industrial and Organizational Psychology, St. Louis, Missouri, April, 1997. |
| 1996 | Success factors for I/O doctoral programs: Planning for the 21st century.  Panel discussion presented at the Society for Industrial and Organizational Psychology, San Diego, California, April 1996. |
| 1995 | Selection techniques for a diverse workforce.  Presented at the American Bar Association Section of Labor and Employment Law Anniversary Celebration, Washington, D.C., May 1995. |
| 1994 | Training to the top:  Workforce skills and global competitiveness.  Symposium presented at the Society for Industrial Organizational Psychology, Nashville, TN, April 1994. |
| 1992 | Attacking the skills gap:  A report from the firing line.  Symposium presented at the Society for Industrial and Organization Psychology, Montreal, Ontario, Canada, May 1992. |
| 1991 | Skill-based job analysis:  A strategy for closing the skills gap.  Paper presented with Michelle M. Crosby at the Society for Industrial and Organizational Psychology, St. Louis, MO, April 1991. |
| 1990 | The role of the analyst in the job analysis process.  Compiler or interpreter?  Paper presented at the annual conference of the International Personnel Management Association Assessment Council, San Diego, CA, June 1990. |
| 1990 | An overview of today's testing technology.  Paper presented at the Annual Labor and Employment Law Conference of Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, June 1990. |
| 1990 | Recent developments in EEO.  Workshop presented with R. Lawrence Ashe, Jr. Esq., at the annual conference of the Society for Industrial and Organizational Psychology, Miami Beach, FL, April 1990. |
| 1990 | Technology, automation and their human resources implications.  Paper presented the Local Government Personnel Association, Washington, D.C., March 1990. |

6/26/2013

| 1989 | Employee selection systems:  Interviews, written and physical tests, experience checks, differential scoring, and formal validation studies after *Hopkins, Atonio and Watson*.  Workshop presented at the National Employment Law Institute Conference on EEO in Federal, State, and Local Government, Washington, D.C., September 1989. |
|------|------|
| 1989 | Designing and conducting large-scale research projects.  Workshop presented with David P. Jones at the annual conference of the Society for Industrial and Organizational Psychology, Boston, MA, April 1989. |
| 1988 | Considerations in setting cutoff scores:  Legal and professional standards.  Workshop presented with David P. Jones at the annual Edison Electric Institute Test Users Conference, Dearborn, MI, October 1988. |
| 1983 | Employment selection and testing:  A review of legal and practical considerations.  Paper presented at the California Employment Law Conference, San Francisco, CA, November 1983. |
| 1980 | Achievement level testing effects on Rasch item difficulty estimates.  Paper presented at the annual meeting of the American Educational Research Association, Boston, MA, April 1980. |
| 1979 | The impact of test speededness of Rasch item calibrations.  Paper presented with A.S. Cohen at the annual meeting of the American Psychological Association, New York, NY, September 1979. |

**PROFESSIONAL AFFILIATIONS**

Phi Beta Kappa

American Psychological Association

Society for Industrial and Organization Psychology

Financial Officer and Member of the Executive Committee, Society for Industrial and Organization Psychology, incoming 2012

Chair, SIOP Doctoral Consortium 2005

National Association of Women Business Owners

National Association of Female Executives

6/26/2013

**LICENSES**

Licensed as a Psychologist in the State of Connecticut, No. 001967

**AWARDS**

Named one of "America's Top Diversity Champions for 2010" by DiversityBusiness.com.

Received the 2010 Diversity Policy/Advocacy Award from Hartford Business Journal.

Finalist in the 2009 Stevie Awards for Women in Business: Best Entrepreneur – Service Businesses - Up to 100 Employees - Business Services; APT wins Best Overall Company of the Year – Service Businesses – Up to 100 Employees – Business Services.

Human Resource Vendor of the Year 2009, Society for Human Resource Management, Southern Connecticut Chapter.

Finalist in the 2007 Ernst & Young Entrepreneur of the Year Award for Metropolitan New York Region.

Connecticut Woman Business Owner of the Year, 2002.

**BOARD MEMBERSHIPS**

Board Member, National Council for Research on Women and member of the Advisory Board of the Council's Corporate Circle, 2010 -- present.

Board Member, Connecticut Business & Industry Association, 2007 – present.

Board Member and Chair of Education Committee, Maritime Aquarium, 2007 - present.

Board Member, Volunteer Center of Southwestern Fairfield County, 2003-2007.

President, Wade Foundation, 2001-present.

**APPOINTMENTS**

Sworn member of the external advisory board for the U.S. Department of State's ForeignService Officer Examination, 2013-2016.

Member of the expert panel on assessment for the National Skills Standards Board (NSSB) and chair of the Endorsement Review Panel for the NSSB, 1999-2003.

6/26/2013

**Addendum to Resume for**
**KATHLEEN KAPPY LUNDQUIST, Ph.D.**

Testimony as an expert in past four years:

| | |
|---|---|
| 2013 – present | Laryssa Jock, *et al.* v. Sterling Jewelers, Inc. Case No. 11 160 00655 08. |
| 2012 – present | Andrews, *et al.* v. City of New York.  Civil Action No. 10-cv-2426 (SHS) (MD). |
| 2011 – present | Ronald Hojnacki v. Exelon Nuclear Security Services, *et al.*  Civil Action No. L-1727-10 (Superior Court of New Jersey, Law Division, Ocean County). |
| 2012 – present | Susie Knott v. Dollar Tree Stores, Inc.  Civil Action No. 7:06-cv-01553-LSC (USDC  N. D. Alabama, Southern Division). |
| 2012 – 2013 | Chelsie Richardson, Cynthia Ann Collins, Beryl Dauzat v. Dollar Tree Stores, Inc.  Civil Action No. 7:08-cv-00693-LSC (USDC  N. D. Alabama, Southern Division). |
| 2011 – present | Katharine Bush, *et al.* v. Ruth's Chris Steak House, Inc., *et al.* Civil Action No. 1:10-cv-01721 (USDC District of Columbia.) |
| 2011 – 2012 | Artis, *et al.* v. John Deere Landscapes.  Civil Action No. C 10-05289 WHA (MEJ) (N. D. California). |
| 2011 – present | EEOC v. Abercrombie & Fitch Stores, Inc.  Civil Action No. 5:10-cv-03911-EJD (USDC  N. D. California). |
| 2011 – 2012 | Hageman, *et al*. v. Accenture, LLP.  Civil No. 10-CV-01739 (USDC MN). |
| 2010 – 2012 | Bazile, *et al.* v. City of Houston.  Civil Action No. 4:08-cv-02404 (USDC Southern District of Texas, Houston Division). |
| 2010 – 2011 | Perkins, et al. v. Southern New England Telephone Company.  Civil Action No. 3:07CV967 (USDC CT). |
| 2010 – 2011 | EEOC v. Abercrombie & Fitch Stores, Inc.  Civil No. 09-CIV-602-GKF-FHM (USDC N. D. Oklahoma). |
| 2010 – 2012 | Garcia, *et al*. v. Oracle Corporation, *et al.*  Case No. RG07321026 (Superior Court of the State of California, County of Alameda). |

6/26/2013
testimony

| | |
|---|---|
| 2009 – present | Susie Knott, *et al.* v. Dollar Tree Stores, Inc.  Civil Action No. 08-P-1267-S (USDC N. D. Alabama). |
| 2009 | EEOC v. J. M. Hollister, LLC and Abercrombie & Fitch Stores, Inc. Civil Action No. 4:08CV1470 (USDC E. D. Missouri). |
| 2009 | Marcus, *et al.* v. PQ Corporation.  Civil Action No. 07-2075 (USDC E. D. Pennsylvania). |
| 2008 – 2009 | DFEH v. Abercrombie & Fitch Stores, Inc.  Case # E-20078-D-0364-00e (Fair Employment and Housing, State of California). |
| 2008 – 2012 | Ronnie Jones, *et al.* v. City of Boston, *et al.*.  Civil Action No. 05-11832-GAO (D. Massachusetts). |
| 2008 – 2009 | Cassandra Welch, *et al*. v. Eli Lilly & Company.  Civil Action No. 1:06-cv-0641-RLY-JMS (S. D. Indiana). |
| 2008 – 2009 | Katherine Puffer, *et al.* v. Allstate Insurance Company. Case No. 04 C 5764 (N. D. Illinois). |
| 2007 – 2009 | Employees Committed for Justice, *et al.* v. Eastman Kodak Company. Civil Action No. 6:04-CV-06098-CJS(F) (W.D. New York). |
| 2007 – 2009 | The Port Authority Police Asian Jade Society of New York & New Jersey Inc., *et al.* v. The Port of Authority of New York and New Jersey. Cause No. 05-CV-3835 (S.D. New York). |
| 2006 – 2012 | Simpson *et al.* v. New York State Department of Civil Service, *et al.* Cause No. 04-CV-1184 (N. D New York). |
| 2006 – 2011 | Ebbert *et al*. v. Nassau County *et al.* Civil Action No. CV-05 5445 (FB)AKT) ( E. D. New York). |

6/26/2013
testimony