UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTHONY GONZALEZ, PRECIOUS DANIELS, ALEXIS MATEO, FELICIA RICKETT-SAMUELS, CHYNELL SCOTT, SCOTTY DESPHY, and EDWARD ZAHNLE, on behalf of themselves and all others similarly situated, and CEPHUS HOUSER as the Trustee for the Trust Agreement of EVELYN HOUSER, individually,<br><br>                 Plaintiffs,<br><br>    -against-<br><br>PENNY PRITZKER, Secretary, United States Department of Commerce,<br><br>                Defendant. | CIVIL ACTION NO.<br>10-CV-3105 (FM) |

**DECLARATION OF OSSAI MIAZAD IN SUPPORT OF PLAINTIFFS'
UNOPPOSED MOTION FOR FINAL APPROVAL OF SETTLEMENT AND
CERTIFICATION FOR DAMAGES OF THE SETTLEMENT CLASS, PLAINTIFFS'
UNOPPOSED MOTION FOR ATTORNEYS' FEES AND COSTS, AND PLAINTIFFS'
UNOPPOSED MOTION FOR CLASS REPRESENTATIVE SERVICE AWARDS**

I, Ossai Miazad, declare as follows:

    1.     I am a partner in the firm of Outten & Golden LLP ("O&G") in New York, New York, Plaintiff's counsel herein, and co-chair of its Discrimination and Retaliation Practice Group. O&G is a 50+ attorney with offices in New York City, New York, San Francisco, California, and Chicago, Illinois that focuses on representing plaintiffs in a wide variety of employment matters, including individual and class action litigation that involve discrimination and wage and hour claims, as well as contract and severance negotiations.

    2.     I am one of the lawyers primarily responsible for prosecuting Plaintiffs' claims against the Government as Class Counsel in this litigation.

    3.     I make these statements based on personal knowledge and would so testify if

called as a witness at trial.

**My Background and Experience**

4.      I received a Juris Doctor degree from American University in 2004.  Since joining O&G in 2007, I have exclusively represented plaintiffs in employment litigation and other employee rights matters, with a focus on representing employees in class action and impact litigation involving discrimination and wage theft.  I currently serve as plaintiffs' counsel in numerous major class action lawsuits involving challenges to the use of criminal history records for employment decisions.

5.      I am the Co-Chair of O&G's Discrimination and Retaliation Practice Group and the Co-Chair of the Subcommittee on USERRA for the American Bar Association's ("ABA") Labor and Employment Law Section, Fair Labor Standards Legislation Committee.  I have also served on the New York City Bar Association's Committee on Civil Rights and am currently a board member of the New York affiliate of the National Employment Lawyers Association ("NELA").

6.      The attorneys at Outten & Golden LLP are experienced, highly regarded members of New York City plaintiffs' employment bar with extensive expertise in the area of class actions and complex litigation involving discrimination claims like those at issue in this litigation. Courts have repeatedly recognized Outten & Golden LLP as qualified counsel for class actions. *See*, *e.g.*, *Amochaev v. Citigroup Global Markets, Inc., d/b/a Smith Barney*, Case No. 05 Civ. 1298 (N.D. Cal.) (gender discrimination class action brought on behalf of a national class of female financial advisors, resulting in settlement of $33 million and comprehensive injunctive relief); *Jaffe v. Morgan Stanley & Co., Inc.*, No. 06 Civ. 3903 (N.D. Cal.) (race discrimination class action brought on behalf of African American and Latino financial advisors, resulting in

settlement of $16 million and comprehensive injunctive relief); *Duling v. Gristede's Operating Corp.,* No. 06 Civ. 10197 (S.D.N.Y.) (appointing O&G as class counsel in a Title VII case); *Easterling v. Connecticut, Dep't of Correction*, 08 Civ. 826 (D. Conn.) (same); *Wright v. Stern*, No. 01 Civ. 4437 (S.D.N.Y.) (same).

7.     The nonprofit Class Counsel are national individual and class action litigators with similar experience in civil rights advocacy.

8.     Together, Class Counsel filed the original complaint in this matter on April 13, 2010, and the operative Third Amended Complaint on September 16, 2014.  Plaintiffs' Counsel vigorously litigated this case  for over six years.  In the last six years, Class Counsel have: (1) interviewed several hundred job applicants; (2) overcome three separate motions to dismiss on the basis of a multitude of procedural and substantive challenges; (3) taken 15 fact and three expert depositions; (4); defended 10 Named Plaintiff and two expert witness depositions; (5) propounded over 50 discovery requests, and responded to over 30 separate requests for discovery, on average, per Plaintiff; (6) analyzed over 66,000 pages of documents, electronic flow applicant flow data regarding Census's four million applicants, and thousands of pages of FBI "rap sheets" to extract relevant information including race identification codes; (7) consulted with five expert witnesses, each of whom provided extensive analysis of the employment practices at issue; (8) attended approximately 28 Court conferences, either in person or telephonically, regarding discovery disputes, motion practice, and settlement; (9) participated in dozens of meet and confers with opposing counsel related to discovery issues; (10) moved to compel discovery multiple times; (11) successfully moved for class certification; (11) successfully addressed errors in the Census's discovery production that led to the erroneous

dismissal of the Latino class; and (12) negotiated a global resolution for an estimated 400,000 job applicants.

9.      In my experience, this was an extremely complex class action to litigate given the large number of Class Members, having the federal government as the defendant party, and the claims at issue.  In fact, this type of national disparate impact class litigation challenging the use of criminal history records had rarely been successfully litigated before.

10.      For the convenience of the Court, Class Counsel has provided information on the investigation and discovery of the litigation into five phases.  Plaintiffs reached out to Defendant to discuss settlement at each phase of the litigation.

**Phase 1: Investigation, Complaint, Early Discovery, Initial Motion Practice**

11.      Class Counsel began investigating and developing the case in 2009.  We reached out to local community and advocacy organizations to understand the extent of the problem and its impact on job applicants.

12.      As part of our investigation, Class Counsel conducted extensive factual research into the decennial census operations including structure, timing and operational details, the application process, the job titles at issue (and their requirements), as well as how past decennial censuses had been handled—building and revising our case theory along the way.

13.      This process included extensive interviews with job applicants, online research, and document review.

14.      Class Counsel conducted thorough legal research, delving deep into constitutional, Title VII, criminal history, and disparate impact case law, the use of statistical proof and expert reports, the appropriateness of a preliminary injunction, and many other research topics.

15.      Class Counsel extensively evaluated how federal and state criminal records were maintained, to inform our understanding of *what* information would be represented on our clients' background checks, and the information's accuracy.

4

16.     Through this process, Class Counsel built a nationwide coalition, which resulted in the mobilization of organizations involved in the issue, who joined together to bring this suit.

17.     Class Counsel were well-aware that this type of national disparate impact class litigation challenging the use of criminal history records had rarely been successfully litigated before.

18.     We knew it was crucial to fully flesh out the theory of the case *before* filing. Thus, using the information painstakingly obtained, Class Counsel carefully constructed the allegations in a complaint filed in April 2010.

19.     After filing the Complaint, Class Counsel were contacted by and conducted detailed interviews with hundreds of Census applicants.

20.     Class Counsel drafted and filed EEO charges for 17 individuals, and vigorously represented these clients through the EEO process, which included correspondence drafting, client interviews, review of documents, and calls with EEO representatives.  Class Counsel also filed 16 EEOC class charges (which involved representation and tasks similar to the EEO process).

21.     Class Counsel zealously pursued early discovery in order to enjoin Defendant's alleged violations.  This early discovery included requests for information and early depositions. Beyond the time and effort involved in crafting these requests, Class Counsel also engaged in letter briefing to the Court and oral arguments.

22.     Early motion practice that Class Counsel had to brief multiple issues to the Court, including researching, drafting, and replying on the following: (1) on July 16, 2010, Defendant filed a motion to dismiss the action pursuant to Rule 12(b)(6), arguing that Plaintiffs had failed to exhaust their administrative remedies; (2) on August 5, 2010, Class Counsel filed a First Amended Class Action Complaint, adding factual allegations related to five additional Named Plaintiffs, and addressing the issues presented in Defendant's motion; (3) on September 10, 2010, Defendant filed a motion to dismiss the First Amended Complaint pursuant to Rule 12(b)(6), again on the basis that Plaintiffs had failed to exhaust their remedies; and (4) on

October 8, 2010, Plaintiffs opposed this motion, after extensive factual and legal research regarding the issues raised in Defendant's motion.

23.     As a result of this briefing, on March 14, 2011, the Court issued a Decision and Order denying the Defendant's motion to dismiss the individual claims of Plaintiffs Johnson, Houser, Gonzalez, Riesco, and Daniels.  However, the Court dismissed the individual claims of Plaintiffs Rickett-Samuels and Anderson and dismissed Plaintiffs' class claims for failure to strictly comply with the federal Class Regulations.

**Phase 2: Post-Filing Investigation, Experts, Discovery, and Motion Practice**

24.     Following the Court's March 13, 2011 Order, Class Counsel continued their factual and legal investigation, including additional job applicant interviews and consultation with experts regarding statistical issues for proving disparate impact.

25.     Part of the challenge during this phase of the litigation was working with experts in the relevant fields on developing statistical theories and new approaches to the case's novel complexities.

26.     Class Counsel also spent substantial additional time performing research on the legal issues that arose as a result.  Additionally, we had to address the potential impact of the Supreme Court's class certification decision in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

27.     Class Counsel engaged in extensive discovery practice, propounding discovery requests, researching ESI issues and engaging in regular meet and confers with Defendant, and reviewing the discovery produced as a result of their efforts.

28.     Defendant also served Rule 68 offers of judgment on Plaintiffs, requiring thoughtful consideration and analysis from Class Counsel and conferrals with Plaintiffs.

29.     Class Counsel also engaged in exhaustive motion practice during the second phase of the litigation:

(1) on May 5, 2011, Class Counsel filed a contested motion for leave to amend its First Amended Complaint to cure the pleading deficiencies found by the Court and to join

three Named Plaintiffs—Chynell Scott, Vivian Kargbo, and Scotty Desphy—each of whom had an exhausted administrative class complaint filed by Class Counsel;

(2) on June 28, 2011, Defendant opposed Class Counsel's motion in its entirety, attacking their class action allegations on the grounds of futility and in the alternative, seeking severance of Plaintiffs' claims and transfer to different fora across the U.S.;

(3) on August 3, 2011, Class Counsel filed a reply brief after further research on the arguments presented by Defendant;

(4) on March 22, 2012, the Court granted Plaintiffs' motion to amend the Complaint to reassert the claims of Rickett-Samuels, and to join Scott, Kargbo, and Desphy, and denied Defendant's motion to sever and transfer;

(5) on June 28, 2011, Defendant also moved to dismiss Plaintiffs' claims for injunctive and declaratory relief, arguing that Plaintiffs lacked Article III standing and the Court lacked jurisdiction because the claims were not yet ripe for review; and

(6) on August 1, 2011, Plaintiffs opposed Defendant's motion after extensive research into Defendant's arguments, which Defendant replied in support of its motion on August 12, 2011.  This latest briefing culminated in the Court denied Defendant's motion to dismiss Plaintiffs' declaratory and injunctive relief claims on March 22, 2012.

**Phase 3: Pre-Certification and Merits Discovery**

30.      Prior to moving for class certification, Class Counsel served over 50 separate discovery requests for production of documents, interrogatories, and requests for admission.

31.      Census, in response, produced more than 66,000 pages of documents as well as electronic applicant flow data regarding Census's nearly four million applicants and thousands of pages of FBI "rap sheets."

32.      Defendant fought vigorously on the scope of discovery resulting in many meet and confers over disputes, repeated exchange of letters and many matters that had to ultimately be briefed and argued resolution by the Court.  As just one example of these efforts, Defendant

invoked deliberative privilege on a number of key documents, which required extensive research and briefing, and resolution by the Court.

33.     The parties had regularly scheduled Court conferences, and the Court's rulings were often challenged by Defendant through re-argument, necessitating additional time incurred by Class Counsel.

34.     Once Defendant began producing documents, Class Counsel spent many hours coding and reviewing these documents, including extracting relevant information related to race identification codes used as part of a sampling methodology to meet their burden of establishing disparate racial impact.

35.     Class Counsel also assisted the Named Plaintiffs in responding to Census's requests for production and interrogatories.

36.     Class Counsel devoted many hours to preparing for, taking, and defending depositions.  All told, they took 18 fact and Rule 30(b)(6) witnesses, including the former Director of the U.S. Census Bureau Robert Groves and the subsequent Director Thomas Mesenbourg.

37.     The vast majority of those depositions (14 out of 18) took place in Washington D.C. at the request of Census, which necessitated repeated travel by Class Counsel.  These depositions were vigorously defended by multiple attorneys for Defendant.  They often involved long documentary exhibits, which required the involvement of two (and, sometimes, three) attorneys for Class Counsel.

38.     Class Counsel also prepared for and defended the full-day depositions of all ten Named Plaintiffs.  They had to travel to New York city for their depositions, as did two of Plaintiffs' experts.

39.     During Phase 3 of the litigation, Class Counsel drafted numerous motions and responses to Defendant's motions, including: (1) on May 4, 2012, Class Counsel filed a motion for reconsideration, which was opposed by Defendant, and Class Counsel filed a reply brief in response; and (2) on September 21, 2012, Class Counsel filed their Second Amended Complaint,

adding two additional Named Plaintiffs, each having applied for, but ultimately been denied, temporary employment with Census during the 2010 decennial census, which involved in-depth interviews of the two new Named Plaintiffs, to which Defendant filed its Answer on October 19, 2012.

**Phase 4: Class Certification, Expert Discovery, and Continued Motion Practice**

40.     In preparation for our motion for class certification, Class Counsel worked closely with five expert witnesses—an industrial organizational psychologist, criminologist, statistician, sociologist, and a labor economist—each of whom provided extensive analysis of the employment practices at issue in the litigation.

41.     First, Class Counsel retained Dr. Marc Bendick Jr., a labor economist, who had to consider a number of different data sources and methods to determine impact because Defendant did not collect race and ethnicity information, including: analyzing national arrest rates, using a randomized sample of 1,500 30-day letter recipients and their accompanying FBI rap sheets to extrapolate race data to determine impact, using geocoding (procedure of estimating individuals' race based on the racial proportions of the residents of that person's census tract)and name matching to attribute race and ethnicity to all 3.9 million applicants including the subset of 850,000 30-day letter recipients.  Defendant deposed Dr. Bendick in a full-day deposition, which required Class Counsel to review all the relevant statistical analysis, conclusions, and prepare Dr. Bendick for deposition.  Dr. Bendick's conclusions and testimony were crucial in Class Counsel's ability to prove commonality for the class on the issue of the racial disparate impact of Defendant's acts.

42.     Second, Class Counsel retained Industrial/Organizational ("IO") Psychologist Dr. Kathleen Lundquist, who evaluated Census's criminal background check system and determined that the 30-day letter and adjudication criteria were not job-related.  Dr. Lundquist was deposed by Defendant in a full-day deposition, which required extensive preparation by Class Counsel. Dr. Lundquist's report and deposition testimony were also important evidence supporting class commonality on the business necessity of Defendant's acts.

43.     Third, Class Counsel retained Criminologist Dr. Kiminori Nakamura to examine the potential future crime risk of those with past criminal histories.  Dr. Nakamura found that the value of criminal records in predicting future criminality diminishes with time and likely becomes irrelevant within 10 years.  Such evidence supported commonality on the issue of the job-relatedness of Census's criminal background check system.

44.     Fourth, Class Counsel retained Dr. Bruce Western, Professor of Sociology and the Daniel and Florence Guggenheim Professor of Criminal Justice Policy at Harvard University, as a rebuttal expert to Defendant's expert Dr. Shawn Bushway, who had provided a report on the pattern of arrests in the applicant pool.  Dr. Western provided necessary rebuttal testimony to contradict Census's efforts to dilute the significance of Plaintiffs' statistics.

45.     Lastly, Class Counsel retained Mr. Frank Campbell, a former Assistant General Counsel of the Federal Bureau of Investigation (FBI) and former Department of Justice Assistant Attorney General.  Mr. Campbell provided important testimony on the management and use of the FBI's criminal history information.  Such testimony was necessary to rebut Defendant's unfounded arguments as to the reliability of the race data relied upon by Plaintiffs.

46.     Although the expert testimony ultimately was not relied upon by the Court in deciding class certification, it was necessary to include in response to the expert testimony that Class Counsel knew Defendant would submit in opposition to their motion.  Moreover, the time spent developing expert reports was also necessary to prepare for the merits stage of the litigation, and Class Counsel would have relied upon their experts at trial.

47.     Defendant utilized three experts: Drs. James L. Outtz, Bernard R. Siskin, and Dr. Shawn Bushway.  Realizing that their testimony would be an important part of Defendant's strategy in opposing class certification, Class Counsel deposed all three of Defendant's experts. These experts were highly qualified, and the depositions required intense preparation—including study of prior testimony transcripts and reports, and the aid of Class Counsel's own experts in understanding their contentions.

48.     Class Counsel researched, drafted, and responded to multiple briefings on the issue of class certification and the validity and legality of our and Defendant's expert witnesses. First, on June 28, 2013, Class Counsel filed our 45-page Motion for Class Certification, which was the culmination of the extensive investigation and litigation in Discovery Phases One thru Three, and Plaintiffs marshalled substantial evidence including testimony from three of its expert—Dr. Kathleen Lundquist, Dr. Marc Bendick, Jr. and Dr. Kiminori Nakamura, a criminologist.  The brief was the result of a complicated analysis of Title VII, disparate impact litigation, and the interplay of both with Rule 23 and the specific facts of Census's involved hiring process.

49.     In response, on October 28, 2013, Defendant filed a 50-page opposition to Plaintiffs' motion, which necessitated extensive research and work to respond to, and the marshalling of many additional exhibits, including expert rebuttal reports by Drs. Lundquist, Bendick, and Nakamura, and responsive reports by Dr. Frank A. S. Campbell and Dr. Bruce Western.

50.     On July 1, 2014, the Court granted Plaintiffs' class certification motion, in part, pursuant to Rule 23(b)(2) for liability, but limited the class to African-American applicants who sought temporary employment during the 2010 decennial census and claim to have been harmed by Census's 30-day letter, its adjudication criteria, or both.  Due to Class Counsel's efforts, the Latino class was subsequently certified, and Gonzalez as subsequently reinstated, to the benefit of the entire Latino class.

51.     During class certification briefing, Defendant filed a motion *in limine*, seeking to preclude the expert report of Dr. Lundquist.  In opposing this report, Class Counsel was required to spend substantial time researching the standards for the admissibility of expert reports, and drafting their opposition.

52.     Additionally, at during class certification briefing, Defendant filed a third Motion to Dismiss, arguing that *all* the Named Plaintiffs lacked standing.  In responding to that motion, Class Counsel had to engage in substantial additional research and briefing—while at the same

time preparing their class certification reply brief and opposition to Defendant's motion *in limine.*

**Phase Five: Further Briefing, Mediation, Negotiations, Preliminary Approval, and Settlement Administration**

53.     After the Court's Order granting class certification, Defendant filed a motion to reconsider and clarify the class certification order, to which Class Counsel opposed after expending significant time researching and then crafting a response.  This motion was not decided by the Court due to the parties' efforts in resolving their dispute and settling the case.

54.     After class certification, the parties engaged in additional discovery related to two additional Named Plaintiffs (including defending their depositions) and to address errors in the Census's discovery production upon which their third motion to dismiss was largely based.

55.     The sum of the error was that, under the Court's definition of "eligibility" from its Decision and Order, at least one Latino plaintiff—Gonzalez—should have been found to have Article III standing to litigate.  As a result of Class Counsel's efforts, on October 2, 2014, the Court amended its July 1, 2014 Order and reinstated Gonzalez as a class representative and the Latino Class.

56.     During this time, Class Counsel interviewed additional class members and drafted a Third Amended Complaint in order to ensure that the claims of the Latino class were protected.

57.     On November 14, 2014, the parties appeared before Magistrate Judge Dolinger for a court-ordered mediation.  In advance of that session, the parties' counsel met and conferred, and Class Counsel submitted a mediation statement to Judge Dolinger that went into detail about potential injunctive relief.  The parties had a productive session, which led them to hold a subsequent in-person conference at O&G on December 5, 2014.

58.     Following the December meeting with the Court, the parties agreed to engage the services of Hunter Hughes, Esq., a private mediator who specializes in the mediation of complex class actions, including employment discrimination litigation.  The ongoing assistance of Mr.

Hughes throughout the approximately 15 months of negotiation was critical in the ultimate resolution of this matter.  Without his expert aide, the case likely would not have settled.

59.     The parties participated in a telephone conference with Mr. Hughes on December 23, 2014, and thereafter worked to compile preliminary information requested by the mediator in advance of the mediation session.

60.     The parties participated in the first of a series of all-day mediation sessions on February 23, 2015, followed by a second all-day session on March 25, 2015.  The sessions were productive and the parties agreed to conduct research in order to propose concrete components of a settlement agreement in advance of a third mediation session.

61.     The parties participated in a third in-person mediation session on June 1, 2015. During this session, the parties narrowed the issues further and agreed on dates for exchanging positions on issues identified by the mediator.  In particular, the parties discussed remedial relief related to the future hiring process and Census committed to consulting with key decision makers regarding those discussions within a set timeframe.

62.     The parties attended a fourth in-person conference with Mr. Hughes at the Department of Commerce headquarters in Washington D.C. on September 15, 2015, after which the mediator circulated a proposed Memorandum of Understanding.

63.     Subsequent to reaching agreement on the Memorandum of Understanding, the parties began negotiating the detailed terms of a full settlement agreement which was concluded by January 2016.

64.     Throughout the entire process, the parties also held private conferences with Mr. Hughes to facilitate the on-going settlement discussion.  Class Counsel also held informational meetings related to crafting a settlement funded program to assist class members with criminal histories.  This included meeting with background check industry experts, Department of Labor and Department of Justice officials, legal aid providers and the Cornell School of Industrial and Labor Relations.

65.     After concluding their negotiations and reaching an agreement, Census took the necessary steps to seek Department of Justice ("DOJ") review and approval.  That process required a series of reviews and approval, ultimately, by the Associate Attorney General.

66.     All all times, the negotiations were conducted at arms' length and on a bifurcated basis: the parties negotiated class programmatic relief first, and only when substantial agreement was reached on these issues, did the parties discuss relief for the Named Plaintiffs and attorneys' fees.

67.     The settlement agreement was executed on April 8, 2016.

**The Settlement**

68.     Based on our communications with the Named Plaintiffs and their communications with various Class Members over the course of the litigation, the primary concern of Class Members is future job prospects.  Class Counsel believe that the settlement directly addresses those concerns by creating the Records Assistance Project and advance notice hiring.

69.     More broadly, the Settlement was structured to address the root causes of Class Members' harm—fixing the hiring criteria and creating a validated selection structure, under the supervision of expert IOs with experience in this litigation.

70.     The cornerstone of the settlement requires Census to hire two jointly selected expert Industrial Organizational Psychologists to develop a recommended validated structure and selection process for temporary hiring for the various operations of the 2020 decennial census that allows hundreds of thousands of African American and Latino applicants to fairly compete for the voluminous temporary job opportunities associated with the decennial census.  The settlement will provide individual Class Members with the option to either receive advance notice of the upcoming decennial census hiring, including information about the criminal background check process, or assistance reconciling and/or clearing mistakes in their criminal history records through a settlement-funded "Records Assistance Project."

14

71.     Class Counsel will work with Cornell University's School of Industrial and Labor Relations ("Cornell ILR") to manage the Records Assistance Project.  The Records Assistance Project will work Class Members to obtain their criminal history record information.   The settlement creates a Records Assistance Project at the Cornell University Institute for Labor and Industrial Relations ("Cornell ILR"), to work directly with class members to provide individualized education and services directed at minimizing the effect of criminal history records on employment opportunities.

72.     Class Counsel took great care in selecting a settlement administrator capable administering this large and complicated settlement, ultimately choosing Rust Consulting.

73.     Rust Consulting Inc.'s settlement bid was markedly lower than the bids Class Counsel solicited from other settlement administrators.   Its cost estimate is warranted to administer a settlement that includes nearly a half-million applicants.

74.     After reaching agreement on the settlement, Class Counsel drafted the preliminary approval motion and supporting documents.  Given the cutting edge issues involved in the litigation, the innovative injunctive relief sought in the settlement, and the length of the litigation, crafting this motion involved more work than the typical preliminary approval brief. The Court granted preliminary approval of the settlement on April 22, 2016.

75.     Since the Court granted preliminary approval, Class Counsel have spent substantial time and effort in helping to administer the settlement.  This included interacting with the Settlement Administer, and finalizing the settlement notice, claim form, and website.

76.     As of Wednesday, August 31, 2016, Class Counsel have fielded over approximately 246 telephone calls from Class Members and 715 email inquiries.

77.     Class Counsel also have spent time coordinating with the Cornell ILR's to establish the Records Assistance Project.

78.     Moreover, Class Counsel have expended significant time, unreported on the fee summary, drafting the final approval papers (including the motion for final approval, the motion for service awards for the Named Plaintiffs, and the motion for attorneys' fees).

79.     Class Counsel anticipate that they will incur further fees in preparing for the Fairness Hearing.

80.     Moreover, in Class Counsel's experience, once the settlement has been finally approved, and relief is provided, we will undoubtedly spend significant additional time fielding Class Members' questions and interacting with the Settlement Administer to resolve those questions.

81.     Class Counsel will continue to be engaged with the implementation of the settlement with reports from the IOs and regular communication and reporting from Cornell ILR's Records Assistance Project.

82.     Class Counsel recognize the costs and risks of prosecuting this litigation through summary judgment, trial, and appeal.  Class Counsel believe that it is in the interest of all members of the Settlement Class to resolve finally and completely the potential claims of the Class Members against Defendant.

83.     Class Counsel, a consortium of private and nonprofit litigators experienced in litigating employment discrimination and class action cases, firmly believe that the terms of the Settlement Agreement are in the best interests of the Class and are fair, reasonable, and adequate. This is underscored by the response of the Class.   Census has informed Class Counsel that it does not oppose court approval of the  proposed settlement, certification of the settlement class for damages, the proposed attorneys' fees, or the service awards to the Named Plaintiffs.

**Notice to the Class**

84.     The Notice sent to the Class included an explanation of the individual and programmatic relief provided for in the settlement.  The Notice also informed Class Members of their right to object to or exclude themselves from the settlement and explained how to do so, including specific information regarding the date, time, and place of the final approval hearing and how to object to or exclude oneself from the settlement.

85. Class Members have submitted claim forms in advance of the September 10, 2016 deadline, with 2,985 choosing to to participating in the Records Assistance Project ("Group A Filers"), and 2,734 choosing receive advance hiring notice for the 2020 decennial census ("Group B Filers"). *See* Exhibit F ¶ 16.

86. The specific efforts taken to provide adequate notice to all Class Members and the result, including the response of the Class, is outlined in the Declaration of Abigail Schwartz for Rust Consulting, Inc., attached as Exhibit F to this Declaration.

87. The proposed notice of final approval, attached as Exhibit O to this Declaration, will ensure that the class members will be adequately informed of their rights and remedies under the settlement.

**Attorneys' Fees and Costs**

88. Pursuant to the settlement agreement, Class Counsel are permitted to seek reimbursement of fees and costs in the amount of $10,000,000 as complete settlement of Plaintiffs' entitlement to attorneys' fees and costs through the termination of the case (including continuing to be engaged with the implementation of the settlement as described below).

89. As witnessed in the below graph, the $10,000,000 fee and cost award is less than Class Counsel's lodestar and costs.

| Firm | Fees | Costs |
|------|------|-------|
| Outten & Golden LLP | $ 8,931,271.00 | $ 1,670,067.24 |
| Community Service Society | $ 41,340.00 | N/A |
| Lawyers' Committee | $ 259,895.00 | $ 2,118.45 |
| Latino Justice | $ 46,000.00 | N/A |
| Public Citizen Litigation | $ 18,432.00 | N/A |
| Community Legal Services | $ 160,746.00 | $ 725.87 |
| Center for Constitutional Rights | $ 76,105.00 | N/A |
| **TOTAL** | **$ 9,533,789.00** | **$ 1,672,911.56** |
| **GRAND TOTAL** | **$11,206,700.56** | |

90.     O&G maintained contemporaneous time records throughout their six-year investigation and litigation of this case.  For the Court's convenience, O&G has submitted a summary of those voluminous records as Exhibit B to this Declaration.

91.     Class Counsel's contemporaneous time records were carefully reviewed and duplicative work, as well as *de minimis* time billed by attorneys and staff who had little participation in the actions, was removed (for example, O&G proactively removed any attorneys or support staff who worked less than five hours on this matter).

92.     The total lodestar also does not include the additional time that Class Counsel have spent in seeking approval of the settlement and, significantly, the time we will spend going forward in implementing the settlement which is not de minis in light of the structure of the settlement.  Class Counsel's commitment of time and labor to this case will continue beyond final judgment as Class Counsel continues to assist both the IOs and the Cornell ILR's Records Assistance Project.  Class Counsel's lodestar will grow as they continue to finalize the settlement process, prepare for the Fairness Hearing, and close the litigation and a settlement implementation process that could go well into 2020.

93.     In Class Counsel's experience (and as indicated by the many Class Member inquiries to date), they can expect to continue to field multiple questions from Class Members, and spend significant time interacting with those Class Members and the Settlement Administrator to resolve the issues that inevitably will arise.

94.     While O&G shouldered the expense and substantial risk of a massive, 100% contingent fee case, the nonprofit co-counsel were crucial in the prosecution of this case including identifying plaintiffs and witnesses, providing targeted expertise in criminal justice and

criminal records related issues and making important contributions to strategy for both the litigation and settlement of the case.

95.     The accompanying declarations of Class Counsel set forth the hours of work and billing rates used to calculate their lodestar.  As described in those declarations, Class Counsel and their staffs have devoted a total of approximately 17,701.85 hours to this litigation, and have a total lodestar to date of approximately $9,533,789.00.  Of those fees, fully $9,533,789.00 were incurred by O&G.  *See* Exhibit C.

96.     Class Counsel prosecuted the claims at issue efficiently and effectively, making every effort to prevent the duplication of work that might have resulted from having multiple firms working on this case.

97.     Tasks were reasonably divided among law firms to avoid replicating work. Further, tasks were delegated appropriately among partners, associate attorneys, paralegals, and other staff according to their complexity such that the attorneys with higher billing rates billed time only where necessary.

98.     Class Counsel's customary rates used in calculating the lodestar have been approved by courts in this District and elsewhere.  As examples, courts have accepted Community Legal Service, Inc.'s hourly rates, *see* Ex. I ¶ 14 (citing, *e.g.*, *Maldonado v. Houstoun*, 256 F.3d 181, 187, (3rd Cir. 2001)), LatinoJustice's hourly rates, *see* Ex. J ¶ 11 (citing, *e.g.*, *Favors v. Cuomo*, 39 F. Supp. 3d 276, 308 (E.D.N.Y. 2014)), and Public Citizen's hourly rates, *see* Ex. L ¶ 12, as reasonable.  Similarly, courts in this District have repeatedly approved O&G's hourly rates as reasonable.  *Rozell v. Ross-Holst*, 576 F. Supp. 2d 527, 545, 547 (S.D.N.Y. 2008) (in 2008, approving over $1 million in fees and costs in confidential settlement of sexual harassment suit, and approving $600 per hour to O&G partner and of counsel, $350 per

hour for senior associates, $250 per hour for junior associates); *Mitchell v. Metropolitan Life Insurance Co.*, No. 01 Civ. 2112, 2003 WL 25914312 (S.D.N.Y. Nov. 6, 2003) (in 2003, approving $3.4 million in fees and costs, and approving $425 per hour for O&G partner and $500 per hour rate for partner in co-counsel's firm).  Significantly, in *Rozell*, the Court noted that the rates awarded in prior cases "should not necessarily be considered a cap" because attorneys' rates generally increase over time—as have O&Gs.  *Rozell*, 576, F. Supp. 2d at 546.  The rates Plaintiffs request are in line with attorneys' fee awards in the Southern District of New York. *See, e.g., Barbour v. White Plains*, No. 07 Civ. 3014, 2011 WL 2022884, at *7 (S.D.N.Y. May 24, 2011) (awarding $625 per hour for an experienced civil rights attorney and finding that the rate is "well within the range of hourly rates for attorneys in civil rights cases in the Southern District and Washington, D.C., area"); *Velez v. Novartis Pharm. Corp.*, No. 04 Civ. 9194, 2010 WL 2010 4877852, at *22 (Nov. 30, 2010) (accepting hourly rates of $400 to $750 per hour for lodestar crosscheck); *Vilkhu v. City of New York*, No. 06 Civ. 2095, 2009 WL 1851019, at *4  (E.D.N.Y. June 25, 2009) ("rates awarded to experienced civil rights attorneys over the past ten years have ranged from $250 to $600, and that rates for associates have ranged from $200 to $350, with average awards increasing over time"), *vacated by* 372 F. App'x 222 (2d Cir. 2010) (vacated because court examined Southern District rates rather than Eastern District rates); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 589 (S.D.N.Y. 2008) (noting that partner hourly rates of $700 to $750 "fall within the norm of the rates charged by those attorneys' common adversaries in the defense bar"); *In re Ind. Energy Holdings PLC*, No. 00 Civ. 6689, 2003 WL 22244676, *9 (S.D.N.Y. 2003) (noting that rates of $650 per hour for a partner and $300 to $425 per hour for associates is "not extraordinary for a topflight New York City law firm").

99.     The rates sought by O&G's attorneys are routinely paid by clients seeking hourly attorney work in this District. The "usual hourly billing rates charged to paying clients . . . are reasonable rates of compensation for their work in this action." *Meriwether v. Coughlin*, 727 F. Supp. 823, 831 (S.D.N.Y. 1989); *cf. Norwest Fin., Inc. v. Fernandez*, 121 F. Supp. 2d 258, 262-63 (S.D.N.Y. 2000) (rejecting challenge to reasonableness of fee request where counsel provided declaration indicating that client was "billed on the basis of services provided at fixed hourly rates which were charged at [counsel's] usual and customary rates"). Even "lawyers who fetch above-average rates are presumptively entitled to them, rather than to some rate devised by the court" because "[l]awyers do not come from cookie cutters." *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1150 (7th Cir. 1993) (Easterbrook, J.); *see also Tamazzoli v. Sheedy,* 804 F.2d 93, 98 (7th Cir. 1986) ("For private counsel with fee-paying clients, the best evidence is the hourly rate customarily charged by counsel or by her law firm."). Courts in this district give great weight to counsel's actual hourly rates. *See Rozell v. Ross-Holst*, 576 F. Supp. 2d 527, 544 (S.D.N.Y. 2008) (finding that actual rates charged to clients is "strong evidence of what the market will bear"); *Reiter v. Metro. Transp. Auth. of New York*, No. 01 Civ. 2762, 2004 WL 2072369, at *5 (S.D.N.Y. Sept. 10, 2004) (noting that "the amount actually paid to counsel by paying clients is compelling evidence of a reasonable market rate"); *Lilly v. County of Orange*, 910 F. Supp. 945, 949 (S.D.N.Y. 1996) (finding that the "actual rate that counsel can command in the market place is evidence of the prevailing market rate").

100.     Class Counsel have also disbursed $1,67,911.56 in costs necessarily expended in litigating the case. Fully $1,670,067.24 of those costs were incurred by O&G. *See* Exhibit C.

101.    Class Counsel's un-reimbursed expenses were necessary to the representation of the Class.  Class Counsel routinely bill hourly individual clients in New York for each of these types of costs (except for settlement administration, which only applies to class cases).

102.    Class Counsel incurred costs associated with running background searches on their clients and potential class members.  Given that this case challenged the propriety of Defendant's denials of employment to individuals because of their criminal records, these searches were a necessary part of Class Counsel's investigation (including to evaluate the strength of the business necessity defense).

103.    Class Counsel incurred costs associated with consulting with media experts that resulted in press releases and other media documents.  These costs were a vital part of Class Counsel's investigation, and led to the interview of many potential class members that Class Counsel relied upon in crafting (and revising) their case theory.

104.    From August 4, 2016, through August 31, 2016, O&G spent approximately over 200 additional hours administering the settlement, answering Class Member questions, and preparing for the Fairness Hearing (among other tasks)—resulting in additional fees of over approximately $64,000.00.

**Service Awards for Named Plaintiffs**

105.    The settlement agreement provides for service awards in the amount of $10,000 for each current Named Plaintiff and two former Named Plaintiffs: Anthony Gonzalez, Ignacio Riesco, Precious Daniels, Alexis Mateo, Felicia Rickett-Samuels, Chynell Scott, Vivian Kargbo, Scotty Desphy, Edward Zahnle, and Evelyn Houser (who is now deceased and whose award would go to her estate).

106.    Each Named Plaintiff made important contributions to the prosecution and fair resolution of this action on behalf of the Class Members.

107.    Each Named Plaintiff provided crucial assistance to Class Counsel in the investigation, prosecution, and settlement of the Title VII race and national origin discrimination claims by providing detailed factual information and documents regarding their application processes and criminal background records.

108.    Each Named Plaintiff was deposed by defense counsel for a full day, and was available during the litigation and negotiations to speak to Class Counsel to assist their factual investigation.

109.    The factual information provided by Named Plaintiffs provided the backbone for Class Counsel to respond effectively to Defendant's arguments during the mediation and help Counsel educate the mediator about the facts.

110.    Although the Class Representatives did not work for Defendant, they nevertheless faced the risk that their current or future employers might discriminate or retaliate against them for their involvement in this high-profile lawsuit against the federal government.  This is particularly true in cases like this one that receive media attention, can be easily located on the internet, and in which the Named Plaintiffs disclosed their criminal history in order to advance the legal claims against Defendant to the benefit of the class.  In addition, in this case, Plaintiffs' names were mentioned in press accounts of the case.

111.    As temporary, entry-level job applicants, Class Representatives are especially vulnerable because they are at the very bottom of the workplace hierarchy and must struggle to find employment in a difficult economy.

112.    Although there were five filed objections to the settlement, none of the objectors opposed the Class Representative service awards.

**Exhibits**

113.    Attached as **Exhibit A** is true and correct copy of the parties' Settlement Agreement and Release.

114.    Attached as **Exhibit B** is a summary of the time spent by each Outten & Golden attorney, paralegal and support staff member at O&G who worked more than five hours on this matter ("O&G time summary")

115.    Attached as **Exhibit C** is a summary of out-of-pocket expenses incurred by O&G ("O&G cost summary").

116.    Attached as **Exhibit D** is true and correct copy of biographical information for the attorneys and support staff who worked on this matter.

117.    Attached as **Exhibit E** is the Declaration of Wayne N. Outten, Managing Partner at O&G.

118.    Attached as **Exhibit F** is the Declaration of Abigail Schwartz for Rust Consulting, Inc.

119.    Attached as **Exhibit G** is the Declaration of Esta R. Bigler, Director of the Labor and Employment Law Program at Cornell University's IRL School.

120.    Attached as **Exhibit H** is the Declaration of Judith M. Whiting, General Counsel for the Community Service Society of New York ("CSS").

121.    Attached as **Exhibit I** is the Declaration of Sharon M. Dietrich, Litigation Director at Community Legal Services ("CLS").

122.    Attached as **Exhibit J** is the Declaration of Jackson Chin, Senior Counsel at LatinoJustice PRLDEF ("LatinoJustice").

123.    Attached as **Exhibit K** is the Declaration of Jon M. Greenbaum, Chief Counsel of the Lawyers' Committee for Civil Rights Under Law (Lawyers' Committee").

124.    Attached as **Exhibit L** is the Declaration of Michael T. Kirkpatrick, an attorney at Public Citizen Litigation Group ("PCLG").

125.    Attached as **Exhibit M** is the Declaration of Darius Charney, Senior Staff Attorney at the Center for Constitutional Rights.

126.    Attached as **Exhibit N** is a true and correct copy of the Rule 68 propounded by Defendant.

127.    Attached as **Exhibit O** is the [Proposed] Order Granting Plaintiffs' Unopposed Motions for Final Approval of Settlement and Certification for Damages of the Settlement Class, Attorneys' Fees and Costs, and Service Awards.

128.    Attached as **Exhibit P** is a true and correct copy of the Notice sent to Class Members informing them of the settlement.

I declare under penalty of perjury, under 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated:  New York, New York
        September 2, 2016

                                Respectfully submitted,

                                By:   /s/ Ossai Miazad

                                Ossai Miazad
                                **Outten & Golden LLP**
                                3 Park Avenue, 29th Floor
                                New York, New York 10016
                                Tel: (212) 245-1000